UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GILEAD SCIENCES, INC., GILEAD SCIENCES :
IRELAND UC, and GILEAD SCIENCES, LLC, :
                                          :
                        Plaintiffs, :
                                          :
v. :
                                          :
PETER KHAIM; 71ST RX PHARMACY INC.; :
AKBAR GRANT; BEST SCRIPTS LLC; IVAN :
OHAR; BORIS AMINOV; BLESS YOU RX INC.; :
RACHEL AMINOV; JONATHAN GAVRIELOF; :
ANTONIO PAYANO; DYNAMIC :
PHARMACEUTICALS SUPPLY, INC.; :
DYNAMIC PHARMACEUTICAL SUPLY INC.; :
NORTHWEST PHARMACEUTICAL & :
MEDICAL SUPPLY INC.; J&M MEDICAL :
SUPPLY INC.; JFK WHOLESALE AND RETAIL :
MEDICAL SUPPLY CORP.; MERRIC BILLING :
INC.; NEW LINE OF PHARMACEUTICAL, :
INC.; ONLINER MARKETING CORP.; PARK :
AVENUE PHARMACEUTICAL CORP.; :
PHARMACEUTICAL WAY, INC.; FOSTER :
MEDIA GROUP, INC.; FOSTER MEDIA :
PHARMACEUTICAL SUPPLY CORP.; Y&S :
STATISTIC MEDICAL SUPPLY INC.; Y&S :
STATISTIC MEDICAL SUPLY INC.; PURE :
GEAR CONSULTING, INC.; CHRISTY :
CORVALAN; ISLAND PHARMACY & :
DISCOUNT CORP.; DAVID FERNANDEZ; :
DEZYRE BAEZ; CRYSTAL MEDINA; IRINA :
POLVANOVA; GALAXY RX INC.; ROMAN :
SHAMALOV; and RIVER CHEMISTS CORP.; :
                                          :
                        Defendants. :

-------------------------------------------------------------- X

Case No. _____

**FILED *EX PARTE* AND UNDER SEAL
PURSUANT TO 15 U.S.C. § 1116(d)**

## **COMPLAINT AND JURY DEMAND**

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (together, "Gilead" or "Plaintiffs"), by and through their counsel, Patterson Belknap Webb & Tyler LLP, for their Complaint against the Defendants listed above allege as follows:

## SUMMARY OF THE ACTION

1.  Gilead brings this suit as a follow-on anti-counterfeiting action to *Gilead Sciences, Inc. et al. v. Safe Chain Solutions LLC, et al.*, No. 21-cv-4106 (AMD)(JAM) (E.D.N.Y.) ("*Gilead I*").[1] In *Gilead I*, Gilead sued more than one hundred members of an international counterfeiting conspiracy selling dangerous counterfeits of Gilead's HIV medications. Gilead brings this action as part of its continuing efforts to protect patients by putting a permanent end to the counterfeiting conspiracy.

2.  The Defendants in this action are all members of the counterfeiting conspiracy exposed in *Gilead I*, and are all co-conspirators with defendants who were named in *Gilead I*. With one exception, the Defendants in this action were not named as defendants in *Gilead I*, and so this action is, in essence, an expansion of the anti-counterfeiting efforts that Plaintiffs undertook in *Gilead I*.

3.  The only Defendant here who is also a defendant in *Gilead I* is Peter Khaim, a twice-convicted medical fraudster who is among the largest and most brazen manufacturers and sellers of counterfeit Gilead medications in the country. Defendant Khaim has been added to this

---

[1] Gilead's efforts to shut down this counterfeiting ring have been the subject of mainstream media coverage, including by CNBC and the Wall Street Journal. *See* CNBC, "Fraud in a bottle: How Big Pharma takes on criminals who make millions off counterfeit drugs," available at https://www.cnbc.com/2023/12/11/fraud-in-a-bottle-big-pharma-takes-on-counterfeit-drugs.html; Corinne Ramey, Justice Department Probes Network Accused of Selling Counterfeit HIV Drugs, Wall Street Journal, (Mar. 30, 2022), available at https://www.wsj.com/articles/justice-department-probes-network-accused-of-sellingcounterfeithiv-drugs-11648653345; Joseph Walker, Corinne Ramey, Drugmaker Gilead Alleges Counterfeiting Ring Sold Its HIV Drugs, Wall Street Journal, (Jan. 18, 2022), available at https://www.wsj.com/articles/drugmaker-gileadalleges-counterfeiting-ring-sold-its-hiv-drugs-11642526471.

action because he has in recent months, in deliberate contempt of the injunctions this Court issued against him in *Gilead I*, continued to sell counterfeit Gilead-branded HIV medication through a new series of pharmacies.

4.      Outside of Defendant Khaim and the nominal owners of the new pharmacies he used to sell counterfeits, the individual Defendants in this action have all been federally indicted in New York for crimes related to their participation in the counterfeiting conspiracy. Defendant Boris Aminov has already been convicted and sentenced for his role in the scheme, and the criminal cases against the other individual Defendants remain pending.

5.      The counterfeits at issue are of Gilead-branded medications, and primarily Gilead-branded HIV medications: life-saving treatments for patients living with HIV, as well as pre-exposure prophylactic, or "PrEP," medication that protects against HIV-1 infection when taken as prescribed.

6.      The Defendants and their co-conspirators manufactured and trafficked these counterfeit Gilead-branded HIV medications to pharmacies and patients in at least New York and New Jersey, putting untold numbers of patients' health and safety at risk.

7.      The counterfeiters began by acquiring once-authentic bottles (empty or full) of Gilead-branded HIV medications that had already been dispensed to patients, typically by purchasing them off the street from vulnerable patients who could be persuaded to give up their life-saving medication for cash. Where the bottles purchased off the street were empty, the counterfeiters filled them with other medication, and then re-sealed the bottle with a fake version of Gilead's tamper-evident seal. The bottles were then altered to make them salable as counterfeits: the patient labeling applied by the dispensing pharmacy was removed, usually with harsh chemicals; the bottles were cleaned and in at least in one instance, re-labeled with the

3

manufacturer's label for a different, more expensive drug; counterfeit patient instructions were sometimes affixed to the outside of the bottle; and the counterfeits were sold as brand-new bottles, accompanied by counterfeit pedigrees or other documentation that falsely claim to trace the sales of the bottle, or with none of the mandated chain-of-custody documentation at all.

8.     The human cost of the Defendants' counterfeiting is staggering. Every counterfeit sold represents a patient who has been deprived of his or her prescribed, life-saving HIV medication. This includes patients who go to their neighborhood pharmacy and, unbeknownst to them, are dispensed a sealed, authentic-looking bottle that does not contain their HIV medication, but an entirely different medication. And this includes patients living with HIV who are preyed upon by Defendants and convinced to give up taking their prescribed medication, which they often receive for free, in exchange for a cash payment. In both cases, both the patients themselves and the community are put at risk: failure to take prescribed HIV medication as instructed can lead to an increase in the patients' viral load, which both endangers the patient's health and makes it possible for the patient to transmit the virus to sexual partners.

9.     In *Gilead I*, Plaintiffs successfully sought injunctive relief from this Court against over one hundred members of the counterfeiting conspiracy, and were able to put an immediate stop to much of the counterfeiting conspiracy's activity. Several of the defendants in *Gilead I* have been convicted of crimes related to their counterfeiting, and many more have been indicted, with more indictments likely to come.

