UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
GILEAD SCIENCES, INC., GILEAD SCIENCES
IRELAND UC, and GILEAD SCIENCES, LLC,

                                  Plaintiffs,

             -against-

PETER KHAIM, *et al.*,

                                  Defendants.
---------------------------------------------------------------------x

**OPINION AND ORDER**

24-CV-4259
(Merle, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

Presently before the Court are two motions arising out of the same discovery dispute in this federal civil action: whether a third-party entity should be ordered to produce GPS data from a defendant's ankle monitor, which that defendant had worn as part of the conditions of his release in a separate federal criminal action. It should not.

Here, Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (collectively "Gilead") move to compel third-party entity BI Incorporated ("BI") to produce GPS data associated with Defendant Peter Khaim's ankle monitor. Mr. Khaim wore the ankle monitor as part of the conditions of his release in *United States v. Khaim*, No. 20-CR-580 (AMD) (E.D.N.Y.). *See* Gilead's Motion to Compel, Dkt. Nos. 86, 106 ("Gilead's Motion"). Mr. Khaim opposes Gilead's Motion and cross-moves to quash Gilead's subpoena *duces tecum* served on BI. *See* Defendant Khaim's Motion to Quash, Dkt. No. 100 ("Mr. Khaim's Motion").

For the reasons that follow, Mr. Khaim's Motion is **GRANTED** and Gilead's Motion is **DENIED**.

I.    **Background**

A.    **Relevant Factual and Procedural History**

Gilead is a pharmaceutical company engaged in the business of developing and marketing a "large portfolio of lifesaving medications"—many of which possess "well-established and famous" registered trademarks that appear on the packaging, tablet, and patient instructions of various drugs.  Dkt. No. 1 at ¶¶ 13-15, 79.  Gilead's portfolio includes "drugs for the treatment or prevention of HIV" which bear certain established trademarks denoting authenticity.  *Id.*

Following the receipt of "multiple complaints" from patients and pharmacies who had purchased Gilead-branded products from a pharmaceutical distributor (*id.* at ¶¶ 73-75) and investigations involving Gilead's own "in-house experts" and an "outside laboratory" (*id.* at ¶ 74), Gilead became aware of a conspiracy involving "more than a hundred thousand bottles of counterfeit Gilead medications" generating millions in illicit proceeds.  *Id.* at ¶ 75.

Gilead commenced this action on June 17, 2024, alleging that Defendants have participated in a counterfeiting conspiracy involving Gilead-branded medications.  *See generally* Dkt. No. 1. Gilead brings claims against Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); false advertising in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; and common-law unjust enrichment and unfair competition.  *Id*. at ¶¶ 12, 142-198.  This is Gilead's second action in this district related to the alleged conspiracy; the first action remains pending before this

Court.  *See Gilead Scis., Inc. v. Safe Chain Sols. LLC*, No. 21-CV-4106 (AMD) (JAM) (E.D.N.Y.) ("*Gilead I*").

Gilead alleges that Mr. Khaim—who is also a defendant in *Gilead I*—is "among the largest and most brazen manufacturers and sellers of counterfeit Gilead medications."  Dkt. No. 1 at ¶ 3. Gilead notes that Mr. Khaim is named as a defendant in the current action because he has recently, "in deliberate contempt of the injunctions this Court issued against him in *Gilead I*, [allegedly] continued to sell counterfeit Gilead-branded HIV medication through a new series of pharmacies." *Id.*  On June 17, 2024, Gilead also moved for a seizure order requesting, *inter alia*, that its private investigators and attorneys be authorized to "secure and remove . . . the cellular or smart phones of or used by [Mr.] Khaim," who shall "provide access (including providing all keys, passwords or codes needed) to inspect the contents of the cellular or smart phones of the individuals identified herein."  *See* Dkt. No. 2-2 at 3-4.[1]

On June 18, 2024, the Court granted Gilead's proposed seizure order and permitted, *inter alia*, Gilead's agents to search, seize, copy, and sequester items in the possession, custody, or control of Mr. Khaim, including electronic records and the cellular or smart phones used by Mr. Khaim.  *See* Dkt. No. 14 at 3-4.

### B.    Mr. Khaim's Parallel Criminal Actions

In addition to his involvement in the two civil actions commenced by Gilead, Mr. Khaim has been convicted in two federal criminal cases: one in this Court, and one in the Southern District of New York.  *See id.* at ¶¶ 84-85; Dkt. 87 at 1-2; *see generally United States v. Khaim*, No. 20-CR-580 (AMD) (E.D.N.Y.); *United States v. Khaimov*, 22-CR-20 (PGG) (S.D.N.Y.).   In this district, Mr. Khaim pleaded guilty on November 3, 2022, to conspiracy to commit money

---

[1]  Page citations are to ECF-stamped pages unless otherwise noted.

laundering in violation of 18 U.S.C. §§ 1956(h) and 3551, *et seq.* *See generally* No. 20-CR-580; *id.*, Text Order dated Nov. 3, 2022. In the Southern District of New York, Mr. Khaim pleaded guilty to three charges of conspiracy involving bribery, health care fraud, and money laundering on November 15, 2023. *See generally* 22-CR-20; *id.*, Text Orders dated Nov. 15, 2023.

As part of the conditions of release for the case in this district, Mr. Khaim continuously wore an ankle monitor from December 21, 2020, to the date of his surrender on September 11, 2024. *See* Dkt. No. 87 at 1; *see also* No. 20-CR-580, Dkt. Nos. 9 (setting conditions for Mr. Khaim's release, which included location monitoring), 134. Mr. Khaim's sentence consists of 15 years' imprisonment for the three counts in the Southern District, and 97 months for the count in this Court—12 of which will run consecutively with the sentence imposed in the Southern District. *See* Nos. 20-CR-00580, 22-CR-00020. Although the case before this Court is closed, Mr. Khaim has appealed his case before the Southern District. *See* No. 20-cr-00020, Dkt. No. 520; *See generally* No. 20-cr-580.