10.     Nevertheless, in a stunning display of hubris and contempt of this Court, Defendant Khaim and his newest co-conspirators have flouted this Court's injunctions and continued to sell counterfeit Gilead-branded HIV medication through new pharmacies owned by

4

strawmen, consistent with Defendant Khaim's *modus operandi* for his numerous other healthcare frauds.

11.    For their part, Defendant Boris Aminov and his co-conspirators flooded the New York market with counterfeits that they manufactured from bottles they purchased from patients off the streets, which they then both dispensed to patients through Defendant Boris Aminov's pharmacy and sold to other pharmacies in the state. Defendant Boris Aminov has admitted his role in the conspiracy and has been convicted of related crimes, and his co-conspirators have been indicted and are awaiting trial or admitted guilt.

12.    In this action, Gilead seeks injunctive relief, including a seizure at certain Defendants' premises, in order to put an immediate stop to the sale of these dangerous counterfeit medications. Gilead also seeks other injunctive and monetary relief against all Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); false advertising in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125), trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; and common-law unjust enrichment and unfair competition.

## THE PARTIES

### A.    PLAINTIFFS

13.    Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 17,000 employees. Its principal place of business is 333 Lakeside Drive, Foster City, California 94404. Gilead develops and markets a large portfolio of lifesaving medications, including drugs for the treatment or prevention of HIV. Gilead is the

5

owner of certain well-established and famous registered trademarks that appear on the packaging (including the pedigrees), tablets, and instructional outserts of certain genuine HIV and other medications.

14.     Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland. Gilead Sciences, Inc. is the ultimate parent of Gilead Ireland. Gilead Ireland is the owner of certain well-established and famous registered trademarks that appear on the packaging (including the pedigrees), tablets, and instructional outserts of certain genuine HIV and other medications.

15.     Plaintiff Gilead Sciences, LLC is a private limited liability company organized under the laws of the State of Delaware, with its principal place of business at 333 Lakeside Drive, Foster City, California 94404. Gilead Sciences, Inc. is the ultimate parent of Gilead Sciences, LLC. Gilead Sciences, LLC is the owner of at least one well-established and famous registered trademark that appears on the packaging (including the pedigrees), tablets, and instructional inserts of certain genuine HIV and other medications.

## B.     DEFENDANTS

### 1.     The Khaim Defendants

16.     Defendant 71st Rx Pharmacy Inc. ("71st Rx") is a retail pharmacy with a principal place of business in Forest Hills, Queens, New York. Defendant 71st RX sold counterfeit Gilead-branded HIV medication with falsified documentation.

17.     Defendant Akbar Grant is an individual residing in the Bronx, New York. He is the principal of record of 71st Rx. Grant supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of 71st Rx, he personally financially

6

benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

18. Defendant Best Scripts LLC ("Best Scripts") is a retail pharmacy with a principal place of business in Fresh Meadows, Queens, New York. Defendant Best Scripts sold counterfeit Gilead-branded HIV medication with falsified documentation.

19. Defendant Ivan Ohar is an individual residing in Brooklyn, New York. He is the principal of record of Defendant Best Scripts. Defendant Grant supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of Defendant Best Scripts, he personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

20. Defendant Peter Khaim is an individual residing in Queens, New York.[2] Defendant Khaim is the off-the-books principal of Defendants 71st Rx and Best Scripts. Defendant Khaim has sometimes used the last name "Khaimov." Defendant Khaim managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications, including through Defendants 71st Rx and Best Scripts. As a principal of Defendants 71st Rx and Best Scripts, Defendant Khaim personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

**2. The Boris Aminov Defendants**

21. Defendant Boris Aminov is an individual residing in Brooklyn, New York. He is the off-the-books principal of all of the following Defendant entities: Bless You Rx Inc., Dynamic Pharmaceuticals Supply, Inc., Dynamic Pharmaceutical Suply Inc., Northwest

---

[2] Defendant Khaim, together with Defendants 71st RX Inc., Best Scripts, Grant, and Ohar are referred to collectively as the "Khaim Defendants."

Pharmaceutical & Medical Supply Inc., J&M Medical Supply Inc., JFK Wholesale and Retail Medical Supply Corp., Merric Billing Inc., New Line of Pharmaceutical, Inc., Onliner Marketing Corp., Park Avenue Pharmaceutical Corp., Pharmaceutical Way, Inc., Foster Media Group, Inc., Foster Media Pharmaceutical Supply Corp., Y&S Statistic Medical Supply Inc., Y&S Statistic Medical Suply Inc., and Pure Gear Consulting, Inc. (collectively, the "Aminov Entities").

22. Defendant Boris Aminov used the Aminov Entities to operate an HIV medication counterfeiting scheme, which included the purchase, manufacture, and sale of counterfeit Gilead-branded medications. Specifically, Defendant Boris Aminov and his co-conspirators bought already-dispensed bottles of medication off the street (or transacted with others who did so), manufactured counterfeits by altering and/or repacking the bottles to hide the fact that they had already been dispensed and to make them look legitimate, and then either (a) dispensed the counterfeits to patients through Bless You Rx Inc., or (b) sold them to other pharmacies owned by his co-conspirators, with payment rendered to one or more of the remaining Aminov Entities (the "Aminov Laundering Entities").

23. Defendant Boris Aminov supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. As principal of the Aminov Entities, he personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

24. Defendant Bless You Rx Inc. is an active single-location retail pharmacy located in Queens, New York, established in 2019. Its owner of record is Defendant Rachel Aminov, Defendant Boris Aminov's mother. Defendant Boris Aminov is the off-the-books principal of Bless You RX Inc. Through Bless You RX Inc., Defendant Boris Aminov knowingly dispensed

8

or caused the dispensation of counterfeit Gilead medications to patients of the pharmacy and other pharmacies.

25.    Defendant Rachel Aminov is an individual residing in Queens, New York. She is the owner of record of Defendant Bless You Rx, the pharmacy through which Defendant Boris Aminov distributed counterfeit Gilead medications to patients. As the principal of Bless You Rx, Defendant Rachel Aminov managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications. Defendant Rachel Aminov personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise her authority to stop it.

26.    Defendant Jonathan Gavrielof is an individual residing in Woodmere, New York. He conspired with Defendant Boris Aminov and others to traffic counterfeit Gilead medications, including through the Aminov Entities. Defendant Gavrielof supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. Defendant Gavrielof personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

27.    Defendant Dynamic Pharmaceuticals Supply, Inc. is a New York corporation with a principal place of business in New York. Its principal of record is an individual named James Murphy. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Dynamic Pharmaceuticals Supply, Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

28.    Defendant Dynamic Pharmaceutical Suply Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Steven Ferguson. Its off-the-

9

books principal is Defendant Boris Aminov. Defendant Boris Aminov used Dynamic Pharmaceutical Suply Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

29.     Defendant Northwest Pharmaceutical & Medical Supply Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Matthew Wildman. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Northwest Pharmaceutical & Medical Supply Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

30.     Defendant J&M Medical Supply Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Jeffrey Schonsky. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used J&M Medical Supply Inc. as a shell entity through which he laundered the proceeds of the counterfeiting scheme.

31.     Defendant JFK Wholesale and Retail Medical Supply Corp. is a New York corporation with a principal place of business in New York. Its principal of record is Matthew Wildman. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used JFK Wholesale and Retail Medical Supply Corp. as a shell entity to launder the proceeds of the counterfeiting scheme.

32.     Defendant Merric Billing Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Mikhail Yampolsky. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Merric Billing Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

33.     Defendant New Line of Pharmaceutical, Inc. is a New York corporation with a principal place of business in New York. Its principal of record is David Mock. Its off-the-

books principal is Defendant Boris Aminov. Defendant Boris Aminov used New Line of Pharmaceutical, Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

34.     Defendant Onliner Marketing Corp. is a New York corporation with a principal place of business in New York. Its principal of record is Sigmond Schnitzler. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Onliner Marketing Corp. as a shell entity to launder the proceeds of the counterfeiting scheme.