### C.     Gilead's Discovery Requests to Mr. Khaim

In July of 2024, Gilead served discovery requests on Mr. Khaim. *See* Dkt. No. 139 at 6-26. Thereafter, Mr. Khaim responded to Gilead's discovery requests by, *inter alia*, "invok[ing] [his] fifth amendment privilege against self-incrimination." *See generally id.*

### D.     Gilead's Subpoena on BI

BI, a company based in Colorado, manufactured Mr. Khaim's ankle monitor and maintains the GPS data associated with said ankle monitor. Dkt. No. 87 at 1. On June 24, 2024, Gilead served BI "with a subpoena seeking, in sum and substance, production of [] GPS data to assist in Gilead's investigation into [Mr.] Khaim's counterfeiting of Gilead-branded medications." *Id.*; *see* Dkt. No. 88 at 4-11.

4

Gilead's subpoena consists of five requests for production concerning data associated with Mr. Khaim's ankle monitor, referenced as the "Device":

[1] All documents or other data reflecting data collected by, transmitted from, and/or recorded by the Device while assigned to Peter Khaim (also known as Peter Khaimov) . . . during the period of June 1, 2023, to the present.

[2] All documents or other data reflecting the location of the Device from June 1, 2023, to the present, including but not limited to any document or data that identifies the location of the Device by address, latitude and longitude, cell phone tower, GPS satellite, radio frequency or otherwise.

[3] All documents or other data reflecting the date(s) and time(s) that the Device was disconnected, powered off, or otherwise rendered unable to record or transmit location from June 1, 2023, to the present.

[4] All documents or other data reflecting the date(s) and time(s) that the Device was unlocked, removed, or otherwise separated from the person of Peter Khaim during the period of June 1, 2023, to the present.

[5] All documents or other data reflecting the date(s) and time(s) that the Device entered or left the range for which Peter Khaim was approved for movement from June 1, 2023, to the present.

Dkt. No. 88 at 8; *see also* Dkt. No. 87 at 2; Dkt. No. 106 at 13.

Gilead alleges that the conspiracy ring "began purchasing and selling Gilead medications at the latest in January 2024" (Dkt. No. 106 at 13), and that data from the prior six months is relevant for substantiating its claims in the underlying suit. *Id.*

## E.    Gilead's Motion

On July 24, 2024, Gilead filed its instant motion before the Court, seeking an order pursuant to Federal Rule of Civil Procedure 45 compelling BI to produce certain documents and information, as requested in Gilead's subpoena. *See generally* Dkt. Nos. 86-88, 106-107, 139. Gilead contends that the requested discovery will "show the extent to which [Mr.] Khaim visited the two current defendant pharmacies with which he claims to have no involvement, as well as any other pharmacies of which Gilead is not aware that may also be involved in Khaim's current

counterfeiting scheme." Dkt. No. 87 at 2; *see also* Dkt. No. 106 at 12-14; Dkt. No. 139 at 1. "In sum, Gilead needs the subpoenaed information not only to prove that [Mr.] Khaim personally visited 71st Rx and Best Scripts, the two pharmacies that are already defendants in this case, but also to identify additional pharmacies that are likely continuing to endanger the public by selling counterfeit versions of Gilead's life-saving HIV medications." Dkt. No. 139 at 1.

In support of its motion, Gilead argues that Mr. Khaim has no standing to challenge the subpoena for relevance, undue burden, and invasion of his privacy rights. Dkt. No. 106 at 5-6, 7-9; Dkt. No. 139 at 3-5. Gilead further claims that BI's production of the requested data cannot violate Mr. Khaim's Fifth Amendment or privacy rights, and that "the scales tip decisively in favor of production." Dkt. No. 106 at 6-14.

Although Gilead notes that "BI has authorized Gilead to state that BI does not oppose [its Motion]" (Dkt. No. 87 at 2; *see also* Dkt. No. 88 at ¶ 2), BI requested that Gilead first obtain an order from the Court authorizing the release of the data at issue. Dkt. No. 87 at 2; Dkt. No. 139 at 1. Moreover, Gilead states that "BI has, through its in-house counsel, consented to this motion to compel being heard before this Court." Dkt. No. 87 at 2; *see also* Dkt. No. 88 at ¶ 3; Dkt. No. 139 at 1.

Gilead also contacted the Pre-Trial Services Agency for the Eastern District of New York ("Pre-Trial Services")[2] in relation to its motion. Dkt. No. 87 at 2; Dkt. No. 139 at 1. Gilead states

---

[2] Pre-Trial Services is tasked with, *inter alia*:

> collect[ing], verify[ing] and report[ing] to the judicial officer, prior to the pretrial release hearing, information pertaining to the pre-trial release of each individual charged with an offense, including information relating to any danger that the release of such person may pose to any other person or the community, and recommend appropriate release conditions for such individual.

Pretrial Services Act of 1982, Pub. L. No. 97-267, 96 Stat. 1136; *see also* U.S. Pretrial Servs. Agency, E.D.N.Y., https://www.nyept.uscourts.gov (last visited Nov. 5, 2024).

that Pre-Trial Services has "requested that Gilead obtain an order from this Court authorizing the release of the Khaim-related data, given that Khaim's criminal case was before this Court." Dkt. No. 87 at 2.

### F.      Mr. Khaim's Motion

Mr. Khaim opposes Gilead's Motion and cross-moves to quash the subpoena. *See generally* Dkt. Nos. 100-1; 118; 142.  In Mr. Khaim's Motion, Mr. Khaim argues that he has standing to quash the subpoena due to his privacy interests; the Court can modify or quash the subpoena on its own; compulsion of the data would violate his Fifth Amendment right against self-incrimination and invade his right to privacy; and Gilead's request is not proportional to the needs of the case because it would be cumulative, not relevant to Gilead's instant claims in conflation with *Gilead I* (Dkt. No. 128 at 42), and overbroad.  Dkt. No. 100-1 at 13-19.  Mr. Khaim requests that the Court quash the subpoena under Federal Rules of Civil Procedure 26 or 45.  Dkt. No. 100-1 at 6, 10-16; Dkt. No. 118 at 5-6, 11-14.