35.     Defendant Park Avenue Pharmaceutical Corp. is a New York corporation with a principal place of business in New York. Its principal of record is David Mock. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Park Avenue Pharmaceutical Corp. as a shell entity to launder the proceeds of the counterfeiting scheme.

36.     Defendant Pharmaceutical Way, Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Marco Graham. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Pharmaceutical Way, Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

37.     Defendant Foster Media Group, Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Sigmond Schnitzler. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Foster Media Group, Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

38.     Defendant Foster Media Pharmaceutical Supply Corp. is a New York corporation with a principal place of business in New York. Its principal of record is Jeffrey Schonsky. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Foster Media Pharmaceutical Supply Corp. as a shell entity to launder the proceeds of the counterfeiting scheme.

39. Defendant Y&S Statistic Medical Supply Inc. is a New York corporation with a principal place of business in New York. Its principal of record is James Murphy. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Y&S Statistic Medical Supply Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

40. Defendant Y&S Statistic Medical Suply Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Steven Ferguson. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Y&S Statistic Medical Suply Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

41. Defendant Pure Gear Consulting, Inc. is a New York corporation with a principal place of business in New York. Its principal of record is Mikhail Yampolsky. Its off-the-books principal is Defendant Boris Aminov. Defendant Boris Aminov used Pure Gear Consulting, Inc. as a shell entity to launder the proceeds of the counterfeiting scheme.

42. Defendant Antonio Payano is an individual residing in the Bronx, New York. Defendant Payano supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications, including through sales to Defendant Corvalan. Defendant Payano personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

43. Defendant Christy Corvalan is an individual residing in the Bronx, New York. She is the principal of record of Defendant Island Pharmacy & Discount Corp and, controlled, operated, and was the off-the-books principal of Laconia Avenue Pharmacy ("Laconia Pharmacy"), a defendant in *Gilead I*. Defendant Corvalan supervised, ratified, and/or personally participated in the manufacture and trafficking of counterfeit Gilead medications. Defendant

Corvalan personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise her authority to stop it.

44. Defendant Island Pharmacy & Discount Corp. is an active single-location retail pharmacy located in the Bronx, New York, opened in 2018. The pharmacy is de-facto owned and controlled by Defendant Corvalan. Island Pharmacy & Discount Corp. purchased and sold counterfeit Gilead-branded medications. In particular, Island Pharmacy paid approximately $3,500,000 to the Aminov Entities in exchange for counterfeit HIV medications.

45. Defendant David Fernandez is an individual residing in the Bronx, New York. He is an employee of Defendant Corvalan and a co-conspirator in the trafficking of counterfeit Gilead medications through Defendant Island Pharmacy & Discount Corp and/or Laconia Pharmacy. Defendant Fernandez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. He personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

46. Defendant Dezyre Baez is an individual residing in the Bronx, New York. She is an employee of Defendant Corvalan and a co-conspirator in the trafficking of counterfeit Gilead medications through Defendant Island Pharmacy & Discount Corp and/or Laconia Pharmacy. Defendant Baez supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. She personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise her authority to stop it.

47. Defendant Crystal Medina is an individual residing in the Bronx, New York. She is an employee of Defendant Corvalan and a co-conspirator in the trafficking of counterfeit Gilead medications through Island Pharmacy & Discount Corp and/or Laconia Pharmacy. Defendant Medina supervised, ratified, and/or personally participated in the trafficking of

counterfeit Gilead medications. She personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise her authority to stop it.

48.     Defendant Irina Polvanova is an individual residing in Jamaica, Queens, New York. She is President of Galaxy RX Inc. Defendant Polvanova supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. She personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise her authority to stop it.

49.     Defendant Galaxy RX Inc. is an active single-location retail pharmacy located in Queens, New York. The pharmacy is de-facto owned and controlled by Defendant Polvanova. Through Defendant Galaxy RX Inc., Defendant Polvanova purchased and sold counterfeit HIV medications, including counterfeit Gilead medications.

50.     Defendant Roman Shamalov is an individual residing in Woodside, Queens, New York. He is the principal of record and CEO of defendant River Chemists Corp. Defendant Shamalov supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications. He personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it.

51.     Defendant River Chemists Corp. is an active single-location retail pharmacy located in the Bronx, New York. The pharmacy is owned and controlled by Defendant Shamalov. Through River Chemists Corp., Defendant Shamalov purchased and sold counterfeit HIV medications, including Gilead medications.

52.     Defendants Boris Aminov, Rachel Aminov, Gavrielof, Corvalan, Fernandez, Baez, Madina, Polvanova, Shamalov, the Aminov Entities, Island Pharmacy & Discount Corp.,

14

Galaxy RX Inc., and River Chemists Corp. are referred to collectively as the "Aminov Defendants," and, together with the Khaim Defendants, "Defendants."

## JURISDICTION AND VENUE

53.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

54.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

55.     As alleged herein, all Defendants are residents of New York. All individual defendants reside in New York. All corporate Defendants are New York entities and/or have a principal place of business in New York.

56.     As alleged herein, all Defendants transacted business in New York and committed tortious acts in New York in connection with the counterfeiting conspiracy described herein. In particular, the Khaim Defendants, through Defendants 71st Rx and Best Scripts, sold counterfeit Gilead medications out of their pharmacy locations in Queens, New York City. The Aminov Defendants also participated in the manufacture, sourcing, purchase, and sale of counterfeit Gilead medications in Queens, New York City.

57.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of New York and at least one Defendant resides in this District. Further, venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendants manufactured and sold counterfeit products in this District, and/or conspired to operate a counterfeiting operation that manufactured and sold counterfeit products in this

15

District, and thus a substantial part of the events giving rise to Gilead's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     GILEAD'S HIV MEDICATIONS

58.     For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapeutics that aim to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients around the world treatments that improve care in areas of unmet medical needs.

59.     Gilead has transformed care for people living with serious diseases, such as HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first prophylactic medicine to prevent HIV infection, and four hepatitis C therapies.

60.     BIKTARVY® is a complete, one-pill, once-a-day prescription medication used to treat HIV. Developed by Gilead and first approved by the FDA in 2018, BIKTARVY® is a single-tablet combination medicine for the treatment of HIV-1 infection, combining an unboosted integrase strand transfer inhibitor called bictegravir with Gilead's dual nucleoside reverse transcriptase inhibitors, emtricitabine and tenofovir alafenamide, the components another Gilead medication approved by the FDA: DESCOVY® (also called DESCOVY for PrEP®, discussed below).

61.     BIKTARVY® has a demonstrated long-term efficacy and safety profile, has few drug interactions and side effects, and a high barrier to developing drug resistance.

62.     Although BIKTARVY® does not cure HIV, when taken every day as prescribed, it can lower the amount of virus in a patient's blood to undetectable levels. In addition to halting the progression of HIV, research shows that having undetectable levels of the virus prevents

transmission of HIV through sex, protecting a patient's sexual partners (and thus the broader community) from possible transmission.

63.     BIKTARVY® also can help increase a patients' CD4 T-cell count. CD4 T-cells are an important part of a person's immune system. HIV attacks and destroys CD4 T-cells, which decreases a patient's ability to fight off other infections, which can lead to serious illness or death. Indeed, a diagnosis of AIDS – the most advanced stage of HIV – is based on low levels of CD4 T-cells and/or the presence of opportunistic infections. AIDS is deadly particularly because those suffering from it cannot fight off other infections. Thankfully, medications like BIKTARVY®, when taken correctly, can stop the progression of an HIV infection and protect patients' immune systems.