### G.      The Court Addresses Gilead's Motion and Mr. Khaim's Motion

On September 12, 2024, the Court held an initial conference, where both Gilead and Mr. Khaim appeared.  Text Order dated Sept. 12, 2024; *see generally* Dkt. No. 128.  After discussing the two motions (*see* Dkt. No. 128 at 31-47), the Court ordered the parties to confer further to attempt a possible resolution; in the event that no resolution could be achieved, the parties were permitted to file supplemental briefing outlining their respective requests and objections.  *Id.*

On October 7, 2024, after Gilead indicated it would "submit further briefing in support of its motion to compel" (Dkt. No. 135), the Court allowed Mr. Khaim to respond to any Gilead submission by October 18, 2024.  Text Order dated Oct. 7, 2024.  On October 11, 2024, and

October 18, 2024, respectively, Gilead[3] and Mr. Khaim filed their supplemental letters in support of their motions. *See generally* Dkt. No. 139; Dkt. No. 142. In its letter, Gilead expressed willingness to reduce the requested GPS data to the range of "January 8 to August 21, 2024." Dkt. No. 139 at 5.

## II.    Discussion

### A.    Mr. Khaim's Standing to Assert Objections to Gilead's Subpoena to BI

As an initial matter, Gilead asserts that Mr. Khaim lacks standing to object to its subpoena because it was served on BI, requiring no production by Mr. Khaim. *See* Dkt. No. 106 at 1-2, 3-5. Mr. Khaim responds that his "real interest" in the requested information confers standing to object to the subpoena (Dkt. No. 100-1 at 10-11), and further that the Court has independent discretion to quash production of the data on relevancy and proportionality grounds. Dkt. No. 118 at 1.

In general, only the recipient of a subpoena may move to quash on the grounds of relevancy and undue burden. *See Silverstone Holding Grp., LLC v. Zhongtie Dacheng (Zhuhai) Inv. Mgmt. Co.*, 650 F. Supp. 3d 199, 202 (S.D.N.Y. 2023) (finding that non-recipient of a subpoena could not challenge the subpoena for relevancy or undue burden); *Hughes v. Twenty-First Century Fox, Inc.*, 327 F.R.D. 55, 57 (S.D.N.Y. 2018) ("Parties generally do not have standing to object to subpoenas issued to non-party witnesses"); *Malibu Media, LLC v. Doe*, No. 15-CV-3147 (AJN), 2016 WL

---

[3] Pursuant to the Court's October 7, 2024, Order (Text Order dated Oct. 7, 2024), Gilead disclosed numerous individuals associated with BI and Pre-Trial Services with whom it discussed its Motion. Dkt. No. 139 at 1. "Gilead states that its counsel spoke with [a] Supervising Pretrial Services Officer at the EDNY Pre-Trial Services Office, and with Anthony Shelton, Corporate Counsel and Chief Privacy Officer of BI's parent company, GEO Group Inc." (Dkt. No. 139 at 1), in addition to "Farieza Juman, an in-house paralegal at BI and GEO Group who acted as a point of contact and conveyed information to and from the company's counsel" earlier in the litigation. *Id.* at 1 n.1.

5478433, at *3 (S.D.N.Y. Sept. 29, 2016) (stating that party could not challenge subpoena to non-party on grounds of undue burden).

A party may nonetheless object to a subpoena issued to a non-party if the objecting party claims some personal right, real interest in, or privilege concerning the documents at issue. *See Est. of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009); *Silverstone Holding Group*, 650 F. Supp. 3d at 202 (allowing party to object to third party subpoena that sought information "from or about" the objecting party); *Hughes*, 327 F.R.D. at 57 (explaining that a party may challenge a subpoena issued to a non-party seeking information related to personal rights or privacy privileges).

Here, Mr. Khaim's real interest in the data subject to Gilead's subpoena is sufficient to confer standing to object to the request. *See* Dkt. No 100-1 at 6, 8-9; Dkt. No. 118 at 4-6. Although the subpoena is directed at BI, a non-party to the action, the requested information pertains to Mr. Khaim's personal and private details, consisting of hundreds of thousands of minutes of his exact location as tracked and maintained by BI. Allowing Mr. Khaim to proceed with his objection due to the personal and private nature of the data is consistent with law in this circuit. *See Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, No. 12-CV-6383 (JFB) (AKT), 2017 WL 1133349, at *5 (E.D.N.Y. Mar. 24, 2017) ("Examples of such personal rights or privileges include the personal privacy right and privilege with respect to the information contained in [ ] psychiatric and mental health records, claims of attorney-client privilege, and other privacy interests, including those relating to salary information and personnel records"); *see also Hughes*, 327 F.R.D. at 57 (finding subpoena issued to non-party seeking information on the plaintiff's sexual history conferred standing in the interest of privacy to object to subpoena); *Allstate Ins. Co. v. All Cnty., LLC*, No. 19-CV-7121 (WFK) (SJB), 2020 WL 5668956, at *2 (E.D.N.Y. Sept. 22, 2020) (stating

that the private nature of party's financial records was sufficient to challenge subpoena seeking those records from non-party); *Equinox Gallery Ltd. v. Dorfman*, No. 17-CV-0230 (GBD) (DF), 2018 WL 637764, at *1 n.1 (S.D.N.Y. Jan. 22, 2018) (same).