64.     One of the most significant developments in the fight against HIV is the development of drugs for pre-exposure prophylaxis, or "PrEP": a method of HIV prevention whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medication on an ongoing basis to decrease their risk of acquiring HIV through sex.

65.     DESCOVY for PrEP® is a therapy developed and manufactured by Gilead that can be taken for PrEP. The drug comes in the form of a tablet. The dosage in the FDA approved label is one tablet per day.

66.     When taken as indicated, DESCOVY for PrEP® is highly effective at preventing HIV-1 infection in individuals exposed to the virus.

67.     DESCOVY for PrEP® was approved by the FDA in 2019. It has been an instrumental part of preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV, including New York City.

68.     Counterfeits of Gilead's HIV medications pose particular health dangers because, for patients treating HIV infection or using PrEP to prevent infection, it is very important that they follow the FDA-approved instructions, including regarding dosage frequency. If a patient with an HIV infection skips doses for even a short period of time, the patient faces the risk that the patient's viral load – that is, the amount of HIV in their blood – will increase. Viral rebound can have severe consequences. Over time, it can weaken the patient's immune system and increase the possibility of infections; it can result in progression of the disease and lead to the development of AIDS; and if patients are not virally suppressed, they may transmit the virus to their sexual partners.

69.     Patients taking DESCOVY for PrEP® similarly must take the medication regularly as prescribed to receive the labeled prophylactic benefits of the drug. DESCOVY for PrEP® is indicated only for certain individuals at risk for HIV infection. A patient who unknowingly discontinues their DESCOVY for PrEP® regimen because they have received counterfeit medication would be at risk for contracting HIV while still believing they are protected from infection.

70.     Gilead Sciences, Inc., Gilead Ireland, and Gilead Sciences, LLC (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on its genuine medications. A complete list of these trademarks is set forth in **Exhibit A** hereto, which is incorporated by reference. Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its medications in the marketplace.

71.     Gilead has used and/or currently is using the Gilead Marks and the Gilead Trade Dress in commerce in connection with its sale of medications, and plans to continue such use in

18

the future. Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

72. Gilead has engaged and continues to engage in activities designed to promote its medications and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

## B. THE COUNTERFEITS

73. Gilead first learned of the counterfeiting ring in *Gilead I* when Gilead received multiple complaints from patients and pharmacies about bottles of Gilead HIV medications that were sold by a pharmaceutical distributor called Safe Chain Solutions, LLC (a defendant in *Gilead I*) and that, when opened, were actually filled with an entirely different drug—sometimes a generic over-the-counter analgesic, but more often, a prescription anti-psychotic medication (quetiapine fumarate) with a number of serious potential side effects. One patient who unknowingly took the antipsychotic medication inside a counterfeit bottle of BIKTARVY® reported being unable to speak or walk afterwards.

74. After acquiring several bottles of counterfeit HIV medications that Safe Chain sold to U.S. pharmacies, Gilead's in-house experts and an outside laboratory examined the bottles and their contents and determined the products to be counterfeit.

75. This discovery led Gilead to conduct an investigation that ultimately unveiled a wide-reaching and prolific counterfeiting conspiracy dealing in more than a hundred thousand bottles of counterfeit Gilead medications and generating hundreds of millions of dollars in illicit proceeds. This conspiracy involved hundreds of persons and entities, including the defendants named in *Gilead I* as well as the Defendants in this action.

19

76.     The counterfeits at issue both in this action and in *Gilead I* are manufactured using once-authentic Gilead bottles. In some cases, the bottles had their contents emptied, were refilled with the wrong medication, and then were re-sealed using a different material than Gilead's authentic tamper-evident foil seals. In at least one instance, Gilead's original manufacturer's label was removed and replaced with the label for a different, more expensive Gilead-branded drug. The co-conspirators then sold the counterfeit bottles with counterfeit patient information documents, counterfeit caps, and/or counterfeit pedigrees or invoices.

77.     The FDA requires Gilead's HIV medications to be sold in the original manufacturer bottles. Authentic bottles of Gilead-branded medication are covered at the lip with a tamper-evident foil seal, which is covered by a screw-on lid. These Gilead-branded medications cannot lawfully be repackaged and dispensed in generic pharmacy bottles.

78.     To create the counterfeits, the conspirators purchased already-dispensed bottles of Gilead-branded medication, whether open or sealed, from patients for cash on the street. These street-level buyback operations targeted particularly vulnerable populations, such as individuals who are unhoused or substance users, who receive their HIV medication for free and therefore may be susceptible to being coerced into giving up their medication for cash. These illegally repurchased bottles are collected, stripped of their pharmacy patient labels using harsh chemicals, cleaned, and sometimes re-labeled with counterfeit versions of Gilead's original labels. If the bottles were purchased empty or partially empty, they are refilled with another medication and resealed with a fake version of Gilead's foil seal.

79.     On authentic Gilead bottles, the FDA-required patient instructions are affixed to the side of the bottle, and are known as "outserts." The instructions are printed on a single piece of paper, machine-folded, and then affixed to the side of the bottle during the manufacturing

process using an adhesive. When the conspirators illegally purchased bottles from patients on the street, the patient instructions were often missing or damaged, or were damaged while the bottles were processed into counterfeits. And so the counterfeiters often attached a counterfeit reprint of the prescribing information/patient instructions. These counterfeit reprints contained misspellings, omitted entire sections (such as drug interaction warnings), contained outdated information, were printed on low-quality paper that tore upon opening, and consisted of multiple sheets of paper that were pasted or taped together. Other times, the counterfeits simply omitted the required patient instructions altogether.

80.     In addition to legitimate and complete packaging, the FDA requires that Gilead's HIV medications be sold with what is known in the industry as a "pedigree" or "T3." Pedigrees are legally mandated chain-of-custody documents that must, with few exceptions, accompany every sale of every bottle of prescription drugs in the United States. *See* 21 U.S.C. §§ 360eee *et seq.* Every authentic bottle of medication that Gilead sells comes with an authentic Gilead-created pedigree that accurately discloses, among other things, when, where, and to whom Gilead sold that bottle. The pedigree is part of the product that Gilead sells.

81.     For Gilead, pedigrees are anti-counterfeiting measures and also play other important internal quality-control functions, such as tracing the distribution of reported suspect bottles and facilitating targeted recalls. For the distributors, pharmacies, and patients that buy Gilead's HIV and other prescription medications, authentic pedigrees that accurately disclose the original and subsequent sales of the product are an important feature of Gilead's products that certify the medication's authenticity and safety.

82.     Counterfeits by definition cannot have valid pedigrees that show a legitimate chain of distribution. The counterfeiters thus sell the counterfeit Gilead-branded medication with

21

counterfeit pedigrees listing fake chains of sale, or with no pedigree at all, each of which differentiates the counterfeits from the products Gilead sells and with which Gilead associates its trademarks.

83.     Gilead's authentic pedigrees use Gilead's registered trademarks to identify the medication, the origin of the bottle, and the authorized distribution channel in which it was sold. Fake pedigrees are unauthorized copies of Gilead's authentic pedigrees that utilize counterfeit copies of Gilead's registered marks.  These counterfeit pedigrees are intended to trick customers into believing the bottles have a legitimate origin and were distributed through legitimate distribution channels, but in reality list fictitious chain-of-custody transactions that never occurred.