But even if Mr. Khaim has no standing, "the Court certainly does," given that, "[i]n cases where the party lacks standing to challenge a subpoena served on a non-party, the Court may nevertheless exercise its inherent authority to limit irrelevant or non-proportional discovery." *Hughes v. Hartford Life & Accident Ins. Co.*, 507 F. Supp. 3d 384, 405 (D. Conn. 2020). Indeed, "the question of standing is beside the point where the objection to the subpoena is on relevance or proportionality." *All Cnty.*, 2020 WL 5668956, at *2 (construing the defendant's motion to quash a subpoena on relevancy and proportionality grounds as a motion for a protective order pursuant to Rule 26(c)(1)). "The federal rules give district courts broad discretion to manage the manner in which discovery proceeds." *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003).

Moreover, the Court may issue a protective order if good cause exists, established through "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Ampong v. Costco Wholesale Corp.*, 550 F. Supp. 3d 136, 139 (S.D.N.Y. 2021). To "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," the Court can forbid the disclosure or discovery; forbid inquiry into certain matters or limit the scope of disclosure or discovery to certain matters; or specify the terms for disclosure or discovery. Fed. R. Civ. P. 26(c)(1); *Johannes v. Lasley*, No. 17-CV-3899 (CBA) (AYS), 2019 WL 1958310, at *3 (E.D.N.Y. May 2, 2019); *All Cnty.*, 2020 WL 5668956, at *1 ("A court may issue a protective order prohibiting discovery that exceeds [Rule 26(b)(1)'s] limits"). The Court possesses inherent authority to issue a protective order *sua sponte*, available if the record contains

"ample good cause therefor." *Smith v. Equifax Info. Servs., Inc.*, No. 3:04-CV-1660 (CFD) (TP), 2005 WL 2660381, at \*5 (D. Conn. Oct. 18, 2005); *see also Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 242-43 (S.D.N.Y. 2012) (issuing Rule 26(c) protective order *sua sponte* in the interest of privacy and to prevent embarrassment of individual defendants); *Strike 3 Holdings, LLC v. Doe*, No. 3:22-CV-301 (VLB), 2022 WL 1050341, at \*2 (D. Conn. Mar. 10, 2022) (outlining Rule 26(c)'s conferrals on district courts).

Thus, the Court—on its own under Rule 26(b), or for good cause shown under Rule 26(c)—may issue an order limiting or circumscribing discovery sought by Gilead that is out of scope the parameters set forth by the Rules. *See* Fed. R. Civ P. 26(b)-(c); *see also In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 69 ("Rule 26(b)(2) permits a district court to limit '[t]he frequency or extent of use of the discovery methods otherwise permitted under [the federal] rules' if it determines that (1) the discovery sought is unreasonably cumulative or duplicative, or more readily obtainable from another source; (2) the party seeking discovery already has had ample opportunity to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit" (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii))); *Roth v. Cnty. of Nassau*, No. 15-CV-6358 (LDW) (AYS), 2017 WL 75753, at \*3 (E.D.N.Y. Jan. 6, 2017) ("a court has discretion to circumscribe discovery even of relevant evidence by making any order which justice requires 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense'" (quoting Fed. R. Civ. P. 26(c)(1))); *Hartford Life & Accident Ins. Co.*, 507 F. Supp. 3d at 405.

The Court next turns to whether Gilead's discovery request complies with the Federal Rules of Civil Procedure.

B.       **Whether the Discovery Sought Complies with the Federal Rules**

1.       **Legal Standards**

a.       **Fed. R. Civ. P. 26**

Federal Rule of Civil Procedure 26(b)(1) permits parties to obtain nonprivileged information that it is relevant to "any party's claim or defense and is proportional to the needs of the case." *See* Fed. R. Civ. P. 26(b)(1); *see also Trooper 1 v. New York State Police*, No. 22-CV-893 (LDH) (TAM), 2024 WL 165159, at *4 (E.D.N.Y. Jan. 16, 2024) ("Federal Rule of Civil Procedure 26(b)(1), as amended on December 1, 2015, recognizes that '[i]nformation is discoverable . . . if it is relevant to any party's claim or defense and is proportional to the needs of the case'" (internal citations omitted)); *Johannes*, 2019 WL 1958310, at *3 ("In general, a party may obtain discovery of any non-privileged matter that is relevant to a claim or defense of any party and proportional to the needs of the case"). "Information is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 47 (E.D.N.Y. 2018) (citing *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016)). "Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." *New Falls Corp. v. Soni*, No. 16-CV-6805 (ADS) (AKT), 2020 WL 2836787, at *2 (E.D.N.Y. May 29, 2020).[4]

---

[4] At the September 12, 2024, conference, counsel for Gilead stated, "[T]his is discovery. *Discovery can be anything*." Dkt. No. 128 at 40 (emphasis added). Although perhaps a misstatement at the conference, discovery, of course, cannot be "anything" and Gilead's counsel appeared to immediately correct that assertion in his subsequent comments at the conference. *See id.* ("The parameters here[,] where you have an asserted privacy right, which is the only basis the defendant has to object, versus the relevance to the case, the need for this particular evidence in this case, and the proportionality to the case.").

Following its 2015 amendment, the proportionality requirement of Rule 26 "has taken on heightened significance in discovery." *Elisa W. ex rel. Barricelli v. City of New York*, No. 15-CIV-5273 (LTS) (HBP), 2018 WL 6695278, at *2 (S.D.N.Y. Dec. 20, 2018); *N. Shore-Long Island Jewish Health Sys.*, 325 F.R.D. at 47-48 ("Thus, Rule 26(b)(1), as amended, although not fundamentally different in scope from the previous version 'constitute[s] a reemphasis on the importance of proportionality in discovery but not a substantive change in the law'" (quoting *Vaigasi*, 2016 WL 616386, at *13)). Whether discovery is proportional to the needs of the case considers "the marginal utility of the discovery sought," *Soni*, 2020 WL 2836787, at *2, taking into consideration "the importance of the issues, the amount in controversy, the parties' resources and access to the information sought, and the importance of the information sought to the asserted claims or defenses." *In re Exactech Polyethylene Orthopedic Prod. Liab. Litig.*, No. 22-MD-3044 (NGG) (MMH), 2024 WL 4381076, at *3 (E.D.N.Y. Oct. 3, 2024). Proportionality and relevancy are assessed together, and "the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi*, 2016 WL 616386, at *14; *see also Soni*, 2020 WL 2836787, at *2.