## C.     THE KHAIM DEFENDANTS

### 1.     Defendant Khaim

84.     Defendant Khaim is a career criminal and twice-convicted medical fraudster. Defendant Khaim is currently awaiting sentencing in a federal criminal case in this District, after being convicted of running a multi-million-dollar pharmaceutical fraud scheme.  The indictment in that case states that Defendant Khaim used several pharmacies nominally owned by strawmen that he controlled, and used those pharmacies to fill fake prescriptions for expensive cancer-related medication.  Defendant Khaim then pushed those fake prescriptions through for insurance reimbursement by using emergency override procedures established for the COVID-19 pandemic.

85.     Defendant Khaim was also convicted in another federal criminal case, which prosecutors from the Southern District of New York described in a press release as "one of the largest no-fault automobile insurance fraud takedowns in history." In particular, he ran a criminal enterprise that exploited insurance programs designed to protect motor vehicle accident

22

victims. The indictment describes that the enterprise created medical clinics that fraudulently billed insurance companies for unnecessary (and sometimes never-performed) medical treatments. It did so by bribing medical professionals and 911 operators for motor vehicle accident victim information and then inducing those patients to seek treatment at the medical clinics, which would then fraudulently bill for the excessive (or nonexistent) treatments. Defendant Khaim was convicted and was recently sentenced to 15 years' imprisonment for his role in the scheme.

86. Defendant Khaim's involvement in the HIV medication counterfeiting conspiracy at issue here runs deep. Defendant Khaim is the only defendant to be named both in this action and in *Gilead I*. He is a willful and unrepentant counterfeiter, and among the most prolific sellers of counterfeit HIV medications in the conspiracy. For example, in *Gilead I*, Defendant Khaim was caught red-handed selling well over 10,000 bottles of counterfeit Gilead-branded medication, all with fake pedigrees and some with the wrong pills inside the bottle, through Boulevard 9229 LLC ("Boulevard"), a company he ran through a strawman.

87. In *Gilead I*, Defendant Khaim was also caught controlling and operating another counterfeit supplier, Valuecare Pharmacy Inc. ("Valuecare"), through which he sold counterfeit Gilead medications to pharmacies via online pharmaceutical marketplaces such as MatchRx. As with Boulevard, Defendant Khaim used a strawman owner to conceal his control of Valuecare.

88. As Gilead demonstrated in *Gilead I*, through these supplier entities, Defendant Khaim made well over $38 million in proceeds selling counterfeit Gilead medications to large-scale distributors and directly to pharmacies.

89. Defendant Khaim is also the de facto principal of over a dozen other entities (that Gilead knows about) involved in the trafficking of counterfeit Gilead medications or laundering

the proceeds therefrom. His *modus operandi* was to establish (through nominal owners that were his relatives, friends, and/or associates) various shell companies that he controlled for the purpose of laundering the illicit proceeds he gained through the counterfeiting enterprise and hiding those proceeds. Those shell companies include a number of entities who are defendants in *Gilead I*: MFK Management LLC d/b/a Boulevard 9229 & 9229 Boulevard ("MFK Management"); 5 Continental Ventures LLC ("5 Continental"); AP Funding LLC; A&P Holding Group Corp.; 441 Willis Ave LLC; La Vie Jewels of NY LLC; Etzhaim, Inc.; B&O Estates LLC; 214 Jamaica LLC; A&P Rockaway LLC; 91 Park LLC; 91 Rego LLC; and 93 Everton LLC. Defendant Khaim also established the Khaim Family Irrevocable Living Trust for the same asset-laundering purpose.

90.     Gilead named Defendant Khaim as a defendant in *Gilead I* on August 19, 2021. Gilead sought a seizure order, a temporary restraining order, and an asset freeze order against him, which the Court granted on August 20, 2021. Gilead also obtained supplemental asset freeze orders on April 26, 2022, and April 25, 2023, restraining various Khaim-controlled entities that Gilead later discovered.

91.     Since August 20, 2021, this Court's Temporary Restraining Order, subsequently converted into a Preliminary Injunction, has prohibited Defendant Khaim from, among other things, "[p]urchasing, selling, distributing, marketing, [or] manufacturing" any "counterfeit or authentic product" bearing any of the Gilead Marks. But as described below, in flagrant and deliberate contempt of this Court's orders, Defendant Khaim nevertheless continued to sell counterfeit Gilead medications under this Court's nose, through new entities and with new co-conspirators.

## 2. Defendant Khaim's New Pharmacies and the Associated Front Men

92. Defendant Khaim established two pharmacies *after* Gilead sued him for counterfeiting and *after* this Court enjoined him from selling any Gilead products: Defendants 71st Rx and Best Scripts (together, the "Khaim Pharmacies"). Defendant Khaim then utilized the Khaim Pharmacies to continue selling counterfeit Gilead medication.

93. Defendant 71st Rx is a single-location retail pharmacy that is still currently in operation, located in Forest Hills, Queens, New York. It filed its articles of incorporation in March 2023.

94. Defendant 71st Rx operates from the first floor of a commercial building located at 107-27 71st Ave., Forest Hills, New York 11375 (the "71st Ave Property"). The 71st Avenue Property is a Defendant Khaim money-laundering vehicle. Gilead obtained an asset freeze order specifically naming the 71st Ave Property in *Gilead I* after proving that the building, which is nominally owned by a shell company nominally owned by Defendant Khaim's wife and mother, was in fact purchased by Defendant Khaim with his illicit proceeds and is controlled and operated by Defendant Khaim. Gilead also proved that Defendant Khaim recorded a sham mortgage on the 71st Ave Property, claiming to owe a company called AP Funding LLC millions of dollars, when in fact Defendant Khaim himself created AP Funding LLC just days prior.

95. As confirmed by depositions of Defendant Khaim's family members in *Gilead I*, Defendant 71st Rx has no lease and pays no rent – it simply operates, without any formalities observed or payment made, out of the building that Defendant Khaim controls and uses for money-laundering purposes.

96. The nominal owner of Defendant 71st Rx is Defendant Grant, who is closely tied to Defendant Khaim. For example, Defendant Grant worked as a 1099 contractor for a company called Make it Happen Marketing, which was one of Defendant Khaim's counterfeit suppliers in

25

*Gilead I.* Defendant Grant is also one of the co-owners of the Royal Leaf Club, which also operates (rent and lease free) from the 71st Ave Property. Consistent with his *modus operandi* in all of his fraudulent schemes, Defendant Khaim is using Defendant Grant as a straw owner to conceal Defendant Khaim's interest in and control of 71st Rx.

97.     In addition to Defendant 71st Rx, the 71st Ave Property houses a beauty parlor that is partially owned by Defendant Khaim's wife, as well as the cannabis dispensary noted above, Royal Leaf Club, that is nominally owned by Defendant Grant and two other close associates of Defendant Khaim, including another defendant in *Gilead I.* Consistent with his *modus operandi*, Defendant Khaim's name does not appear on the Royal Leaf Club's filings, but a local journalist identified Defendant Khaim and his brother as the "managers" of the dispensary.

98.     Defendant Best Scripts is a single-location retail pharmacy formed on June 6, 2023. It has an active pharmacy license as well as an active wholesaler license in New York, both issued on August 30, 2023. The nominal owner of Defendant Best Scripts is Defendant Ohar, but in reality, Defendant Khaim is the de facto owner and operator.