Additionally, the Court is required to limit "the frequency or extent of discovery" under Rule 26(b)(2)(C) if it finds that the relevant discovery is "unreasonably cumulative or duplicative"; if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). "Although a 'party must be afforded a meaningful opportunity to establish the facts necessary to support his claim,' a 'district court has wide latitude to determine the scope of discovery.'" *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,

No. 14-MC-2548 (VEC), 2021 WL 2481835, at *2 (S.D.N.Y. June 17, 2021) (quoting *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)).

### b.    Fed. R. Civ. P. 45

Federal Rule of Civil Procedure 45 allows a party to serve a subpoena for production of documents on a non-party.  Fed. R. Civ. P. 45(a)(1).  Subpoenas served on non-parties are subject to the relevance and proportionality requirements of Rule 26(b)(1).  *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2018 WL 6712769, at *5 (S.D.N.Y. Nov. 30, 2018) (citations omitted) (explaining the relevance requirement of non-party subpoenas); *All Cnty.,* 2020 WL 5668956, at *2 (explaining the proportionality requirement of non-party subpoenas).  Rule 45 obligates the Court to modify or quash a subpoena that, *inter alia*, "requires disclosure of privileged or other protected information" or "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A).  "[T]he party issuing the subpoena bears the initial burden of demonstrating the relevance of the requested documents," and "the party seeking to quash the subpoena bears the burden of demonstrating that one of the grounds for quashing a subpoena applies."  *Malibu Media*, 2016 WL 5478433, at *2 (quotations and citations omitted).  "The decision to grant or deny a motion to compel 'lies within the sound discretion of the district court.'"  *In re Exactech*, 2024 WL 4381076, at *3 (quoting *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *4 (S.D.N.Y. Nov. 16, 2016)).

### 2.    The Relevance of the Requested Discovery

Here, the Court is doubtful that *all* of the GPS data sought from Mr. Khaim's ankle monitor—thousands of hours of data—is relevant to its underlying claims.  *See* Dkt. No. 87 at 2-5; Dkt. No. 106 at 10-11; *see also* Dkt. No. 1 at ¶¶ 12, 142-98.  The Court recognizes that information concerning all of Mr. Khaim's movements during the requested period could pertain

to his involvement and furtherance of the allegedly illicit counterfeiting operation and conspiracy, *see* Dkt. No. 1 at ¶¶ 12, 92-115, 142-98 (alleging that Mr. Khaim established and used the relevant defendant-pharmacies after issuance of the *Gilead I* injunction), as well as Mr. Khaim's denial of affiliation with certain Defendants. *See* Dkt. No. 101 at ¶ 20 ("[Mr. Khaim] denies the allegations . . . that Defendant is associated with Defendants 71st RX Inc., Best Scripts"); *see also AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 487 (S.D.N.Y. 2020) ("Under the Lanham Act, a plaintiff makes out a false designation of origin claim upon showing that the defendant 'attempt[ed] to sell its product with a false designation that suggests the product originated from the plaintiff'" (citations omitted)).

The scope of Gilead's request, however, will invariably produce scores of data not relevant to any aspect of Gilead's suit. The Court struggles to understand how geolocation data on Mr. Khaim's mundane, daily tasks and social engagements—which might potentially include Mr. Khaim's personal medical or psychiatric appointments, as well as his religious practices, care for family members, and grocery shopping—would further Gilead's pursuit of its trademark claims. Although access to Mr. Khaim's precise geolocation for every minute since June 1, 2023, has the potential to shed light upon his alleged connection to the counterfeiting ring and possibly reveal unidentified participants in the conspiracy, it undoubtedly will result in vastly more data that has little, if anything, to do with Gilead's claims. At bottom, Gilead "cannot simply engage in a 'fishing expedition' based on bare speculation that additional data might reveal something beneficial." *Loma Deli Grocery Corp. v. United States*, No. 20-CV-7236 (JPC), 2021 WL 4135216, at *12 (S.D.N.Y. Sept. 10, 2021).

Thus, Gilead has not shown that the enormous amount of data sought meets the standards of relevancy under Rule 26.

3.    **Whether the Requested Discovery is Proportionate to the Needs of the Case**

But even if the requested GPS data was deemed relevant, this Court finds that the request is not proportional to the needs of the case at hand.  Gilead does not seek GPS data from a specific date or time frame, but rather all data from Mr. Khaim's ankle monitor since June 1, 2023, through confinement, or, alternatively, "January 8 to August 21, 2024."  *See* Dkt. No. 106 at 13; Dkt. No. 139 at 5; *see also* Dkt. No. 88 at 8.  Although Gilead indicates that its "current evidence proves that [the alleged counterfeiting ring] began purchasing and selling Gilead medications at the latest in January 2024" (Dkt. No. 106 at 13), such a basis is insufficient to compel production to the requested degree when the purported connection to Mr. Khaim is conclusory and based off suspicions, as set forth in its motion papers.  *See id.* ("Gilead suspects that Khaim began building up his new counterfeiting ring shortly after he was enjoined in *Gilead I* in the Fall of 2021"); *id.* ("Khaim continues to sell dangerous counterfeit HIV medications at the expense of unwitting patients, all the while using a network of pharmacies and co-conspirators that Gilead has not yet fully identified").  The Court is not convinced that Gilead's representations illustrate that the subpoena "is judicious in scope" (*id.*), as it fails to explain in non-conclusory or speculative terms how the GPS data, depicting months' worth of Mr. Khaim's precise location at any given moment, falls within the limits of Rule 26.