99.     Defendant Best Scripts shares the exact same location, down to the suite number, as another pharmacy that Defendant Khaim used in one of his prior pharmaceutical fraud schemes. That exact same space was used by a company named IVS Pharmacy, which is specifically named in Defendant Khaim's indictment in this District as one of the pharmacies that Defendant Khaim controlled, through a strawman, to commit massive healthcare fraud. It is no coincidence that Defendant Best Scripts is in the exact same location as a previous Defendant Khaim-controlled pharmacy used to facilitate Defendant Khaim's criminal activity.

100. Defendant Best Script's nominal owner, Defendant Ohar, also has deep ties to Defendant Khaim. For example, Defendant Ohar is also the organizer and sole member of two other businesses, both of which are run out of storefronts in Defendant Khaim-controlled commercial properties. Those properties were frozen in *Gilead I* after Gilead proved that those properties – nominally owned by LLCs that were nominally owned by Defendant Khaim's father – were in fact purchased by and controlled by Defendant Khaim himself.

101. Parking tickets and moving violations associated with Defendant Khaim's luxury SUVs demonstrate he frequented the immediate vicinities of the Khaim Pharmacies between February 2023 and March 2024.

### 3. Defendant Khaim's Continued Sale of Counterfeits Online

102. Gilead has caught Defendant Khaim, using the Khaim Pharmacies, engaged in the same scam he used in *Gilead I* to sell counterfeit Gilead-branded HIV medication on an online pharmaceutical marketplace called MatchRx. Defendant Khaim previously used MatchRx to sell millions of dollars' worth counterfeits through Valuecare, a defendant in *Gilead I*. Given the known scope of Defendant Khaim's past counterfeiting and his brazenness in defying this Court's injunctions, the new counterfeit bottles of which Gilead is aware are almost certainly just the tip of the iceberg.

103. MatchRx is an online pharmaceutical marketplace whose listings can only be viewed by pharmacies that create a MatchRx account. MatchRx's marketplace is used by pharmacies to sell prescription medications to other pharmacies.

104. On March 20, 2024, Gilead received verification requests from MatchRx related to two bottles of BIKTARVY® sold on MatchRx – one by Defendant 71st Rx and one by Defendant Best Scripts – both of which were purchased by the same pharmacy in New Jersey. Both bottles bore the lot number 7315304A.

105. Gilead investigated the bottles sold by the Khaim Pharmacies on MatchRx and determined they were counterfeit and had been fraudulently sold with documentation falsely claiming to trace the bottles back to a legitimate distributor.

106. MatchRx informed Gilead that it requires sellers to upload an invoice proving that the bottle of medication they are selling came from a legitimate source. Defendant 71st Rx uploaded an invoice claiming it had purchased its bottle of BIKTARVY® from a wholesaler called Independent Pharmacy Cooperative ("IPC"). However, the IPC invoice did not provide lot or serial numbers, making it impossible to verify that the invoice corresponded to the bottle that Defendant 71st Rx sold via MatchRx. Gilead contacted IPC, which confirmed that IPC had *never* sold any bottles from lot number 7315304A. Thus, Defendant 71st Rx's provision of the IPC invoice as evidence of the listed bottle's provenance was fraudulent.

107. In connection with its sale via MatchRx, Defendant Best Scripts uploaded an invoice claiming it had purchased its bottle of BIKTARVY® from AmerisourceBergen Corporation ("ABC"), a Gilead-authorized distributor. Once again, the invoice did not provide lot or serial numbers, making it impossible to verify that the invoice corresponded to the bottle Defendant Best Scripts sold via MatchRx. However, Gilead sells directly to ABC, and Gilead's internal records confirmed that Gilead had never shipped to ABC a bottle with the serial number matching what Defendant Best Scripts sold via MatchRx.

108. Both IPC and ABC confirmed that their respective invoices were legitimate, and that they had in fact each sold *a* bottle of BIKTARVY® to the respective Khaim Pharmacies. The Khaim Pharmacies were thus both employing the same scam: making a small legitimate purchase, then fraudulently using the invoice from that purchase as cover to sell illegitimate products obtained off the street and repackaged into counterfeits. The Khaim Defendants

28

knowingly and purposefully submitted the invoices to MatchRx knowing they did not correspond to the bottles being sold, and did so with the purpose of tricking customers into believing that the counterfeit BIKTARVY® they were selling was legitimately sourced.

109.     Moreover, both of the Khaim Pharmacies claimed to have purchased their respective bottles of BIKTARVY® at full price, and then sold them at a steep discount on MatchRx several days later. If it were true, this would have caused the Khaim Pharmacies to incur losses of several hundred dollars on each sale. In reality, the Khaim Pharmacies were selling counterfeits obtained off the street for pennies-on-the-dollar and thus profited handsomely from the sales.

110.     Gilead obtained from the purchasing pharmacy the two bottles that the Khaim Pharmacies sold on MatchRx.

111.     The bottle sold by Defendant 71st Rx had significant and obvious damage to the Gilead FDA-mandated label: it was torn, and there was sticky residue around the area of the tear. The bottle had obviously had another label applied to it – a pharmacy patient label when the bottle was first dispensed – that was subsequently removed in a manner that damaged the original label.



112. The bottles sold by the Khaim Pharmacies were both missing their instructional outserts, without which the medications cannot lawfully be dispensed. On the bottle sold by Defendant 71st Rx, the adhesive that originally affixed the outsert to the bottle was visible; on Defendant Best Scripts' bottle, the adhesive appeared to have been removed or cleaned off.

113. Gilead sent the bottles sold by the Khaim Pharmacies to an outside laboratory for analysis. Using infrared spectroscopy, the outside laboratory determined that the adhesive used on the foil seal of both bottles was inconsistent with authentic Gilead product. Specifically, both bottles used a seal adhesive that contained polyester, a material that does not appear in the seal adhesive on authentic Gilead bottles.

114. The laboratory had seen this before: it identified in its record four other counterfeit bottles of Gilead medication that it had tested previously that had matching levels of polyester in the seal adhesive. All four of those prior instances were confirmed counterfeit bottles with the wrong pills inside sold by defendants in *Gilead I*.

115. Defendant Khaim's continued sale of counterfeit Gilead-branded medications through Defendants 71st Rx and Best Scripts is unquestionably willful and in knowing contempt of this Court's orders.

## D. THE BORIS AMINOV DEFENDANTS

### 1. Defendant Boris Aminov, His Employee Defendant Jonathan Gavrielof, His Pharmacy Defendant Bless You RX, and His Mother Defendant Rachel Aminov

116. Defendant Boris Aminov has already been sentenced for his admitted role in the counterfeiting conspiracy. Defendant Boris Aminov is also connected to several defendants in *Gilead I*, including Defendant Khaim, whose phone records show numerous FaceTime calls between the two.

30

117. Defendant Boris Aminov is also connected to Quan Hernandez, one of Defendant Khaim's suppliers of counterfeit Gilead medications and also a defendant in *Gilead I.* Specifically, Quan Hernandez worked for a supposed charity run by Defendant Boris Aminov called God Bless You All, which operates from the same location as Defendant Boris Aminov's counterfeit distributor, Defendant Bless You Rx. Quan Hernandez is also the son of another individual indicted with Defendant Boris Aminov, Juan Hernandez Sr.

118. As the government detailed in its sentencing memorandum, from at least 2020 to 2023, Defendant Boris Aminov led a conspiracy to distribute more than ten million dollars' worth of black-market HIV medication, acquired off the street from low-income individuals and re-sold as counterfeits. Defendant Boris Aminov took over the business when his brother, Koyen Aminov, passed away in 2019.

119. In furtherance of the scheme, Defendant Boris Aminov worked alongside his co-conspirator and employee, Defendant Gavrielof, and his mother, Defendant Rachel Aminov.