According to Gilead, the scope of the data sought is appropriate because "Gilead's investigation is necessarily broad and includes unknown dates and unknown locations."  Dkt. No. 106 at 13 n.2 (citing *Alsaadi v. Saulsbury Indus., Inc.*, No. 2:23-CV-291 (KG) (KRS), 2024 WL 2132467, at *3 (D.N.M. May 13, 2024)).  But the uncertainty of any precise dates or locations of Mr. Khaim's suspected activity at issue (Dkt. No. 106 at 13), along with Gilead's aspirations of uncovering additional possible co-conspirators (*id.* at 10; Dkt. No. 87 at 4-5), suggests that its

16

request amounts to an impermissible fishing expedition. *See Walsh v. Top Notch Home Designs Corp.*, No. CV-200-5087 (GRB) (JMW), 2022 WL 3300190, at *6 (E.D.N.Y. Aug. 11, 2022) ("fishing expeditions are not allowed when premised on mere speculation of what may come up in production"), *appeal withdrawn*, No. 22-2609, 2022 WL 18277011 (2d Cir. Nov. 3, 2022); *Alvarado v. GC Dealer Servs. Inc.*, No. 18-CV-2915 (SJF) (SIL), 2018 WL 6322188, at *2 (E.D.N.Y. Dec. 3, 2018) ("Moreover, 'courts should not grant discovery requests based on pure speculation that amount to nothing more than a fishing expedition'" (quoting *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004))).

Gilead cites to the Expedited Discovery Order to support the wide range of data requested (Dkt. No. 106 at 13 (citing Dkt. No. 16)).  Gilead, however, makes no attempt to meaningfully constrict or otherwise tailor that time frame to specific days, let alone specific months, of Mr. Khaim's alleged counterfeiting activity.  Other courts have found similar requests—constrained to narrower periods of time—to be outside Rule 26's proportionality scope and limits.  *See, e.g.*, *Alsaadi*, 2024 WL 2132467, at *3 (rejecting subpoena for two months of a party's unfettered cell phone data because the party seeking the data failed to narrow or tailor the range); *Coleman v. Reed*, No. CIV-15-1014-M, 2016 WL 4523915, at *2 (W.D. Okla. Aug. 22, 2016) (finding subpoena to cellphone provider requesting three days of "Technical Records," "Network Information," and "Subscriber Information" concerning a party's cellphone use was overbroad and limiting production to one-hour); *Kizer v. Starr Indem. & Liab. Co.*, No. CIV-18-846-D, 2019 WL 2017556, at *3 (W.D. Okla. May 6, 2019) (reducing subpoena request for cellphone records to 24 hours because the initial request of three days was overbroad); *Parker v. Bill Melton Trucking, Inc.*, No. 3:15-CV-2528-G-BK, 2017 WL 6554139, at *5-*6 (N.D. Tex. Feb. 3, 2017) (reducing subpoena for all of a party's cellphone records from the requested one day time frame to one hour

before and after the events giving rise to the cause of action); *cf. Latimore ex rel. Estate of Latimore v. Campbell*, No. 1:23-CV-00349 (DDD) (KAS), 2024 WL 4471980, at *2 (D. Colo. May 29, 2024) (finding subpoena seeking all call, voice, and text information from a party's cellphone overbroad as drafted in part because it was "devoid of any reasonable temporal limitations" but remanding to parties to negotiate a protective order and temporal limitations due to the need and relevance of the information).

Gilead relies on the out-of-circuit decision *Arias v. DynCorp* in support of its motion.  Dkt. No. 139 at 4 (citing 856 F. Supp. 2d 46 (D.D.C. 2012)).  That case—involving an action brought by residents of Ecuador alleging that the defendant injured their farms when it aerial-sprayed pesticides on cocaine and heroin plantations in Colombia—is distinguishable.  856 F. Supp. 2d at 49.  In *Arias*, the district court's compulsion of the flight location records at issue was based on its potential to "corroborate or dispute accounts from the pilots or accounts from the victims or accounts from potential eyewitnesses about the spraying" alleged in the suit.  *Id.* at 50.  Here, Gilead does not represent that Mr. Khaim's GPS data will corroborate or dispute any information already presented by any individuals.  Nor has it explained whether the basis for its suspicions stems from knowledge provided by such individuals.

Accordingly, the Court finds that the discovery request here is not proportional to the needs of this case.

### 4.    Whether the Requested Discovery is Premature

But even if the request was relevant and was proportionate to the needs of the case, granting Gilead's Motion would be premature at this stage in the litigation.  In short, Gilead has not shown that the information requested cannot be obtained by other means.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) ("On motion or on its own, the court must limit the frequency or extent of

discovery . . . if it determines that: (i) the discovery sought . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive").

The Court recognizes Gilead's assertion that Mr. Khaim has "refused to participate in discovery" (Dkt. No. 106 at 12-13) and invoked the Fifth Amendment privilege both in *Gilead I* and in discovery responses in the instant case. *See* Dkt. No. 106 at 12-13; Dkt. No. 128 at 37, 43 47; Dkt. No. 139 at 2-3; Dkt. No. 139 at 9-12, 18, 25. Indeed, thus far, Mr. Khaim has repeatedly invoked the privilege in response to Gilead's first request for production of documents (Dkt. No. 139 at 7-12), second set of interrogatories (*id.* at 16-18), and second request for production of documents (*id.* at 23-25). Gilead argues that it is likely that Mr. Khaim will invoke the Fifth Amendment privilege at his deposition. *See* Dkt. No. 128 at 33 (indicating Gilead's belief that Mr. Khaim's cooperation with discovery requests was "not going to happen"); Dkt. No. 137 (suggesting that Gilead has not yet attempted to depose Mr. Khaim based on his past behavior); Dkt. No. 106 at 13 (citing Mr. Khaim's past evasiveness and non-cooperation as basis to grant the motion to compel); Dkt. No. 87 at 5) (same); Dkt. No. 139 at 2-3 (same).