120. Defendant Rachel Aminov is the on-paper owner of Defendant Bless You Rx, a pharmacy in Jamaica, Queens, New York. Defendant Boris Aminov conspired with her to use the pharmacy to dispense counterfeit Gilead-branded HIV medication to unsuspecting patients.

121. Together with Defendant Gavrielof, Defendant Boris Aminov acquired the bottles (empty or full) of HIV medication to produce the counterfeits by buying already-dispensed bottles off the street, often from vulnerable patients who were willing to sell their life-saving medication in exchange for small cash payments.

122. Defendant Gavrielof sent Defendant Boris Aminov WhatsApp messages with lists and photographs of the bottles of HIV medication to acquire. Defendant Boris Aminov would

sign off on Defendant Gavrielof's acquisitions. The bottles of medication in the photographs were visibly used and adulterated, as in the below examples:

 

123. After acquiring these bottles and processing them into counterfeits, Defendant Boris Aminov would either dispense them to unsuspecting patients of Defendant Bless You RX or sell them to other Defendants' pharmacies, as discussed below.

124. Defendant Boris Aminov recently pled guilty and was sentenced to 108 months in prison after being indicted in the Southern District of New York for running this counterfeit HIV scheme. Defendant Gavrielof has also pled guilty to the same conduct and is awaiting sentencing.

125. In March 2023, federal law enforcement officials executed a search warrant at a townhouse in Queens, from which Defendant Boris Aminov orchestrated aspects of this scheme. As reported in the government's sentencing memorandum: "the Government found stockpiles of black-market and potentially dangerous HIV medications. The medication bottles contained labels in the names of patients of many different pharmacies, indicating they had been bought from patients for re-sale to other unknowing patients. The Government also recovered printing

labels, lighter fluid, and other materials used to alter medication bottles for illegal re-sale. For example, lighter fluid is commonly used in diversion schemes like the defendant's to strip the adhesive from labels on medication bottles, so that the labels can be removed without patients detecting that the medication had previously been prescribed to others. The Government also recovered $318,393.00 in cash from two large safes in the Townhouse, as well as firearms and ammunition." Photographs from the search are below:








**2.    Defendant Boris Aminov's Money Laundering Entities**

126.    Defendants Boris Aminov and Gavrielof used the Aminov Laundering Entities, a network of shell companies, to facilitate the sale of the counterfeits and to hide and launder the illicit proceeds of their counterfeiting scheme. Employing the same strategy as Defendant Khaim, Defendant Boris Aminov set up these shell entities using nominal paper principals, but in practice, Defendant Boris Aminov owns and controls the entities.

127.    Defendant Boris Aminov personally instructed his pharmacy customers, including Defendants, to make payments to the Aminov Money Laundering Entities in exchange for the counterfeit medications he supplied.

128.    Defendant Boris Aminov, who pled guilty to money-laundering charges (among others), also laundered his assets through real estate transactions. Since 2022, well after he started selling counterfeits, Defendant Boris Aminov purchased at least four real estate properties with a combined assessed value over $1 million. Defendant Boris Aminov purchased another two properties in 2019, the year in which he took over the counterfeiting business from his brother. Further, shortly after *Gilead I* was unsealed and became the subject of mainstream press articles, Defendant Boris Aminov established a series of trusts and shell owners to take nominal

34

ownership of his and Defendant Rachel Aminov's real-estate assets in a further attempt to shield their ill-gotten gains.

### 3. Defendant Payano

129. Defendant Payano was another supplier of counterfeit HIV medication for the Aminov Defendants. Similar to Defendants Boris Aminov and Gavrielof, Defendant Payano purchased already-dispensed bottles of HIV medication from patients off the street and processed those bottles into counterfeits by altering the bottles. Defendant Payano was aware of harm he was causing to the patients he convinced to sell him their life-saving HIV medication. One such patient texted him, asking: "why am I risking my life for such little $."

130. Defendant Payano sold at least some of the counterfeit HIV medication that he helped source and manufacture to New York City pharmacies, including Corvalan's (discussed below).

### 4. Defendant Boris Aminov's Pharmacy Customers

131. The pharmacies who purchased counterfeits from Defendant Boris Aminov and his co-conspirators included, at a minimum, Laconia Pharmacy (a defendant in *Gilead I*), whose principal is Defendant Corvalan; Defendant Island Pharmacy & Discount Corp., whose principal is also Defendant Corvalan; Defendant Galaxy Rx Inc., whose principal is Defendant Polvanova; and Defendant River Chemists Corp., whose principal is Defendant Shamalov. All of these pharmacy customers and their principals knew they were buying counterfeit HIV medication and willfully trafficked in the counterfeits in order to make an illicit profit at the expense of patients.

132. In total, these pharmacy customers paid the Aminov Laundering Entities over $8 million in exchange for large quantities of counterfeit HIV medication. Defendant Boris Aminov personally instructed Defendants Corvalan, Polvanova, and Shamalov to make these payments to the Aminov Laundering Entities.

133.    Defendant Corvalan paid approximately $6 million to the Aminov Laundering Entities in exchange for counterfeit HIV medications, the majority of which were Gilead-branded HIV medications.  Corvalan made those purchases through her two pharmacies, Laconia Pharmacy and Defendant Island Pharmacy Discount Corp.  Corvalan also sourced counterfeit HIV medications directly from Defendant Payano and her patients.

134.    In addition to knowingly purchasing and selling counterfeit Gilead-branded HIV medication from Defendants Boris Aminov and Payano, Corvalan conspired with her employees, Defendants Fernandez, Baez, and Medina, to purchase HIV medication from patients for cash and process the repurchased bottles into counterfeits.  Through their pharmacies, Laconia Pharmacy and Defendant Island Pharmacy Discount Corp., Defendants Corvalan, Fernandez, Baez, and Medina purchased already-dispensed HIV medication from customers of the pharmacies who would sell back the HIV medication they were dispensed.

135.    Laconia Pharmacy is a retail pharmacy located in the Bronx.  Laconia first came to Gilead's attention in July 2022 when a patient reported to Gilead that Laconia Pharmacy dispensed him counterfeit Gilead-branded HIV medication with the wrong pills in the bottle. The patient reported that Laconia had delivered to him what appeared to be a sealed bottle of GENVOYA®, but that after the patient had consumed one of the pills inside, he noticed that the pills had a different appearance than he expected, that the bottle had blue staining on the inside, and "smelled like paint."  Gilead obtained the bottle from the patient and confirmed it was counterfeit.

136.    In August 2022, Gilead executed a seizure at Laconia, where it found a stash of over 100 bottles of HIV medication, including many Gilead-branded bottles, that had been

purchased from patients for cash. Many of the bottles still had pharmacy patient labels attached indicating they had been dispensed by other pharmacies in the New York region. Gilead also found several bottles of lighter fluid in the pharmacy that Defendant Corvalan and her employees were using to remove the pharmacy patient labels, and a stack of envelopes each containing exactly $175 in cash, which Defendant Corvalan and her employees used to purchase the medications back from patients.

137. Based on the foregoing evidence, the Court in *Gilead I* enjoined Laconia Pharmacy from transacting in Gilead-branded medications, and Laconia Pharmacy has since defaulted.

138. Defendants Corvalan, Baez, Fernandez, and Medina would also recruit and pay kickbacks to patients to induce them to fill their prescriptions for HIV medications at their preferred pharmacies, allowing Defendant Corvalan and her employees to harm even more patients by dispensing more counterfeit HIV medication and reaping more enormous illicit profits.