Anticipation of Mr. Khaim's invocation of the Fifth Amendment, however, does not militate against Gilead first attempting to obtain relevant information by less intrusive means. Certain inquiries Gilead could make at Mr. Khaim's deposition could narrow the necessary scope of the terms and dates of the requested data.

But even apart from his deposition, Gilead appears to have other avenues to obtain the requested information. Counsel for Gilead explained at the September 12, 2024, hearing that it "want[s] [Mr. Khaim] to comply with the Court's order to unlock his phone." Dkt. No. 128 at 33. It is unclear to the Court why Gilead did not first move to compel enforcement of the Court's prior seizure order to unlock and obtain Mr. Khaim's cellphone (Dkt. No. 14 at 3-4) before making the

19

instant motion.  Doing so may have obviated the need for the current motion practice, as the information in Mr. Khaim's cellphone or electronic communications may have provided insights into what other pharmacies, if any, Mr. Khaim visited as part of the purported conspiracy.

Notwithstanding the above, the Court might consider entertaining another application by Gilead in the future if the progression of discovery necessitates the request.  Gilead should confirm whether BI can limit the scope of Mr. Khaim's location data to proximity of a particular place, especially pertaining to the two pharmacies with which Gilead believes Mr. Khaim to be involved. The Court would invite a future conference that includes representatives for BI to explain the feasibility of this option.

Moreover, and to resolve the issue of any Fifth Amendment privileges afforded to Mr. Khaim in preventing production of the documents, the Court will likely require additional briefing on the matter, including consultation from relevant federal prosecutor offices.  Such an option will be addressed by the Court at a later date as needed.

In sum, Gilead did not make all attempts to obtain the information by other means prior to engaging in the current motion practice.  *See Ampong*, 550 F. Supp. 3d at 138 n.1 ("under Rule 26, a court can order that discovery take place in a particular sequence"); *Rofail v. United States*, 227 F.R.D. 53, 54 (E.D.N.Y. 2005) ("District courts are given reasonable latitude and discretion to establish a priority or to fashion an appropriate sequence of the discovery to be performed in each case").

C.     **Privacy Interests**

Finally, even if Gilead's discovery request conformed with the scope and limitations of Rule 26, and even if Gilead's discovery request was not premature, the Court has serious concerns about whether the subpoenaed data intrudes on Mr. Khaim's privacy interests.  Mr. Khaim

contends that compulsion of the data would invade his reasonable expectations of privacy because any consent he gave to be tracked by the ankle monitor extended only to the Court (Pre-Trial Services), and further that that the data can only be used to gauge whether he violated his conditions of release. Dkt. No. 118 at 9; *see also* Dkt. No. 100-1 at 13-14; Dkt. No. 142 at 3-4.

Gilead claims maintains that Mr. Khaim's expectations of privacy are "severely diminished" such that Gilead's needs for the data outweigh any privacy interest he possesses. Dkt. No. 106 at 7-10; *see also* Dkt. No. 139 at 3. Gilead cites to cases that consider "the objecting party's 'privacy interests' against the opposing party's interest in receiving the subpoenaed information, including factors such as 'the relevance or probative value of the' information and whether that information 'is not otherwise readily available.'" Dkt. No. 106 at 9 (first citing *In re Rule 45 Subpoena Issued to JP Morgan Chase Bank, N.A.*, 319 F.R.D. 132, 134 (S.D.N.Y. 2016); then citing *Solow v. Conseco, Inc.*, No. 06-CIV-5988 (BSJ) (THK), 2008 WL 190340, at *4 (S.D.N.Y. Jan. 18, 2008); and then citing *Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, No. CV-12-6383 (JFB) (AKT), 2017 WL 1133349, at *11 (E.D.N.Y. Mar. 24, 2017)).

In *Carpenter v. United States*, the Supreme Court considered the privacy interests in one's cell phone location records that amounted to "a comprehensive chronicle of the user's past movements." 585 U.S. 296, 300, 310 (2018). There, the government obtained cell phone records from the defendant's wireless carriers to track and pinpoint his movements, resulting in, *inter alia*, six robbery convictions. *Id.* at 302-03. In finding the government's methods unconstitutional, the Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements." *Id.* at 310. The Court cautioned that historical cell-site records provide the possessor of the data "near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 311-12.

Discussing the relationship between privacy rights and data shared with others, the Supreme Court in *Carpenter* also factored the third-party doctrine into its decision. *Id.* at 308-10, 313-15. That doctrine stands for the notion that "'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'" *Id.* at 308 (quoting *Smith v. Maryland*, 442 U.S. 735, 743-744 (1979)). The Court reiterated that the government is "typically free to obtain [information shared with others] from the recipient" without triggering constitutional protections "even if the information is revealed on the assumption that it will be used only for a limited purpose." *Id.* In acknowledging such reduced protections under the doctrine, however, the Court rejected any inference that constitutional protections "fall[] out of the picture entirely." *Id.* at 314. The focal point of analysis is not "the act of sharing," but instead "'the nature of the particular documents sought' to determine whether 'there is a legitimate "expectation of privacy" concerning their contents.'" *Id.* (citations omitted). The Court explained that it "has in fact already shown a special solicitude for location information in the third-party context" in finding privacy interests in one's GPS location data. *Id.*

Both parties point to *Carpenter* to support their respective positions. Mr. Khaim argues that the "detailed chronicle of a person's physical presence compiled every day, every moment, over several years . . . implicates privacy concerns" as held in *Carpenter*, and that that data was created by a third party does not diminish the privacy interest of the individual subject to the monitoring. Dkt. No. 100-1 at 14; Dkt. No. 118 at 7. Gilead counters that unlike the *Carpenter*, ankle monitors are not "indispensable to participation in modern society" and that "submission to one (and thus location monitoring) as a condition of release is voluntary. Dkt. No. 106 at 8. Such consent precludes any "reasonable or legitimate" expectation of privacy in the data, according to Gilead. *Id.*