139. Defendants Corvalan, Baez, Fernandez, and Medina used counterfeiting proceeds to purchase property, luxury cars, designer clothes, and jewelry to launder and hide their assets. For example, Corvalan used illicit funds to purchase at least two waterfront apartments in the Bronx for a total of $2.4 million and a $245,000 Mercedes Benz Maybach.

> **b.** **Defendant Polvanova, Her Pharmacy, Defendant Galaxy RX Inc., Defendant Shamalov, and his His Pharmacy, Defendant River Chemists Corp**

140. Defendants Polvanova and Shamalov used their pharmacies, Defendants Galaxy RX Inc. and River Chemists Corp., respectively, to knowingly and willfully buy counterfeit HIV medications, including Gilead-branded medications, from Defendants Boris Aminov and Gavrielof. Defendants Polvanova and Shamalov paid Defendant Aminov, through the Aminov

Laundering Entities, to disguise the nature of the payments. Once they procured the counterfeit HIV medications, Defendants Polvanova and Shamalov distributed the counterfeits they bought to unsuspecting patients of their pharmacies.

141.    Defendants Polvanova and Shamalov also resold the counterfeit HIV medications to other pharmacies through online pharmaceutical marketplaces, spreading the counterfeits throughout the country.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))
(Against all Defendants)

142.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

143.    In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction, counterfeit, copy or colorable imitation of the Gilead Marks and the Gilead Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered, falsified, and/or nonexistent pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

144.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

145.    Defendants are directly, contributorily, and vicariously liable for their infringement.

38

146.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

147.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

148.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### SECOND CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))
### (Against all Defendants)

149.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

150.    In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products with altered, falsified, and/or nonexistent pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-

control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

151.    For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Gilead Marks on the labels of the counterfeit bottles of Gilead HIV medications they purchased, advertised, and sold, as well as on altered and/or falsified pedigrees for bottles of Gilead HIV medications.

152.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

153.    Defendants are directly, contributorily, and vicariously liable for their infringement.

154.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

155.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

156.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### THIRD CLAIM FOR RELIEF
### FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE
### (Against all Defendants)

157.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

158. In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit Gilead medication, and in connection with Gilead products with altered, falsified, and/or nonexistent pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States, and/or that are not subject to and subvert Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

159. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

160. Defendants are directly, contributorily, and vicariously liable for their infringement.

161. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

162. Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

163. As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

41

## FOURTH CLAIM FOR RELIEF
## FEDERAL FALSE ADVERTISING
### (Against all Defendants)

164. Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

165. In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of counterfeit Gilead medication, and in connection with the sale of Gilead products with altered, falsified, and/or nonexistent pedigrees that are materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit Gilead medication.

166. Defendants advertised, marketed, and promoted the counterfeit Gilead products, and the materially different Gilead products with altered, falsified, and/or nonexistent pedigrees, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

167. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

168. Defendants are directly, contributorily, and vicariously liable for their infringement.

169. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the

42

industry. Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

170. Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

171. As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FIFTH CLAIM FOR RELIEF
## FEDERAL DILUTION OF MARK
### (Against all Defendants)

172. Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

173. The Gilead Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

174. Defendants are selling and/or have sold counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress after such trademarks and trade dress became famous.

175. By selling these products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Gilead in violation of 15 U.S.C. § 1125(c).

176. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

177. Defendants are directly, contributorily, and vicariously liable for their infringement.

43

178. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

179. Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

180. As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF
## NEW YORK DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION
### (Against all Defendants)

181. Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

182. All of the Gilead Marks and Trade Dress are individually distinctive under New York General Business Law § 360-1.

183. By selling counterfeit, altered, and/or falsified products bearing the Gilead Marks and Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Gilead's business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Gilead, in violation of New York General Business Law § 360-1.

184. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the

industry. Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

185.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

186.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
## NEW YORK DECEPTIVE BUSINESS PRACTICES
### (Against all Defendants)

187.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

188.    In violation of New York General Business Law § 349, Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or distributing counterfeit, altered, and/or falsified products unlawfully bearing the Gilead Marks and Trade Dress.

189.    As a direct and proximate result of Defendants' deceptive conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

190.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

## EIGHTH CLAIM FOR RELIEF
## COMMON-LAW UNFAIR COMPETITION
### (Against all Defendants)

191.    Gilead realleges and incorporates by reference the paragraphs above as if fully set

forth herein.

192.    In violation of the common law of the State of New York and elsewhere,

Defendants, independently and in conspiracy with one another, have unfairly competed with

Gilead by selling the counterfeit, altered, and/or falsified products.

193.    As a direct and proximate result of Defendants' unfair competition, Gilead has

suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in

the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably

harmed.

194.    Gilead has no adequate remedy at law that will compensate for the continued and

irreparable harm it will suffer if Defendants' acts are allowed to continue.

195.    As a direct and proximate result of Defendants' unfair competition, Gilead has

suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount

to be proved at trial.

## NINTH CLAIM FOR RELIEF
## COMMON-LAW UNJUST ENRICHMENT
### (Against all Defendants)

196.    Gilead realleges and incorporates by reference the paragraphs above as if fully set

forth herein.

197.    By selling the counterfeit, altered, and/or falsified products bearing Gilead's

valuable trademarks independently and in conspiracy with one another, Defendants have been

unjustly enriched at Gilead's expense in violation of the common law of New York and elsewhere.

198. Under principles of equity, Gilead is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

## **PRAYER FOR RELIEF**

WHEREFORE, Gilead demands judgment against Defendants as follows:

A. preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

> (i) from selling any Gilead medication, whether genuine or counterfeit;
>
> (ii) from using any of the Gilead Marks and Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medication;
>
> (iii) from using any logo, trade name, or trademark confusingly similar to any of the Gilead Marks and Trade Dress, which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Gilead;
>
> (iv) from directly, contributorily, and vicariously infringing any of the Gilead Marks and Trade Dress;

47

(v)     from otherwise unfairly competing with Gilead in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Gilead medications;

(vi)    from falsely representing themselves as being connected with Gilead or sponsored by or associated with Gilead or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Defendants, or any of them, are associated with Gilead;

(vii)   from using any reproduction, counterfeit, copy, or colorable imitation of any of the Gilead Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of medications;

(viii)  from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being authentic Gilead medication and from offering such goods in commerce;

(ix)    from diluting the Gilead Marks and Trade Dress;

(x)     from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be Gilead medication; and

          (xi)     from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (x) above; and

      B.     ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

      C.     ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

      D.     awarding to Gilead punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

      E.     awarding to Gilead statutory, actual damages, or threefold damages in an amount to be ascertained at trial, and costs and attorney's fees; and

      F.     awarding to Gilead an accounting, and an award of: (i) all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit medication; (ii) Gilead's lost profits; and (iii) Gilead's remedial costs; and

      G.     awarding to Gilead pre-judgment and post-judgment interest; and

      H.     awarding such other and further relief to Gilead as may be just, proper, and equitable.

## JURY DEMAND

Gilead hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all claims and issues so triable.

Dated:     New York, New York
           June 17, 2024

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
       Geoffrey Potter
       Timothy A. Waters
       Thomas P. Kurland
       Maxwell K. Weiss
       Andrew Haddad
       Angelica Nguyen
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E: gpotter@pbwt.com
   twaters@pbwt.com
   tkurland@pbwt.com
   maweiss@pbwt.com
   ahaddad@pbwt.com
   anguyen@pbwt.com

*Attorneys for Plaintiffs*
*Gilead Sciences, Inc., Gilead Sciences Ireland UC,*
*and Gilead Sciences, LLC*