22

Here, the Court is doubtful that the scope of data, as requested by Gilead, does not impermissibly invade Mr. Khaim's constitutional privacy interests. *See, e.g.*, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 342 (4th Cir. 2021) (enjoining use of police department's aerial surveillance program in a § 1983 action by finding it "opens 'an intimate window' into a person's associations and activities, it violates the reasonable expectation of privacy individuals have in the whole of their movements); *Harper v. Rettig*, 675 F. Supp. 3d 190, 200 (D.N.H. 2023) (acknowledging and applying *Carpenter* in the civil context), *aff'd sub nom. Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024); *Sanchez v. Los Angeles Dep't of Transportation*, 39 F.4th 548, 555 (9th Cir. 2022) (same); *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189-90 (N.D. Cal. 2020) (same).

Allowing Gilead—a non-governmental entity bringing a civil lawsuit—to possess the data would bestow it with "near perfect surveillance" for months' of Mr. Khaim's life. *Carpenter*, 585 U.S. at 311-12. Although it is true that one "'has no legitimate expectations of privacy he voluntarily turns over to third parties,'" *see United States v. Brown*, 627 F. Supp. 3d 206, 221 (E.D.N.Y. 2022) (quoting *Smith*, 442 U.S. at 743-744), nothing suggests that the data an individual shares with the government can be then accessed by an unrelated private party upon request. Indeed, that this is a civil matter involving private parties cautions against application of a doctrine derived from criminal actions brought by the government.

Significantly, Gilead's briefing is devoid of citations to any authority where a court allowed data associated with a criminal defendant's ankle monitor to be turned over to a civil litigant. Allowing Gilead unfettered access to months' worth of Mr. Khaim's precise location data in pursuit of its trademark claims would expand the doctrine by a spacious margin.

In support of its request, Gilead likens its subpoena to methods it employed in *Gilead I*, explaining it "had great success identifying and shutting down members of the counterfeiting ring in *Gilead I* using electronic geolocation data," where it identified a defendant "by subpoenaing a phone company and tracing [the defendant's] movement by using the location data provided by his phone's 'pings' on local cell towers." Dkt. No. 87 at 5. The nature and the circumstances of that data in *Gilead I*, however, are different from Mr. Khaim's data here. Indeed, Gilead specifically explained that the data used in *Gilead I* was "*not* GPS data," but rather cell phone data, possessed by T-Mobile, providing "location information based on [the defendant's] phone's proximity to the cell towers." *See Gilead I*, No. 21-CV-4106, Dkt. No. 607, at 40 (emphasis in original). Thus, Gilead's prior use of a fundamentally different type of data, working off cellphone pings to nearby cell towers, is inapposite to its request for data associated with an ankle monitor equipped with continuous GPS tracking capabilities. *See Carpenter*, 585 U.S. at 311-12 (explaining that the government tracking cellphone data consisting of "nearly exactly the movements of its owner," it "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user"); *see also United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring) ("the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy").

Gilead further points to *United States v. Lambus* to support its position. Dkt. No. 106 at 7-10 (citing 897 F.3d 368 (2d Cir. 2018); *see also* Dkt. No. 139 at 3-4. There, the Second Circuit permitted state and federal law enforcement officers to use GPS data from the defendant-parolee's ankle monitor to investigate suspected drug-trafficking activity in violation of conditions of his release. *Lambus*, 897 F.3d at 412. Reversing the district court, the panel ruled that a parolee's GPS data can be used by law enforcement officers to investigate suspected criminal activity

violating parole so long as the GPS monitoring bears a "reasonable and rational relationship" to the officers' official duties and responsibilities. *Id.* at 412. The data at issue in *Lambus* was collected by law enforcement and used by law enforcement to investigate the parolee's suspected violations of his conditions of release—to which the Court explicitly acknowledged that he had consented as part of such conditions. *Id.* at 410.

But nothing in *Lambus* suggests that the data collected from a parolee's ankle monitor could be accessed and used by a third party—unrelated to the underlying criminal action and not a party to the parolee's release agreement—in a separate and distinct civil suit. Nothing here indicates that Mr. Khaim's consent extended to use of the data by anyone besides law enforcement entities for purposes other than the criminal matters for which the conditions were imposed. Gilead is not a law enforcement entity, and its instant suit is not furthering any criminal investigations of the already incarcerated Mr. Khaim. *See Lambus*, 897 F.3d at 312 ("we conclude that the GPS monitoring of Lambus throughout the investigation jointly led by BSS had a reasonable and rational relationship to Scanlon's *performance of his responsibilities as a State parole officer*" (emphasis added)). *Lambus* provides no basis to argue that Mr. Khaim waived his right to prevent any third-party from accessing that information for any purpose.

Gilead also appeals to the public interest as a weight in favor of disclosure of the data. *See* Dkt. No. 106 at 14; Dkt. No. 139 at 2. Gilead's argument, however, contains no supporting authority that there exists a public interest exception in the civil context that could abridge Mr. Khaim's constitutional rights to the extent sought here. Gilead's interest in the data cannot override the protections afforded by the Constitution. Accordingly, Gilead's subpoena must be quashed.

25

**III.** <u>**Conclusion**</u>

Accordingly, for the reasons set forth above, the Court **GRANTS** Mr. Khaim's Motion and

**DENIES** Gilead's Motion.

Dated:          Brooklyn, New York              **SO ORDERED.**
                November 5, 2024

                                             */s/ Joseph A. Marutollo*
                                         JOSEPH A. MARUTOLLO
                                         United States Magistrate Judge