# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                             :
GILEAD SCIENCES, INC., et al.,                               :    Case No. 24-cv-4259 (NCM) (JAM)
                                                             :
                           Plaintiffs,                       :    **HIGHLY CONFIDENTIAL**
                                                             :
v.                                                           :
                                                             :
PETER KHAIM, et al.,                                         :
                                                             :
                           Defendants.                       :
                                                             :
------------------------------------------------------------ x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR DEFAULT JUDGMENT**

**Highly Confidential**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 3

LEGAL STANDARD ....................................................................................................... 5

    A.    Liability and Causation ....................................................................... 5

    B.    Personal Jurisdiction .......................................................................... 6

    C.    Sufficiency of Pleadings ..................................................................... 6

    D.    Damages .............................................................................................. 7

ARGUMENT ..................................................................................................................... 9

II.    GILEAD IS ENTITLED TO A FINDING OF LIABILITY, INCLUDING WILLFUL
INFRINGEMENT ...................................................................................................... 9

III.    GILEAD IS ENTITLED TO RECOVER ITS ACTUAL DAMAGES ...................... 10

    A.    The Method and Calculation of Damages Are Not in Dispute ............ 11

        1.    Each Counterfeit Displaced the Sale of an Authentic Product ................ 12

        2.    Gilead's Per-Unit Lost Profits ................................................ 13

    B.    Individualized Evidence of Liability and Damages for Each Defaulted Defendant
Against Whom Gilead Seeks Its Actual Damages ............................... 16

        1.    Boris Aminov and Antonio Payano ....................................... 16

        2.    Rachel Aminov and Bless You Rx .......................................... 19

        3.    The Corvalan Defendants ...................................................... 20

        4.    Galaxy Rx ............................................................................. 21

IV.    GILEAD IS ENTITLED TO RECOVER THE PROFITS OF OHAR AND THE
AMINOV ENTITIES ............................................................................................... 22

    A.    Ivan Ohar ........................................................................................... 22

**Highly Confidential**

B.      The Aminov Entities ............................................................................ 23

V.     GILEAD IS ENTITLED TO MANDATORY TREBLE DAMAGES AND ATTORNEYS' FEES UNDER THE LANHAM ACT ..................................................... 25

VI.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST ................................. 26

A.      This Is an "Exceptional Case" that Warrants Prejudgment Interest ..................... 26

B.      The Applicable Rate and Compounding of Interest ............................................. 27

C.      The Date of Interest Accrual ................................................................................ 29

VII.   GILEAD IS ENTITLED TO A PERMANENT INJUNCTION AGAINST ALL DEFAULTED DEFENDANTS ........................................................................................ 30

CONCLUSION .......................................................................................................................... 32

**Highly Confidential**

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*4 Pillar Dynasty LLC v. New York & Co.*,
    933 F.3d 202 (2d Cir. 2019)................................................................26

*Abbott Lab'ys v. Adelphia Supply USA*,
    2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) .........................................10, 11, 12

*Abbott Lab'ys v. H&H Wholesale Servs., Inc*.,
    2022 WL 17977495 (E.D.N.Y. Dec. 28, 2022), *aff'd*, 2024 WL 4297472 (2d
    Cir. Sept. 26, 2024)................................................................................8, 13

*Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*,
    2011 U.S. Dist. LEXIS 111889 (E.D.N.Y. Aug. 31, 2011), *adopted*, 2011 U.S.
    Dist. LEXIS 106308 (E.D.N.Y. Sept. 21, 2011).........................................6, 10, 27

*BAC Local 2, Albany v. Moulton Masonry & Constr.*,
    779 F.3d 182 (2d Cir. 2015)................................................................5

*Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*,
    2016 WL 658310 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215
    (S.D.N.Y. Apr. 27, 2016)................................................................27, 28, 29

*Bus. Casual Holdings, LLC v. TV-Novosti*,
    No. 21CV2007JGKRWL, 2023 WL 1809707 (S.D.N.Y. Feb. 8, 2023), *report
    and recommendation adopted*, 2023 WL 4267590 (S.D.N.Y. June 28, 2023)..............29, 30

*Cartwright v. Lodge*,
    2017 U.S. Dist. LEXIS 48052 (S.D.N.Y. Mar. 30, 2017) ..............................7

*Choi v. 37 Parsons Realty LLC*,
    642 F. Supp. 3d 329 (E.D.N.Y. 2022) ................................................5, 6, 7

*Contemp. Mission, Inc. v. Famous Music Corp.*,
    557 F.2d 918 (2d Cir. 1977)................................................................8

*Delchi Carrier SpA v. Rotorex Corp.*,
    71 F.3d 1024 (2d Cir. 1995)................................................................14

*Dish Network, LLC v. Saddiqi*,
    2019 WL 5781945 (S.D.N.Y. Nov. 6, 2019) ..........................................24

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)................................................................31

**Highly Confidential**

*Flanagan v. Odessy Constr. Corp.*,
   2018 WL 1179889 (E.D.N.Y. Feb. 9, 2018), *adopted*, 2018 WL 1175164
   (E.D.N.Y. Mar. 6, 2018) ................................................................................................29

*Fustok v. Conticommodity Servs., Inc.*,
   873 F.2d 38 (2d Cir. 1989).............................................................................................7

*General Elec. Co. v. Speicher*,
   877 F.2d 531 (7th Cir. 1989) ........................................................................................11

*Genesee Brewing Co. v. Stroh Brewing Co.*,
   124 F.3d 137 (2d Cir.1997)...........................................................................................31

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.*,
   471 F.3d 1264 (Fed. Cir. 2006).....................................................................................11

*Gomez v. El Rancho de Andres Carne de Tres Inc.*,
   2014 U.S. Dist. LEXIS 45580 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 U.S.
   Dist. LEXIS 43988 (E.D.N.Y. Mar. 31, 2014) ..........................................................5, 7

*Gomez v. El Rancho de Andres Carne de Tres, Inc.*,
   2014 WL 1310296 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 WL 1310299
   (E.D.N.Y. Mar. 31, 2014) ..............................................................................................30

*Gov't Emples. Ins. Co. v. Sannit-Thomas*,
   2015 U.S. Dist. LEXIS 135117 (E.D.N.Y. Sept. 4, 2015)............................................16

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
   973 F.2d 155 (2d Cir. 1992)..............................................................................5, 12, 15

*GTFM, Inc. v. Solid Clothing, Inc.*,
   2002 WL 31886349 (S.D.N.Y. Dec. 26, 2002) .......................................................27, 28

*Gutierrez v. Taxi Club Mgmt.*,
   2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018), *adopted*, 2018 U.S.
   Dist. LEXIS 118262 (E.D.N.Y. July 16, 2018) ..............................................................7

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
   955 F.2d 1143 (7th Cir. 1992) .......................................................................................10

*Harris v. Fairweather*,
   2012 U.S. Dist. LEXIS 128409 (S.D.N.Y. Sept. 10, 2012), *adopted*, 2012 U.S.
   Dist. LEXIS 151696 (S.D.N.Y. Oct. 19, 2012) .............................................................11

*Hilton v. Int'l Perfume Palace, Inc.*,
   2013 WL 5676582 (E.D.N.Y. Oct. 17, 2013)..............................................................8, 22

**Highly Confidential**

*Hudson Furniture, Inc. v. Mizrahi*,
    2024 WL 565095 (S.D.N.Y. Feb. 7, 2024), *adopted*, 2025 WL 1453584
    (S.D.N.Y. May 21, 2025)............................................................................28, 29

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
    176 F. Supp. 3d 137 (E.D.N.Y. 2016) ....................................................10, 12, 22

*Int'l Consulting Servs. v. Cheap Tickets, Inc.*,
    2007 U.S. Dist. LEXIS 71689 (E.D.N.Y Sep. 12, 2007).....................................27

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
    80 F.3d 749 (2d Cir. 1996)...................................................................................11

*Intel Corp. v. Terabyte Int'l*,
    6 F.3d 614 (9th Cir. 1993) ......................................................................................8

*KAWS v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, &*
    *Unincorporated Associations Identified on Schedule A Hereto*,
    2023 WL 1438637 (S.D.N.Y. Feb. 1, 2023) ..........................................................6

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009) .................................................................25

*Kotuwage v. NSS Petroleum, Inc.*,
    2018 U.S. Dist. LEXIS 21917 (E.D.N.Y. Feb. 8, 2018), *adopted sub nom.*,
    *Kotuwage v. Bilt Petroleum, Inc.*, 2019 U.S. Dist. LEXIS 50498 (E.D.N.Y.
    Mar. 25, 2019)......................................................................................................16

*Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*,
    2013 WL 5977440 (S.D.N.Y. Nov. 12, 2013), *report and recommendation*
    *adopted*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014).......................................31, 32

*Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*,
    534 F.2d 422 (2d Cir. 1975)................................................................................28

*Manzo v. Sovereign Motor Cars, Ltd.*,
    2010 WL 1930237 (E.D.N.Y. May 11, 2010), *aff'd*, 419 Fed. Appx. 102 (2d
    Cir, 2011) .............................................................................................................29

*Melodrama Publ'g, LLC v. Santiago*,
    2015 WL 2380521 (S.D.N.Y. May 19, 2015), *adopted*, 2015 WL 7288639
    (S.D.N.Y. Nov. 16, 2015) .....................................................................................28

*Merck Eprova AG v. Brookstone Pharms., LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013)..................................................................27

*Merck Eprova AG v. Gnosis*,
    901 F. Supp. 2d 436 (S.D.N.Y. 2012)..................................................................28

**Highly Confidential**

*Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*,
    2006 WL 5804603 (S.D.N.Y. Dec. 11, 2006), *adopted*, 2007 WL 656274
    (S.D.N.Y. Feb. 23, 2007) .................................................................................27, 29

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010) ....................................................................32

*Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*,
    2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. Aug. 29, 2012), *adopted*, 2012 U.S.
    Dist. LEXIS 178195 (E.D.N.Y Dec.17, 2012) .................................................26, 27

*Perez v. Progenics Pharms., Inc.*,
    204 F. Supp. 3d 528 (S.D.N.Y. 2016) .....................................................................28

*Philip Morris USA, Inc. v. Shalabi*,
    352 F. Supp. 2d 1067 (C.D. Cal. 2004) ...................................................................10

*Ramada Inns, Inc. v. Gadsden Motel Co.*,
    804 F.2d 1562 (11th Cir. 1986) ................................................................................8

*Rouse v. Broadway & Cooper LLC*,
    753 F. Supp. 3d 153 (E.D.N.Y. 2024) ......................................................................6

*Santillan v. Henao*,
    822 F. Supp. 2d 284 (E.D.N.Y. 2011) ......................................................................6

*Sara Lee Corp. v. Bags of N.Y., Inc.*,
    36 F. Supp. 2d 161 (S.D.N.Y. 1999).........................................................................8

*Saulpaugh v. Monroe Cmty. Hosp.*,
    4 F.3d 134 (2d Cir. 1993) ..................................................................................28, 29

*Schalaudek v. Chateau 20th St. LLC*,
    2017 U.S. Dist. LEXIS 26272 (S.D.N.Y. Feb. 24, 2017), *adopted*, 2017 U.S.
    Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017)........................................................5, 7

*Sexy Hair Concepts, LLC v. Sexy Hair, Inc.*,
    2013 WL 5460629 (E.D.N.Y. Sept. 30, 2013) ........................................................31

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004).......................................................................................10

*Taubman Co. v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ...................................................................................10

*TigerCandy Arts, Inc. v. Blairson Corp.*,
    2012 WL 760168 (S.D.N.Y. Feb. 23, 2012), *adopted*, 2012 WL 1948816
    (S.D.N.Y. May 30, 2012)..........................................................................................28

**Highly Confidential**

*Trans World Airlines, Inc. v. Hughe*s,
   449 F.2d 51 (2d Cir. 1971) *rev'd on other grounds*, *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973) .................................................................6

*Wilson v. Great Am. Indus., Inc.*,
   763 F. Supp. 688 (N.D.N.Y. 1991), *aff'd in part, rev'd in part*, 979 F.2d 924 (2d Cir. 1992) .................................................................28

## Statutes

15 U.S.C. § 1114(a) .................................................................25

15 U.S.C. §1116(a) .................................................................31

15 U.S.C. § 1117(a) .................................................................10, 22, 26

15 U.S.C. § 1117(b) .................................................................25, 26, 28, 32

26 U.S.C. § 6621(a)(2) .................................................................28

26 U.S.C. § 6622 .................................................................29

28 U.S.C. § 1961(a) .................................................................28

Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq*. .................................................................3

## Other Authorities

Fed. R. Civ. P. 55(b)(2) .................................................................7

*McCarthy on Trademarks and Unfair Competition* § 30:75 (5th ed.) .................................................................12

N.Y. C.P.L.R. § 5001 .................................................................31

N.Y. C.P.L.R. § 5004 .................................................................29

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (collectively, "Gilead") respectfully submit this brief in support of their claimed damages against defaulted defendants Ivan Ohar; Boris Aminov; Antonio Payano; Rachel Aminov; Bless You Rx Inc.; the "Corvalan Defendants" (Christy Corvalan; Island Pharmacy & Discount Corp.; David Fernandez; Dezyre Baez; and Crystal Medina); Galaxy Rx Inc.; and the "Aminov Entities" (Dynamic Pharmaceuticals Supply, Inc.; Dynamic Pharmaceutical Suply Inc.; Northwest Pharmaceutical & Medical Supply Inc.; J&M Medical Supply Inc.; JFK Wholesale and Retail Medical Supply Corp.; Merric Billing Inc.; New Line of Pharmaceutical, Inc.; Onliner Marketing Corp.; Park Avenue Pharmaceutical Corp.; Pharmaceutical Way, Inc.; Foster Media Group, Inc.; Foster Media Pharmaceutical Supply Corp.; Y&S Statistic Medical Supply Inc.; Y&S Statistic Medical Supply Inc.; and Pure Gear Consulting, Inc.) (collectively, the "Defaulted Defendants").[1]

## PRELIMINARY STATEMENT

Gilead moves for default judgment on its Lanham Act claims against the Defaulted Defendants, all of whom conspired to traffic counterfeit versions of Gilead's life-saving medications. As set forth in Gilead's Complaint, these defendants preyed on vulnerable patients by buying already-dispensed bottles of Gilead-branded HIV medication off the street and processing them into counterfeits, including by filling the bottles with the wrong medication and applying a fake foil seal to make them seem unopened, and by creating counterfeit pedigrees with false chains of sale. This Court has already issued preliminary injunctions against each of the Defendants, finding that Gilead was likely to succeed on the merits of its claims against each.

---

[1] A similar motion is being filed in the related action captioned *Gilead Sciences, Inc., et al. v. Safe Chain Solutions, LLC, et al.*, 21-cv-4106 (AMD) (JAM) (E.D.N.Y.) ("*Gilead I*"). Given the overlapping conduct and relevant legal principles, the two motions are substantially similar but submitted in full to present a complete record.

**Highly Confidential**

Although Gilead's evidence of the Defaulted Defendants' liability is substantial and uncontroverted, by virtue of their default the allegations against each of them are deemed admitted. The only question for this Court at this stage is the quantum of damages.

Gilead's damages award against the Defaulted defendants has four components. First, Gilead seeks actual damages based on each Defaulted Defendants' role in the scheme and the resulting financial harm to Gilead. Second, Gilead seeks a mandatory award of trebled damages under the Lanham Act. Third, Gilead seeks a mandatory award of its attorneys' fees, again under the Lanham Act. Fourth, Gilead seeks an award of prejudgment interest on its actual damages.

On a motion for default judgment, Gilead is entitled to all factual inferences being resolved in its favor. Gilead's actual-damages methodology and calculations are straightforward and are set out in the opinion of its damages expert, Dr. Gregory Bell. As Dr. Bell explains, the counterfeits were disguised as authentic Gilead-branded medicines and were dispensed to U.S. patients holding a prescription that could only lawfully be filled by authentic, name-brand Gilead medicine. Thus, each counterfeit sold displaced the sale of an equivalent authentic bottle of Gilead-branded medicine. Gilead's per-bottle actual damages are therefore the wholesale price it would have received for the displaced sale of an authentic bottle of Gilead-branded medication, minus the incremental costs of producing that bottle. And although Gilead needs only to calculate its damages with "reasonable probability," Gilead seeks in this motion a very conservative estimate of its losses, and seeks default judgments that substantially understate Gilead's actual damages.

The Defaulted Defendants' counterfeiting scheme stands apart from the reported Lanham Act caselaw. This is not a case about fake designer handbags or bootleg T-shirts. The Defaulted Defendants conspired to enrich themselves and endanger patients by passing off counterfeit Gilead-branded medications as authentic life-saving drugs. The human cost of their scheme is

**Highly Confidential**

horrific: every counterfeit bottle they sold represents a patient who was deprived of his or her prescribed HIV medication. The Defaulted Defendants are presumed as a matter of law to have acted knowingly and willfully by virtue of their decision not to answer Gilead's complaint or otherwise participate in this litigation. The Court should award treble damages, attorneys' fees, and pre-judgment interest. The Defaulted Defendants' conduct deserves to be condemned to the fullest extent of the law, to serve as an important deterrent to them and to others who seek to line their own pockets by endangering patients and populations dealing with serious disease

## BACKGROUND

Gilead develops and markets lifesaving medications, including medications for HIV, which have transformed care for people living with serious diseases. ECF No. 1 at ¶¶ 58-59. In connection with the sale of its medications, Gilead owns and uses a number of well-established and famous registered trademarks that appear on its genuine medications, as well as distinctive packaging to distinguish its medications in the marketplace. *Id.* ¶ 70; *see also* ECF No. 1-4 (listing trademarks).

Federal law (specifically, the Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq.*) requires that each Gilead medication be accompanied by a pedigree — a document tracking every sale of the physical bottle from seller to seller, all the way back to the manufacturer. ECF No. 1 ¶ 80. The pedigree is part of the product that Gilead sells. *Id.* These pedigrees are an important anti-counterfeiting and quality-control measure. *Id.* ¶ 81. For the distributors, pharmacies, and patients that buy Gilead's HIV and other medications, authentic pedigrees that accurately disclose the original sale of the product are an important feature of Gilead's products that guarantee the medications' authenticity and safety. *Id.* Gilead's authentic pedigrees use Gilead's registered trademarks to identify the medication, the origin of the bottle, and the authorized distribution channel in which it was sold. *Id.* ¶ 83.

**Highly Confidential**

Defendants knowingly and willfully conspired to manufacture, sell, market, and distribute counterfeit prescription Gilead medications. *Id.* ¶¶ 1-11. Defendants' counterfeiting scheme relied on passing off their counterfeits as authentic Gilead-branded medications to unsuspecting patients, who were prescribed these medications to treat potentially life-threatening health concerns. Specifically, Defendants conspired to purchase and re-use once-authentic Gilead medication packaging to manufacture counterfeits, dispense them to patients, or sell them online to other pharmacies. *Id.*

The Defaulted Defendants purchased HIV medication from vulnerable populations on the street, such as unhoused individuals and/or drug users, for cash. *Id.* ¶¶ 7, 11, 22, 78, 108-09, 118, 121, 129. They then stripped the bottles of their required pharmacy-generated patient labeling and often attached counterfeit labelling. *Id.* ¶¶ 7, 78, 111, 125, 136. The Defaulted Defendants then sold the counterfeits to other pharmacies or dispensed them to patients. *Id.* ¶¶ 7, 11. In some cases, the Defaulted Defendants dispensed a bottle of Gilead-branded HIV medication with the wrong pills inside. *Id.* ¶ 135. In others, Gilead has confirmed that the Defaulted Defendants replaced the tamper-proof foil seal of a bottle to disguise that it had already been opened, then sold the bottle with a fake purchase record to pass it off as legitimate. *Id.* ¶¶ 76, 113.

The Defaulted Defendants did not provide or obtain legitimate pedigrees for the black-market medication in which they transacted, as required by law. *Id.* ¶ 82. Instead, the Defaulted Defendants obtained bottles of Gilead-branded medicine off the street — or purchased the bottles from others who did so — and either dispensed them directly to patients or sold them to other pharmacies to be dispensed to patients, with fake pedigrees or no pedigrees at all. *Id.* ¶¶ 7, 11, 92-115 (Ohar), 116-141 (remaining Defaulted Defendants); *see also* Decl. of Timothy Waters dated

**Highly Confidential**

August 1, 2025 ("Waters Decl.") Ex. 1.[2]  These false pedigrees, which made unauthorized use of Gilead's registered trademarks, were intended to trick customers into believing the medication originated from Gilead and was distributed through legitimate channels, when in fact it was purchased from a patient off the street.  *Id.* ¶¶ 82-83, 226-227, 232-233.

## LEGAL STANDARD

On a motion for default judgment, the plaintiff has a duty to establish the defaulted parties' liability when all the factual allegations are complaint are taken as true, as well as sufficient evidence to establish the amount of damages.  *See generally BAC Local 2, Albany v. Moulton Masonry & Constr.*, 779 F.3d 182, 187-190 (2d Cir. 2015).  The legal standards for such a finding of liability and damages are set forth below.

### A.    Liability and Causation

The Clerk of the Court has entered notations of default against all of the Defaulted Defendants.  ECF No. 131.  When a defendant is held in default, all well-pleaded allegations in the operative pleadings, and all reasonable inferences that can be drawn therefrom, are deemed admitted, other than allegations of the quantum of damages.  *See, e.g.*, *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992); *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 U.S. Dist. LEXIS 45580, at *4 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 U.S. Dist. LEXIS 43988 (E.D.N.Y. Mar. 31, 2014); *Schalaudek v. Chateau 20th St. LLC*, 2017 U.S. Dist. LEXIS 26272, at *6-7 (S.D.N.Y. Feb. 24, 2017), *adopted*, 2017 U.S. Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017).  While, as discussed below, the plaintiff must demonstrate the quantum of damages, the fact that the defendants' actions caused the plaintiff to suffer damages is admitted.

---

[2] While not critical to decide this motion, the Court may consider evidence outside the pleadings on a motion for default judgment.  *See Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 337 (E.D.N.Y. 2022) ("I see no reason why such affidavits should not be considered on a motion for a default judgment.").

Highly Confidential

*Santillan v. Henao*, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011) (citation omitted) (at default judgment, plaintiff is entitled to finding that "that damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged." (citation omitted)); *see also Trans World Airlines, Inc. v. Hughe*s, 449 F.2d 51, 70 (2d Cir. 1971) (holding plaintiff did not have the burden to show any violation of the law or causation, but just "the extent of the injury caused [plaintiff], in dollars and cents.") *rev'd on other grounds*, *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973). In a Lanham Act case, when a defendant defaults, the defendant's acts of infringement are deemed to be willful as a matter of law. *Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*, 2011 U.S. Dist. LEXIS 111889, at *21-22 (E.D.N.Y. Aug. 31, 2011) (collecting cases holding defendants deemed willful infringers by virtue of their default), *adopted*, 2011 U.S. Dist. LEXIS 106308 (E.D.N.Y. Sept. 21, 2011).

## B.    Personal Jurisdiction

Gilead's well-pled allegations must also be accepted as true for purposes of establishing personal jurisdiction over each Defaulted Defendant. *KAWS v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, 2023 WL 1438637, at *2 (S.D.N.Y. Feb. 1, 2023). Here, each of the Defaulted Defendants is a New York resident and subject to this Court's general jurisdiction. ECF No. 1 ¶¶ 16-57; *see also, e.g.*, *Rouse v. Broadway & Cooper LLC*, 753 F. Supp. 3d 153, 167 (E.D.N.Y. 2024).

## C.    Sufficiency of Pleadings

On a motion for default judgment, district courts have discretion whether to *sua sponte* review the pleadings for sufficiency before proceeding to a damages inquest. *Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 335-36 (E.D.N.Y. 2022). "Although the Court of Appeals has

**Highly Confidential**

not defined the parameters for the exercise of that discretion," district courts "apply the same standard that applies to a court's determination of whether to dismiss a complaint *sua sponte* at the outset of a case." *Id.*; *see also id.* at 336-338 (finding it "inappropriate [for the court] . . . to take on the role of counsel for a defendant when the defendant itself has chosen not to appear," but that default judgment may be denied where the "complaint is frivolous, or if it is plainly barred by judicial immunity or some other preclusive doctrine").

###    D.    Damages

To determine damages against defaulted defendants, the Court must conduct an inquest. Fed. R. Civ. P. 55(b)(2). At the Court's discretion, the inquest can take the form of an evidentiary hearing or submissions based on affidavits and documents. *See Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). It is especially appropriate for the damages inquest to be done on the paper record, without an evidentiary hearing, where the Court is already familiar with the facts. *Id.*

The burden of proof at the damages inquest is significantly lower than at a jury trial. At an inquest, Gilead's burden is to establish only a "reasonable basis" for its damages. *See Gomez*, 2014 U.S. Dist. LEXIS 45580, at *4; *Cartwright v. Lodge*, 2017 U.S. Dist. LEXIS 48052, at *12 (S.D.N.Y. Mar. 30, 2017) (in case of default, plaintiff must provide "some reasonable basis to quantify" damages); *Gutierrez v. Taxi Club Mgmt.*, 2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018), at *7 ("In the damages phase, the court must ensure that there is a reasonable basis for the damages requested in a default judgment motion."), *adopted*, 2018 U.S. Dist. LEXIS 118262 (E.D.N.Y. July 16, 2018).

Importantly, at the inquest, all reasonable inferences from the facts concerning damages must be drawn in Gilead's favor. *See Gomez* 2014 U.S. Dist. LEXIS 45580, at *4; *Schalaudek*, 2017 U.S. Dist. LEXIS 26272, at *6 ("[P]laintiffs are entitled to all reasonable inferences from the

**Highly Confidential**

evidence presented in support of their damages claims" at a damages inquest); *Gutierrez*, 2018 U.S. Dist. LEXIS 106808 at *7 ("In the damages phase [of a default judgment] … [t]he moving party is entitled to all reasonable inferences from the evidence it offers.").

In a Lanham Act case, the plaintiff's low burden for proving damages at inquest is coupled with the Lanham Act's already plaintiff-friendly standards for proving the amount of damages. Under the Lanham Act, once the fact (as opposed to the amount) of damages is established — as it is here as a matter of law due to the defendants' default — "a mark holder is held to a lower standard in proving the exact amount of actual damages." *Abbott Lab'ys v. H&H Wholesale Servs., Inc.*, 2022 WL 17977495, at *3 (E.D.N.Y. Dec. 28, 2022), *aff'd*, 2024 WL 4297472 (2d Cir. Sept. 26, 2024).  Under that relaxed standard, "courts may entertain some degree of speculation in computing the amount of damages, particularly where the inability to compute them is attributable to the defendant's wrongdoing."  *Id.*; *see also Hilton v. Int'l Perfume Palace, Inc.*, 2013 WL 5676582, at *7 (E.D.N.Y. Oct. 17, 2013); *see also Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) ("[W]hen the existence of damage is certain, ... the burden of uncertainty as to the amount of damage is upon the wrongdoer.") (citations omitted); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("[A] plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation."); *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 621 (9th Cir. 1993) (holding actual damages may be proved using methods that are "somewhat crude," as long as they are "n[ot] ... fanciful."); *Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F. Supp. 2d 161, 169 (S.D.N.Y. 1999) ("[I]n determining infringement damages, courts are to resolve against the defendants any factual uncertainties … when the defendants left the uncertainty by not responding to the evidence of [infringing] sales with evidence of their own." (citation omitted)).

**Highly Confidential**

## ARGUMENT

Although Gilead would be entitled to a finding of liability as to all of its claims, for purposes of default judgment, Gilead chooses to rely solely on its Lanham Act claims.

The argument section of this brief is divided into three parts. First, Gilead addresses its Lanham Act claims against the Defaulted Defendants, including the legal standard, proof of liability, calculation and defendant-by-defendant proof of damages, and entitlement to treble damages (Sections I-IV). Second, Gilead discusses its entitlement to pre-judgment interest (Section V). Third and finally, Gilead sets forth the bases for ordering permanent injunctive relief (Section VI).

## II.   GILEAD IS ENTITLED TO A FINDING OF LIABILITY, INCLUDING WILLFUL INFRINGEMENT

With the allegations of the Complaint admitted and all inferences drawn in Gilead's favor, the liability of each of the Defaulted Defendants under the Lanham Act is not in dispute. Indeed, the Court has already found Gilead's Lanham Act claims valid and likely to succeed against all of the Defaulted Defendants in issuing preliminary injunctions and asset freezes against them.

Gilead sets forth in Section II.B, *infra*, the individualized allegations and evidence against each Defaulted Defendant, including proof of their counterfeit sales. But more generally, each of the Defaulted Defendants is alleged to have sold counterfeit Gilead-branded medications bearing multiple counterfeit Gilead Marks.[3]  ECF No. 1 ¶¶ 70, 82-83. Every one of these counterfeits was sold accompanied by a fake pedigree, bearing unauthorized replicas of Gilead Marks, that bore a fake chain of custody that falsely claimed to trace the bottle back to an original sale by Gilead. *Id.* ¶¶ 7, 76, 82, 86. Moreover, Gilead has alleged that the Gilead-branded medicines sold by the

---

[3] The Gilead Marks are trademarks owned by Gilead, as set forth in Exhibit A to the Complaint.

**Highly Confidential**

Defaulted Defendants had multiple other counterfeit elements: bottles with the wrong pills inside; bottles with counterfeit reproductions of Gilead's Patient Information documents (which also bear the Gilead Marks) adhered to them; bottles with replica seals to make them appear unopened; and bottles with counterfeit labels. *Id.* ¶¶ 7, 76, 78-79, 113-114, 135.  The sale of these counterfeits is a *per se* violation of Gilead's trademark rights under the Lanham Act.  *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act."); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003); *Philip Morris USA, Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2004).  And in addition to the corporations that made the counterfeit sales, each of the individual Defaulted Defendants is personally liable, on a joint and several liability basis, with their respective companies as an moving, active, conscious force behind the infringement.  *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 155 (E.D.N.Y. 2016); *Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 5696148, at *16 (E.D.N.Y. Sept. 30, 2019).

Finally, Gilead reiterates that each of the Defaulted Defendants is deemed to be willful as a matter of law by virtue of their default.  *E.g.*, *Aw Indus.*, 2011 U.S. Dist. LEXIS 111889, at *21-22.  The Court should therefore find that each of the Defaulted Defendants is liable for willful counterfeiting under the Lanham Act.

## III.    GILEAD IS ENTITLED TO RECOVER ITS ACTUAL DAMAGES

For each Defaulted Defendant, the Lanham Act entitles Gilead to elect, at any time prior to the entry of judgment, to recover either (1) its actual damages suffered as a result of the Defaulted Defendant's infringing conduct or (2) the Defaulted Defendant's profits.  15 U.S.C. § 1117(a).  Here, Gilead seeks to recover its actual damages against all of the Defaulted Defendants except Ivan Ohar and the Aminov Entities.

**Highly Confidential**

Actual damages under the Lanham Act are defined as "lost sales or revenue" (as well as other expenditures such as corrective advertising not at issue here). *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) (citation omitted); *see also Harris v. Fairweather*, 2012 U.S. Dist. LEXIS 128409, at \*17-18 (S.D.N.Y. Sept. 10, 2012) (collecting cases), *adopted*, 2012 U.S. Dist. LEXIS 151696 (S.D.N.Y. Oct. 19, 2012). Where a plaintiff elects to seek its actual damages (as opposed to the defendant's profits or statutory damages), a full damages award is mandatory: the Lanham Act provides no discretion for a downward adjustment. *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006) (while "[a] district court ha[s] discretion under § 1117" to award less than the defendant's full profits, "§ 1117 does not allow for a downward adjustment of actual [i.e., lost revenue] damages"); *see also General Elec. Co. v. Speicher*, 877 F.2d 531, 535-36 (7th Cir. 1989); *McCarthy on Trademarks and Unfair Competition* § 30:75 (5th ed.) ("There is no equitable basis to refuse the recovery of actual losses ….").

## A.    The Method and Calculation of Damages Are Not in Dispute

As set forth in Dr. Gregory Bell's expert report, dated May 14, 2024, Gilead's damages are straightforward and easily calculated. Dr. Bell is a seasoned and well-respected damages expert who holds an M.B.A. and a Ph.D. in business economics, both from Harvard University, and is a Group Vice President at Charles River Associates, an economics and management consulting firm. Waters Decl. Ex. 2 ("Bell Report") at 12; *see also Abbott Lab'ys*, 2019 WL 5696148, at \*47 ("Dr. Bell's expert opinions have been relied on by other courts in this Circuit."). Dr. Bell's report is completely unrebutted: no Defendant in this case, defaulted or otherwise, submitted a rebuttal expert report, and no Defendant chose to depose Dr. Bell.

**Highly Confidential**

### 1. Each Counterfeit Displaced the Sale of an Authentic Product

As Dr. Bell explains in his report, each counterfeit Gilead-branded medication sold in U.S. commerce represents a lost sale of a unit of the equivalent authentic Gilead-branded medicine. Bell Rpt. ¶¶ 7-8. The counterfeits were disguised as authentic Gilead-branded medicines and were used to fill the prescriptions of unwitting U.S. patients. *Id.* ¶¶ 7, 17-22. Those patients – also victims of Defendants' counterfeiting scheme – believed they were receiving the *only* thing that could lawfully fill their prescription: the authentic Gilead-branded medicine their doctor prescribed. *Id.* Each counterfeit medication sold represents a patient who came to the pharmacy seeking to purchase Gilead's legitimate medications, and instead was given a potentially dangerous counterfeit. *Id.* Thus, each patient who received a counterfeit would have, but for the counterfeiting, received authentic Gilead-branded medicine, and that authentic medicine would necessarily have been sold by Gilead. *Id.* ¶ 7; *see also, e.g.*, ECF No. 1 ¶¶ 6, 8, 11, 22, 24, 25, 73, 120, 123, 125, 133, 138, 140 (alleging that defendants sold counterfeits to be dispensed to unwitting patients).

In short, the unique nature of this counterfeiting case, involving counterfeit brand-name prescription drugs sold in place of authentic drugs, leaves no doubt that each counterfeit caused Gilead to lose the sale of an equivalent authentic product. But as noted above, on a motion for default judgment, Gilead's allegations regarding causation of damages must be assumed to be truthful, and all inferences from those allegations drawn in Gilead's favor. *E.g.*, *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158. And Gilead's burden of proof of causation under the Lanham Act is low to begin with: "[A] plaintiff need not present absolute proof that purchasers of the infringing product would have bought [plaintiff's] product instead. Rather, plaintiff's burden of proof is one of reasonable probability." *Innovation Ventures*, 176 F. Supp. 3d at 162 (citation omitted)). In short, there can be no question that Gilead is entitled on this motion to a finding that

12

**Highly Confidential**

each counterfeit product displaced the sale of an authentic product, on a one-for-one basis.  *See Abbott Lab'ys,* 2022 WL 17977495, at *6-*7.

### 2.    Gilead's Per-Unit Lost Profits

Because each counterfeit sold caused Gilead to lose the sale of an authentic product, Gilead's actual damages – i.e., its lost profits – are the wholesale price Gilead would have received for the equivalent authentic medicine, minus the incremental costs of manufacturing that authentic medicine.

These calculations are not complex.  Gilead's per-unit profits are the wholesale price that Gilead receives when it sells the medicine in U.S. commerce, minus the incremental cost of manufacturing that unit of medicine.  Dr. Bells' calculations of both elements — price received and incremental cost incurred — are based on undisputed evidence and highly conservative assumptions that understate Gilead's damages.

### a.    Gilead's Per-Unit Income

In the United States, Gilead sells its medicines to all of its authorized wholesalers at the same set price: the wholesale acquisition cost (also known as "WAC").  Bell Rpt. ¶ 14; Waters Decl. Ex. 3 ¶ 13, Ex. 4 ¶ 3. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

**Highly Confidential**

####    b.    Gilead's Per-Unit COGS

Dr. Bell is also extremely conservative in deducting Gilead's per-unit manufacturing costs, also known as costs of goods sold or COGS.  Gilead publicly reports its global COGS, as a percentage of net sales, in its annual Form 10-K financial statements.  *See* Bell Rpt. ¶ 27 (citing Gilead Form 2021 10-K at 58); Waters Decl. Ex. 9 ¶ 3; Waters Decl. Exs. 10-13 (Gilead's Form 10-K statements for damages period).  That publicly reported COGS figure is calculated across all of Gilead's products globally — not just the U.S.  Bell Rpt. ¶¶ 25-26; Waters Decl. Ex. 9 ¶ 3.  Gilead's Vice President of Finance has reviewed the Gilead COGS reported in its Form 10-K annual reports, as well as data concerning COGS for the U.S. Gilead-branded medicines at issue in this suit.  Waters Decl. Ex. 9 ¶ 4.  Mr. Jorden has confirmed that for each product at issue for the 2017-2022 damages period, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ [4]

---

[4] In addition to COGS, Gilead sometimes incurs an additional cost when its medicines are sold into the United States: if a patients' health insurer pays for the medicine, Gilead typically pays a contractually set rebate to that insurance company.  *See* Bell Rpt. ¶¶ 25-26.  However, that rebate is immaterial to Gilead's damages calculations, because Gilead pays that same rebate regardless of whether the bottle is authentic or counterfeit.  *Id.*

Insurance companies do not knowingly pay for counterfeit medications.  *Id.*  If a counterfeit is sold through the patient's insurance, that means the counterfeit was disguised as an authentic bottle of Gilead-branded medicine and processed by the insurance company as though it were authentic, and so Gilead paid the contractual rebate on that medicine.  *Id.*  Because Gilead paid rebates on the counterfeit sold through insurance, and but for the counterfeiting would have paid those same rebates on authentic medicines, those rebates are not a variable cost and have no effect on Gilead's damages.  *Id.*; *see Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1029-30 (2d Cir. 1995) ("[C]ourts generally do not include fixed costs in the

**Highly Confidential**

In sum, as set forth in Dr. Bell's unrebutted report and supported by undisputed evidence, the highly conservative estimate of Gilead's actual damages for each counterfeit sold in U.S. commerce is: that product's WAC price (███████████████████████████████), minus Gilead's COGS for the product, as reported in Gilead's public 10-K reports (████ ████████████████████████████████████).

      c.   <u>The Undisputed Evidence of Defendants' Sales of Counterfeit Gilead-Branded Medicines</u>

By virtue of their default, the Defaulted Defendants are deemed to have admitted that every bottle of Gilead-branded medicine they trafficked is a counterfeit bearing one or more of the counterfeit features detailed in Gilead's pleadings: wrong pills inside the bottle, counterfeit reproductions of patient information documents, counterfeit labels, and/or counterfeit pedigrees. *See* ECF No. 1 ¶¶ 7, 76, 78-79, 113-114, 135; *see, e.g., Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158.

In calculating each Defaulted Defendants' damages, Dr. Bell relies on the undisputed evidence of each Defendants' trafficking of these counterfeit Gilead-branded medicines. Dr. Bell's report includes spreadsheets that set forth the details of every infringing bottle. *Id.* ¶ 28, Exs. C-1, E, E-1–E-7. The Defaulted Defendants did not produce documents concerning their counterfeit sales, and so Dr. Bell's spreadsheets were compiled from multiple sources. First, Dr. Bell relied on a compilation of business records produced by online pharmacy-to-pharmacy platforms showing purchases and sales of Gilead-branded products by the Defaulted Defendants on those platforms. Bell Rpt. ¶ 12; *see also* Waters Decl. Exs. 14-17 (records produced by third-

---

calculation of lost profits. This is, of course, because the fixed costs would have been encountered whether or not the breach occurred.... [T]he district court was correct to use the standard formula employed by most American courts and to deduct only variable costs from sales revenue to arrive at a figure for lost profits." (citation omitted)).

**Highly Confidential**

party platforms).  Second, Dr. Bell relied on a compilation of data sent to Gilead by the Centers

for Medicare & Medicaid Services ("CMS") in connection with CMS seeking rebates from Gilead

for the dispensation of Gilead-branded drugs to CMS patients.  Bell Rpt. ¶ 12.  The CMS data at

issue shows dispensations made by the Defaulting Defendants and their co-conspirators to CMS

patients of Gilead-branded medications.  *Id.*; *id.* Ex. C.[5]

## B. Individualized Evidence of Liability and Damages for Each Defaulted Defendant Against Whom Gilead Seeks Its Actual Damages

### 1. Boris Aminov and Antonio Payano

Boris Aminov and Antonio Payano were at the top of the counterfeiting conspiracy at issue

in this litigation, and are jointly and severally liable for selling thousands of bottles of counterfeit

Gilead-branded medications.  They were both criminally indicted for their roles in this

counterfeiting conspiracy, and both pled guilty.  Waters Decl. Exs. 1, 22 at 1, 23 at 1.

"[F]rom at least 2020 to 2023, Defendant Boris Aminov led a conspiracy to distribute more

than ten million dollars' worth of black-market [Gilead-branded] HIV medication, acquired off the

street from low-income individuals and re-sold as counterfeits."  ECF No. 1 ¶ 118; *see also* Waters

Decl. Ex. 18 (government's sentencing memorandum).  Together with his co-conspirators, Boris

---

[5] Some of the non-defaulted Defendants who purchased counterfeits from Defaulted Defendants, then dispensed them to CMS patients, have settled with Gilead.  For several reasons — including that Gilead settled numerous claims, including those giving rise to damages well beyond Gilead's actual damages — the Defaulted Defendants would not be entitled, under any circumstances, to set off any portion of its liability against the settlement payments Gilead has received.  But the Court need not reach the issue, because by virtue of their default, the Defaulted Defendants have waived any right to seek or receive any such set-offs. *Gov't Emples. Ins. Co. v. Sannit-Thomas*, 2015 U.S. Dist. LEXIS 135117, at *30 (E.D.N.Y. Sept. 4, 2015) (collecting cases and holding "a defendant in default may not invoke the benefits of the set-off rule." (internal quotation marks omitted)).  And even if they had not waived their right to seek a set-off (which they have), the Defaulted Defendants have made no effort to meet their burden of establishing their right to a set-off.  *Id.*; *see also Kotuwage v. NSS Petroleum, Inc.*, 2018 U.S. Dist. LEXIS 21917, at *30 (E.D.N.Y. Feb. 8, 2018) ("When a non-settling defendant seeks a set-off, the burden rests squarely upon [defendant] to show the extent to which a recovery against it would be duplicative of [a plaintiff's] recovery from settling defendants." (alterations in original) (internal quotation marks omitted)), *adopted sub nom.*, *Kotuwage v. Bilt Petroleum, Inc.*, 2019 U.S. Dist. LEXIS 50498 (E.D.N.Y. Mar. 25, 2019).

**Highly Confidential**

Aminov procured black-market Gilead-branded HIV medications from patients off the street. ECF No. 1 ¶¶ 121-122. "After acquiring these bottles and processing them into counterfeits, Defendant Boris Aminov" then sold those counterfeit Gilead-branded medications to pharmacies, where they were dispensed to unwitting patients. *Id.* ¶ 123.

Specifically, as alleged in the Complaint, Boris Aminov supplied counterfeits to Laconia Avenue Pharmacy ("Laconia Pharmacy"), Island Pharmacy & Discount Corp. ("Island Pharmacy"), Galaxy Rx Inc. ("Galaxy Rx"), and now-settled defendant River Chemists Corp. ("River Chemists"), all of whom dispensed those counterfeits to unwitting patients. *Id.* ¶ 131. Boris Aminov also conspired with his mother, Rachel Aminov, to dispense counterfeit Gilead-branded HIV medication to unsuspecting patients through Bless You Rx, a pharmacy owned by Rachel Aminov. *Id.* ¶¶ 24, 120. Moreover, Gilead learned through third-party discovery that one of Aminov's customers, settled defendant Roman Shamalov (principal of defendant River Chemists), also operated another pharmacy through which he sold counterfeits purchased from Aminov: Chemistry Bench Inc. ("Chemistry Bench"). *See* Waters Decl. Ex. 17 (indicating Shamalov as the operator of Chemistry Bench); *see also id.* Ex. 19 (requesting restitution for sales through Chemistry Bench); *id.* Ex. 20 (granting restitution for sales through Chemistry Bench). Judge Vyskosil of the United States District Court for the Southern District of New York sentenced Boris Aminov to 108 months of incarceration for his admitted role in the conspiracy. *Id.* Ex. 22 at 2.

For his part, Antonio Payano conspired with Aminov and "purchased already-dispensed bottles of HIV medication from patients off the street and processed those bottles into counterfeits by altering the bottles," and then "sold the counterfeit HIV medication that he helped source and manufacture to New York City pharmacies." ECF No. 1 ¶¶ 42, 129-130. Payano was informed

**Highly Confidential**

of the harm he was causing to patients from whom he was purchasing Gilead-branded HIV medicine from the street: one such patient texted him, asking: 'why am I risking my life for such little $.'" *Id.* ¶ 129.

In connection with his guilty plea, Payano admitted to joining a conspiracy "to divert and redistribute black market HIV medications," and that his co-conspirators were "Christy Corvalan [principal of Island Pharmacy and Laconia Island Pharmacy], Irina Polvanova [principal of Galaxy Rx], Roman Shamalov [principal of Chemistry Bench and River Chemists], and others." Waters Decl. Ex. 21 at 1. During his plea allocution, Payano admitted that he "joined a conspiracy to commit healthcare fraud." Waters Decl. Ex. 24 at 34:9-19. Payano "made street purchases of prescription medications, including HIV medications, from illegal sources at below wholesale prices and resold them to a pharmacy for a profit." *Id.* He "knew that these pharmacies, in turn, would dispense the medication to customers and then bill the Medicaid or Medicare at full pricing." *Id.* Payano was "also was aware that buying HIV medication from HIV patients meant that they wouldn't have their medicine they had been prescribed to take" and that "what he was doing was illegal." *Id.* Judge Vyskosil sentenced Payano to 68 months of incarceration for his admitted role in the conspiracy. *Id.* Ex. 23 at 2.

As a victim of the conspiracy, Gilead sought a criminal restitution award against Payano.[6] As part of its motion for a criminal restitution award, Gilead presented in essence the same evidence of damages as presented here and in Dr. Bell's expert report. *Id.* Ex. 19 at 19-28. Judge Vyskosil ordered Payano to pay, jointly and severally with his co-conspirators, $16,063,045.07 in restitution to Gilead. *Id.* Ex. 23 at 6.

---

[6] Gilead did not seek a criminal restitution award against Boris Aminov as the result of timing: Boris Aminov was the first of the co-conspirators to plead guilty in the criminal case, and he was sentenced before Gilead filed the instant action.

**Highly Confidential**

Because Boris Aminov and Payno did not produce their sales records, Gilead calculates the actual damages caused by Boris Aminov and Payano's infringement based on the sales of counterfeit Gilead-branded medications made by their pharmacy customers. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by those pharmacy customers of Boris Aminov and Payano as follows:

| Pharmacy | Bottles Sold | Resulting Actual Damages |
|---|---|---|
| Bless You Rx Inc. | 1,038 | $2,529,188 |
| Island Pharmacy | 2,916 | $6,920,737 |
| Laconia Pharmacy | 264 | $642,694 |
| Galaxy Rx | 970 | $2,617,141 |
| Chemistry Bench | 1,259 | $3,126,625 |
| River Chemists (a/k/a DJ Drugs)[7] | 109 (80 + 29) | $245,040 ($190,161 + $54,879) |
| **Total** | **6,556** | **$16,081,425** |

Bell Report Exs. E & F. Thus, Boris Aminov and Payano's infringing sales caused Gilead a total of $16,081,425 in actual damages (before trebling).[8]

### 2.    Rachel Aminov and Bless You Rx

Rachel Aminov is Boris Aminov's mother and the owner and principal of Bless You Rx, a retail pharmacy in Queens that dispensed counterfeit Gilead medications to patients. ECF No. 1 ¶¶ 24-25, 120. As the owner of Bless You Rx, Rachel Aminov managed, supervised and personally participated in the trafficking of counterfeit Gilead HIV medications. *Id.* ¶ 25. Rachel

---

[7] Dr. Bell separated sales between River Chemists and D J Drugs. These are the same entity. Waters Decl. Ex. 25.

[8] Gilead notes that this calculation of $16,081,425 in actual damages (before trebling) is nearly identical to the calculation of damages caused by Payano's manufacture and sale of black-market Gilead-branded medicines as reflected in the restitution award issued by Judge Vyskosil. Waters Decl. Ex. 23 at 6; *id.* Ex. 19 at 9-10, 22-24.

**Highly Confidential**

Aminov conspired with Boris Aminov, her son, to use Bless You Rx to dispense counterfeit Gilead-branded HIV medication to unsuspecting patients. *Id.* ¶¶ 24, 120.

The record shows that Bless You Rx sold 1,038 counterfeit Gilead-branded medicines. As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Bless You Rx's sale of infringing products (before trebling) to be $2,529,188. Bell Rpt. at 59.

### 3. The Corvalan Defendants

Christy Corvalan is the principal of record of Defaulted Defendant Island Pharmacy, and the off-the-books principal of Laconia Pharmacy, a defaulted defendant in *Gilead I*; Corvalan controlled and operated both entities. ECF No. 1 ¶¶ 43-44. Fernandez, Baez, and Medina employees of Corvalan, and co-conspirators in the trafficking of counterfeit Gilead medications through Island Pharmacy and Laconia Pharmacy. *Id.* ¶¶ 45-47, 133-39. Corvalan, Fernandez, Baez, and Medina all supervised and personally participated in those pharmacies' trafficking of counterfeit Gilead medications. *Id.* ¶¶ 43-47, 133-39.

All of the Corvalan Defendants were indicted, along with Aminov, for their role in the counterfeiting conspiracy at the heart of this case. *Id.* ¶¶ 4, 11, 117. Christy Corvalan pled guilty to conspiracy to commit healthcare fraud and expressly admitted to buying and dispensing counterfeit HIV medications. Waters Decl. Ex. 26 at 30:25-31:6, 35:9-39:4, 39:13-41:25. On December 2, 2024, Judge Vykosil sentenced Corvalan to 108 months imprisonment for her role in the counterfeiting scheme. Waters Decl. Ex. 27 at 2. The criminal case against Fernandez, Biaz, and Medina is ongoing.

As a victim of the conspiracy, Gilead sought a criminal restitution award against Corvalan. *See* Waters Decl. Ex. 19. As part of its motion for a criminal restitution award, Gilead presented in essence the same evidence of damages as presented here and in Dr. Bell's expert report. *Id.* at

**Highly Confidential**

19-20.  Judge Vyskosil ordered Corvalan to pay, jointly and severally with her co-conspirators, $7,646,289.95 in restitution to Gilead.  *Id.* Ex. 28 at 6.

The record shows that Island Pharmacy sold 2,916 bottles of Gilead-branded medicine, and Laconia Avenue Pharmacy sold 264 bottles of Gilead-branded medicine.  *See* Bell Rpt., Exs. E, E-5, E-6.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Island Pharmacy's sale of infringing products to be $6,920,737, and the actual damages caused by Laconia Pharmacy's sale of infringing products to be $642,694.  Thus, in total, the actual damages (before trebling) caused by the Corvalan Defendants is $7,563,431.[9]  *Id.* Exs. F, F-5, F-6.

### 4.    Galaxy Rx

Galaxy Rx is a single-location pharmacy in Queens.  ECF No. 1 ¶ 48.  Now-settled Defendant Irina Polvanova served as its president.  *Id.* ¶ 49.  Polvanova used Galaxy Rx to purchase and sell counterfeit Gilead-branded medications.  *Id.*  Galaxy Rx knowingly purchased counterfeits from Boris Aminov and then dispensed them to patients or resold them online.  *Id.* ¶¶ 140-141.  For her conduct through Galaxy Rx, Polvanova was convicted of conspiracy to commit healthcare fraud.  Waters Decl. Ex. 29.

The record shows that Galaxy Rx sold 970 bottles of Gilead-branded medicine.  As set forth in Dr. Bell's report, and using the methodology, conservative assumptions, and calculations described above, Dr. Bell calculates the actual damages caused by Galaxy Rx's sale of infringing products (before trebling) to be $2,617,141.  Bell Rpt. Exs. F, F-4.

---

[9] Gilead notes that this calculation of $7,563,431 in actual damages (before trebling) is nearly identical to the calculation of damages caused by Corvalan's manufacture and sale of black-market Gilead-branded medicines as reflected in the restitution award issued by Judge Vyskosil.

**Highly Confidential**

## IV.    GILEAD IS ENTITLED TO RECOVER THE PROFITS OF OHAR AND THE AMINOV ENTITIES

As noted above, Gilead is entitled to choose to recover, in lieu of Gilead's actual damages, any Defaulted Defendant's profits from their sale of infringing products. 15 U.S.C. § 1117(a); *see, e.g., Innovation Ventures*, 176 F. Supp. 3d at 158-59 (discussing choice of damages). Here, Gilead elects to recover the profits of Defaulted Defendants whose actual damages were not calculated in the Bell Report: Ivan Ohar and the Aminov Entities.

Section 1117(a) provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Because none of the Defaulted Defendants has participated in the litigation or attempted to prove any element of cost or deduction, Gilead is entitled to recover the entirety of the Defaulted Defendants' income from the sale of the infringing products. *See Hilton v. Int'l Perfume Palace, Inc.*, 2013 WL 5676582, at *6 (E.D.N.Y. Oct. 17, 2013) ("If costs are to be deducted from the sales in order to arrive at a net figure, the defendant must prove all elements of cost or deduction claimed. Thus, a plaintiff is entitled to recover a defaulting defendant's proven gross revenue with no reductions for expenses." (cleaned up)).

### A.    Ivan Ohar

Ohar is the principal of Best Scripts LLC ("Best Scripts"), a now-settled pharmacy defendant in Queens. ECF No. 1 ¶ 19. Ohar worked with now-settled defendant Peter Khaim to operate Best Scripts. *Id.* ¶ 20. Ohar and Khaim have deep ties, including Ohar acting as the organizer and sole member of two other businesses run from Khaim-controlled commercial properties. *Id.* ¶ 100. Ohar supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead medications through Best Scripts. *Id.* ¶¶ 19, 108; *see also, e.g.*, Waters Decl. Exs. 30 at 1, 31 (Ohar signing on behalf of Best Scripts to change pharmacists). As Best Scripts'

Highly Confidential

principal, Ohar "personally financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise his authority to stop it." ECF No. 1 ¶ 19; *see also, e.g.*, Waters Decl. Exs. 32 at 3, 33 at 6 (showing counterfeiting funds paid to "Ivan" via check, signed by Ohar).

In March 2024, Gilead received a verification request from an online pharmacy-to-pharmacy platform called MatchRx related to a sale by Best Scripts of a bottle purporting to be the Gilead-branded medicine BIKTARVY®. ECF No. 1 ¶¶ 103-104. Gilead investigated the bottle sold by Best Scripts, determined it was a counterfeit with a fake seal to make it appear unopened, and that it had been fraudulently sold with documentation falsely claiming to trace the bottle back to a legitimate distributor. *Id.* ¶¶ 105-113.

Gilead submits with this motion records obtained from three online platforms through which Best Scripts sold counterfeit Gilead-branded medications: MatchRx, Rxeed, and RxWorld. Waters Decl. Exs. 14-16. The below chart summarizes this data.

| Medication | Bottles | Total Proceeds of Sales |
|---|---|---|
| Biktarvy® | 73 | $217,556.88 |
| Descovy® | 41 | $63,570.25 |
| Epclusa® | 3 | $59,500.00 |
| Genvoya® | 6 | $17,705.00 |
| Odefsey® | 7 | $18,755.00 |
| Sovaldi® | 1 | $6,000.00 |
| Truvada® | 2 | $2,405.00 |
| Vosevi® | 1 | $13,000.00 |
| **Total** | **134** | **$398,492.13** |

Because Ohar has failed to prove any element of cost or other deduction from his net proceeds from the sale of infringing Gilead-branded medicines, Gilead is entitled to recover as profits the full net revenue of those sales: $398,492.13 (before trebling).

## B.    The Aminov Entities

The Aminov Entities are "a network of shell companies" created by Boris Aminov to "facilitate the sale of the counterfeits and to hide and launder the illicit proceeds of their

**Highly Confidential**

counterfeiting scheme." ECF No. 1 ¶¶ 22, 126. Specifically, Aminov "personally instructed his pharmacy customers, including [the Defaulted] Defendants, to make payments to the Aminov [] Entities in exchange for the counterfeit medications he supplied." *Id.* ¶ 127. Thus, for all the counterfeits that Aminov sold, "payment [was] rendered to one or more of the [] Aminov Entities." *Id.* ¶¶ 22, 127. The Aminov Entities are directly liable under the Lanham Act for receiving the payments for counterfeit products. *See, e.g.*, *Dish Network, LLC v. Saddiqi*, 2019 WL 5781945 at *2 (S.D.N.Y. Nov. 6, 2019) (defendant directly liable for counterfeiting under Lanham Act where his role in the scheme was to receive "payments from plaintiff's hoodwinked subscribers.").

Gilead submits with this motion bank records showing payments from Island Pharmacy and Laconia Pharmacy alone to the Aminov Entities, which Gilead seeks as damages. Waters Decl. Exs. 34-35. Although the Aminov Entities received payments from several other pharmacies that purchased counterfeit Gilead-branded medicines, Gilead was able to obtain payment records for only these two pharmacies. The below chart shows the amount of proceeds (before trebling) each Aminov Entity received:

| Aminov Entity | Total Proceeds Received |
| --- | --- |
| Dynamic Pharmaceuticals Supply Inc. | $473,532.51 |
| Foster Media Group Inc. | $473,606.32 |
| Foster Media Pharmaceutical Supply Corp. | $468,734.49 |
| J&M Medical Supply Inc. | $974,282.07 |
| JFK Wholesale & Retail Medical Supply Corp. | $556,304.62 |
| Merric Billing Inc. | $544,894.53 |
| New Line of Pharmaceutical, Inc. | $106,392.96 |
| Northwest Pharmaceutical & Medical Supply Inc. | $557,771.53 |
| Onliner Marketing Corp. | $31,019.05 |
| Park Avenue Pharmaceutical Corp. | $458,157.86 |
| Pharmaceutical Way, Inc. | $457,042.82 |
| Pure Gear Consulting Inc. | $509,879.98 |
| Y&S Statistic Medical Supply Inc. | $497,644.85 |

*Id.* Gilead is entitled to an award of each of the Aminov Entities' profits (before trebling) as set forth in the chart above. Because all of the Aminov Entities failed to prove any element of cost or

other deduction from their net proceeds from the sale of infringing Gilead-branded medicines, Gilead is entitled to recover as profits the full net revenue of those sales.

## V.   GILEAD IS ENTITLED TO MANDATORY TREBLE DAMAGES AND ATTORNEYS' FEES UNDER THE LANHAM ACT

The Lanham Act requires an award of treble damages and attorneys' fees in this case for all Defaulted Defendants, regardless of whether Gilead is seeking its actual damages or the Defendant's profits.  In assessing damages for willful violation of 15 U.S.C. § 1114(a) involving a counterfeit mark (as Gilead alleges in Count One of its Complaint), the court "shall … enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee."  15 U.S.C. § 1117(b).  In such cases, treble damages and attorneys' fees must be awarded "unless the court finds extenuating circumstances."  *Id.*

Awards of treble damages and attorneys' fees are the norm for willful counterfeiters.  *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 325-27 (E.D.N.Y. 2009) ("Congress has indicated that it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages…. Moreover, § 1117(b) states that reasonable attorney's fees are mandatory upon a finding that defendants acted willfully." (cleaned up)).  Extenuating circumstances that justify deviation from this norm are limited: for example, a court might find extenuating circumstances and decline to issue treble damages where a defendant is "an unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family."  *Id.*  Here, the Defaulted Defendants willfully counterfeited life-saving HIV medicine, putting thousands of patients at risk, as part of a sophisticated conspiracy that has already led to numerous criminal convictions.  They are the polar opposite of the type of defendants who might qualify for a finding of "exceptional

**Highly Confidential**

circumstances" that would exempt them from otherwise mandatory treble damages and attorneys' fees for willful counterfeiting. Because there is no basis for a finding of exceptional circumstances here, Section 1117(b) requires an award of treble Gilead's actual damages and an award of Gilead's reasonable attorneys' fees against the Defaulted Defendants.

## VI.    THE COURT SHOULD AWARD PREJUDGMENT INTEREST

Gilead is also entitled to an award of prejudgment interest.

### A.    This Is an "Exceptional Case" that Warrants Prejudgment Interest

Prejudgment interest is not automatic under the Lanham Act; rather, this Court should award prejudgment interest if it finds this to be an "exceptional case," as that term is used in Section 35 of the Lanham Act, 17 U.S.C. § 1117(a). *4 Pillar Dynasty LLC v. New York & Co.*, 933 F.3d 202, 215 (2d Cir. 2019).

As noted above, Gilead is entitled to mandatory treble damages under Section 1117(b) because the Defaulted Defendants engaged in willful counterfeiting. Section 1117(a), on the other hand, gives district courts discretion to award up to treble damages even absent willful counterfeiting in "exceptional cases." Thus, this Court need <u>not</u> engage in the Section 1117(a) "exceptional case" analysis for the purpose of awarding treble damages or attorneys' fees, because those awards are mandatory under Section 1117(b). But the Court must determine whether this is an "exceptional case" as defined by Section 1117(a) solely for the purpose of prejudgment interest. *4 Pillar Dynasty*, 933 F.3d at 215-16.

For the reasons discussed above, there can be little doubt that this case qualifies as an "exceptional case" under the Lanham Act. In addition to the horrific human cost of Defendants counterfeiting of life-saving HIV medicine, all of the factors that courts consider in making a finding of exceptionality are present here: willful infringers, highly conservative damages calculations, and a strong need for deterrence and to protect the public. *See, e.g. Ortho Sleep*

**Highly Confidential**

*Prods., LLC v. Dreamy Mattress Corp.*, 2012 U.S. Dist. LEXIS 183253, at *28-29 (E.D.N.Y. Aug. 29, 2012) ("Courts have held that treble damages [for an exceptional case] may be appropriate where, as here, the infringer has engaged in willful behavior") *adopted*, 2012 U.S. Dist. LEXIS 178195 (E.D.N.Y Dec.17, 2012); *AW Indus.*, 2011 U.S. Dist. LEXIS 111889, at *21 (trebling actual damages "given the conservative nature of … [plaintiff's] actual damages calculation"); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 430-31 (S.D.N.Y. 2013) (finding of an exceptional case "confirmed by the need to deter [the defendant] from engaging in such willful violations in the future").

**B.    The Applicable Rate and Compounding of Interest**

The appropriate rate of prejudgment interest to be applied lies in the sound discretion of the Court.  *See GTFM, Inc. v. Solid Clothing, Inc.*, 2002 WL 31886349, at *4 (S.D.N.Y. Dec. 26, 2002).  Prejudgment interest should be awarded "to: (i) ensure that an infringer not profit in any way from its misconduct; and (ii) provide a specific and general deterrent to those who might exploit another's trademark rights without authorization."  *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*, 2006 WL 5804603, at *7 (S.D.N.Y. Dec. 11, 2006), *adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007).  Courts have found these objectives particularly salient where the defendant has engaged in willful infringement or has defaulted.  *See Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *12 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016).

Courts in the Second Circuit have generally adopted one of three interest rates.  Many have utilized the 9% rate called for in N.Y. C.P.L.R. § 5004.  *See, e.g.*, *GTFM*, 2002 WL 31886349, at *4; *Bumble & Bumble*, 2016 WL 658310, at *12; *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *27 (E.D.N.Y Sep. 12, 2007); *Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at *7.  The Second Circuit, in analogous contexts, has confirmed that

**Highly Confidential**

it is proper "to look to state law in order to determine the appropriate rate." *Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975).

Other courts, by comparison, have borrowed from Section 1117(b) of Title 15, which governs unlawful uses of counterfeit marks and utilizes the interest rate established under 26 U.S.C. § 6621(a)(2): the federal short-term rate plus three points, which currently would calculate to 7.03%. *See, e.g.*, *Melodrama Publ'g, LLC v. Santiago*, 2015 WL 2380521, at *7 (S.D.N.Y. May 19, 2015), *adopted*, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015); *Merck Eprova AG v. Gnosis*, 901 F. Supp. 2d 436, 461 (S.D.N.Y. 2012); *TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 WL 760168, at *1 (S.D.N.Y. Feb. 23, 2012), *adopted*, 2012 WL 1948816 (S.D.N.Y. May 30, 2012).

Finally, some courts have used the federal post-judgment interest rate set out at 28 U.S.C. § 1961(a). *See Hudson Furniture, Inc. v. Mizrahi*, 2024 WL 565095, at *14 (S.D.N.Y. Feb. 7, 2024) (collecting cases), *adopted*, 2025 WL 1453584 (S.D.N.Y. May 21, 2025).

Where the purpose of the damages award is to make the plaintiff whole, the Second Circuit has stated that goal "can only be achieved if interest is compounded." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (in Title VII action, finding failure to apply a compound rate of interest an abuse of discretion). Courts applying a 9% interest rate have typically compounded on an annual basis. *See Wilson v. Great Am. Indus., Inc.*, 763 F. Supp. 688, 691 (N.D.N.Y. 1991), *aff'd in part, rev'd in part*, 979 F.2d 924 (2d Cir. 1992); *Bumble & Bumble*, 2016 WL 658310, at *12; *GTFM*, 2002 WL 31886349, at *4; *cf. Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 549 (S.D.N.Y. 2016) (applying 9% interest rate with annual compounding for Sarbanes-Oxley cause of action, finding monthly compounding "unnecessary"). Section 1117(b) and 28 U.S.C. § 1961(a), on the other hand, call for prejudgment interest to be compounded on a ***daily*** basis. *See*

**Highly Confidential**

26 U.S.C. § 6622; *see, e.g.*, *Flanagan v. Odessy Constr. Corp.*, 2018 WL 1179889, at *8 (E.D.N.Y. Feb. 9, 2018), *adopted*, 2018 WL 1175164 (E.D.N.Y. Mar. 6, 2018) (compounding daily in ERISA case); *See Hudson Furniture,* , 2024 WL 565095, at *14 (compounding daily in copyright and trademark infringement case); *but see Manzo v. Sovereign Motor Cars, Ltd.*, 2010 WL 1930237, at *12 (E.D.N.Y. May 11, 2010) (applying interest rate embodied in Section 6621(a)(2), but compounding annually), *aff'd*, 419 Fed. Appx. 102 (2d Cir, 2011).

Here, the Court should apply the New York statutory 9% rate, compounded annually, when calculating pre-judgment interest.  That rate is both legally appropriate and necessary to make Gilead whole.  *See Saulpaugh*, 4 F.3d at 145.  Gilead is seeking its actual losses, not statutory or hypothetical damages.  For years, Gilead did not have access to and was therefore unable to spend or invest those funds in research and development.

For the same period of years, the Defaulted Defendants had full access to and use of their ill-gotten gains, essentially receiving an interest-free loan for that entire period.  Applying the New York 9% rate, compounded annually, will ensure that the Defaulted Defendants do not profit from their misconduct.  *See Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at *7.

And perhaps most importantly, awarding the proposed 9% rate with annual compounding will serve as a clear deterrent to the Defaulted Defendants and any other would-be counterfeiters who view willful counterfeiting as part of a lucrative business plan.  *See id.*; *Bumble & Bumble*, 2016 WL 658310, at *12.  The Court should enter a comprehensive prejudgment interest award.

**C.     The Date of Interest Accrual**

Finally, in addition to setting the rate and compounding of prejudgment interest, the Court in its discretion should set the date(s) on which prejudgment interest begins to accrue.  Courts have generally found that prejudgment interest should begin to accrue at or in proximity to the time the unlawful act occurred.  *See, e.g.*, *Bus. Casual Holdings, LLC v. TV-Novosti*, No.

**Highly Confidential**

21CV2007JGKRWL, 2023 WL 1809707, at *13 n. 6 (S.D.N.Y. Feb. 8, 2023) ("With respect to copyright infringement, pre-judgment interest ordinarily would begin from the date of infringement."), *report and recommendation adopted*, 2023 WL 4267590 (S.D.N.Y. June 28, 2023); *Gomez v. El Rancho de Andres Carne de Tres, Inc.*, 2014 WL 1310296, at *10 (E.D.N.Y. Mar. 11, 2014), *adopted*, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014) (relying on N.Y. C.P.L.R. § 5001, the companion to § 5004, and explaining in an FLSA case that "interest may be calculated from the earliest ascertainable date the cause of action existed," or , where "damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.'").

Here, the Defaulted Defendants' infringement occurred over the course from 2020 to 2023. Given the breadth of their infringement, the Court should apply pre-judgment interest once per each of the given years, as appropriate for each Defendant, based on the time that they each began infringing on Gilead's marks. In his report, Dr. Bell noted that he "reserve[d] the right to calculate prejudgment interest on all damages in this matter, at the appropriate time, as directed by the Court." Bell Rpt. ¶ 5. At this Court's direction, Dr. Bell can calculate the appropriate prejudgment interest for each of the Defaulted Defendants.

## VII.  GILEAD IS ENTITLED TO A PERMANENT INJUNCTION AGAINST ALL DEFAULTED DEFENDANTS

As noted above, this Court has already issued a preliminary injunction against each of the Defaulted Defendants prohibiting, among other things, their purchasing, selling, distributing, marketing, or otherwise any of the Gilead Marks. *See, e.g.,* ECF No. 84. In entering those preliminary injunctions, this Court found, among other things, that Gilead was likely to succeed on its Lanham Act claims, that Gilead would be irreparably harmed absent an injunction, that the

**Highly Confidential**

balance of the equities tipped in Gilead's favor, and that the public interest favored an injunction. *E.g.*, *id.*

Now, each of the Defaulted Defendants' liability has been established as a matter of law in light of their default, and the remainder of the analysis has not changed. After a finding of liability, courts apply the familiar four-factor test to determine whether a permanent injunction should issue: "(1) [t]hat [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBav, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, Gilead easily satisfies each of these four factors. <u>First</u>, Gilead is entitled to a statutory presumption of irreparable harm, 15 U.S.C. §1116(a); and in any event, irreparable harm is "automatically satisfied by actual success on the merits." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997). <u>Second</u>, the requirement that Gilead show it has no adequate remedy at law, "is satisfied where the record contains no assurance against defendant's continued violation of plaintiff's trademark." *Sexy Hair Concepts, LLC v. Sexy Hair, Inc*., 2013 WL 5460629, at *4 (E.D.N.Y. Sept. 30, 2013) (citation omitted); *see also Laboratorios Rivas, SRL v. Ugly & Beauty, Inc*., 2013 WL 5977440, at *11 (S.D.N.Y. Nov. 12, 2013) ("Where default is entered, a court may infer from a defendant's default that it is willing to, or may continue its infringement.") (citation and quotation marks omitted), *report and recommendation adopted*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014). <u>Third</u>, the balance of hardships clearly weighs in Gilead's favor: the Defaulted Defendants cannot claim any hardship in being ordered not to engage in or facilitate counterfeiting of HIV medicines, and in any event, the Defaulted Defendants "ha[ve] not identified

**Highly Confidential**

any hardships for the Court to consider." *Laboratorios Rivas*, 2013 WL 5977440 at *12. <u>Fourth</u>, the public interest is clearly in favor of Gilead, the lawful manufacturer of life-saving medicines, and not the Defaulted Defendants, who participated in a conspiracy to illegally counterfeit those medicines, creating an enormous risk to patient health and safety. *See, e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

The court should therefore issue a permanent injunction against all the Defaulted Defendants, identical in substance to the permanent injunctions this Court has issued against other Defendants in this action. A Proposed Permanent Injunction is submitted herewith.

## CONCLUSION

For the reasons stated above, this Court should enter a damages award (1) finding Gilead's actual damages against each Defaulted Defendant, as set forth in the chart below; (2) issuing a damages award of treble the actual damages for each Defaulted Defendant, pursuant to 15 U.S.C. § 1117(b); (3) awarding Gilead its reasonable attorneys' fees against each Defaulted Defendant in an amount to be determined via a future submission; and (4) awarding Gilead prejudgment interest against each of the Defaulted Defendants at 9% per annum, calculated beginning the year in which the record reflects the defendant's first sales of Gilead-branded products began, to be calculated via a future submission. The Court should also issue a permanent injunction against all of the Defaulted Defendants in the form of the Proposed Permanent Injunction submitted herewith.

| Defendant | Actual Damages | Treble Damages | Pre-Judg. Interest? | Permanent Injunction? |
|---|---|---|---|---|
| Boris Aminov | $16,081,425 | $48,244,275 | Y | Y |
| Antonio Payano | $16,081,425 | $48,244,275 | Y | Y |
| Rachel Aminov | $2,529,188 | $7,587,564 | Y | Y |
| Bless You Rx | $2,529,188 | $7,587,564 | Y | Y |
| Christy Corvalan | $7,563,431 | $22,690,293 | Y | Y |
| David Fernandez | $7,563,431 | $22,690,293 | Y | Y |
| Dezyre Baez | $7,563,431 | $22,690,293 | Y | Y |
| Crystal Medina | $7,563,431 | $22,690,293 | Y | Y |

**Highly Confidential**

| **Defendant** | **Actual Damages** | **Treble Damages** | **Pre-Judg. Interest?** | **Permanent Injunction?** |
|---|---|---|---|---|
| Island Pharmacy | $7,563,431 | $22,690,293 | Y | Y |
| Galaxy Rx | $2,617,141 | $7,851,423 | Y | Y |
| Ivan Ohar | $398,492.13 | $1,195,476.39 | Y | Y |
| Dynamic Pharmaceuticals Supply Inc. | $473,532.51 | $1,420,597.53 | Y | Y |
| Foster Media Group Inc. | $473,606.32 | $1,420,818.96 | Y | Y |
| Foster Media Pharmaceutical Supply Corp. | $468,734.49 | $1,406,203.47 | Y | Y |
| J&M Medical Supply Inc. | $974,282.07 | $2,922,846.21 | Y | Y |
| JFK Wholesale & Retail Medical Supply Corp. | $556,304.62 | $1,515,341.19 | Y | Y |
| Merric Billing Inc. | $544,894.53 | $1,668,913.86 | Y | Y |
| New Line of Pharmaceutical, Inc. | $106,392.96 | $319,178.88 | Y | Y |
| Northwest Pharmaceutical & Medical Supply Inc. | $557,771.53 | $1,673,314.59 | Y | Y |
| Onliner Marketing Corp. | $31,019.05 | $93,057.15 | Y | Y |
| Park Avenue Pharmaceutical Corp. | $458,157.86 | $1,374,473.58 | Y | Y |
| Pharmaceutical Way, Inc. | $457,042.82 | $1,371,128.46 | Y | Y |
| Pure Gear Consulting Inc. | $509,879.98 | $1,529,639.94 | Y | Y |
| Y&S Statistic Medical Supply Inc. | $497,644.85 | $1,492,934.55 | Y | Y |

**Highly Confidential**

Dated:  New York, New York
       August 1, 2025

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/ Geoffrey Potter*

Geoffrey Potter (gpotter@pbwt.com)
Timothy Waters (twaters@pbwt.com)
Thomas P. Kurland (tkurland@pbwt.com)
Andrew Haddad (ahaddad@pbwt.com)
George Soussou (gsoussou@pbwt.com)
Maxwell K. Weiss (maweiss@pbwt.com)
Anna Blum (ablum@pbwt.com)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc.,*
*Gilead Sciences Ireland UC, and Gilead Sciences,*
*LLC*

**Highly Confidential**

## CERTIFICATE OF SERVICE

Pursuant to Local Civil Rule 55.2, I, Timothy Alan Waters, hereby certify that I caused a copy of Plaintiffs' papers in support of their motion for default judgment damages and a permanent injunction, as well as the applicable certificate of default, to be mailed to the Defaulted Defendants at their last known residences or business addresses, as set forth below.[10]

| **Defendant** | **Last Known Address** |
|---|---|
| Antonio Payano | 3215 Bainbridge Ave, Apt 1C<br>Bronx, NY 10467 |
| Bless You Rx Inc | 86-09 66 Ave<br>Rego Park, NY 11374<br>*and/or*<br>9531 Jamaica Ave<br>Woodhaven, NY 11421[11] |
| Boris Aminov | 86-09 66 Ave<br>Rego Park, NY 11374 |
| Christy Corvalan | 3184 Wissman Ave, 2<br>Bronx, NY 10465 |
| Crystal Medina | 3184 Wissman Ave, 2<br>Bronx, NY 10465 |
| David Fernandez | 2105 Ryer Ave, Apt 3G<br>Bronx, NY 10457 |
| Dezyre Baez | 300 Hayward Ave, Apt 2N<br>Mount Vernon, NY 10552 |
| Dynamic Pharmaceutical Suply Inc | c/o Steven Ferguson<br>445 Park Ave<br>New York, NY 10022 |

---

[10] In light of the volume of exhibits annexed to the Declaration of Timothy A. Waters filed in support of this motion, I have caused a letter with a link to download those exhibits to be sent to each of the Defaulted Defendants, along with instructions to contact Plaintiffs' counsel in case of any difficulty accessing the exhibits.

[11] Papers have been mailed to both addresses.

**Highly Confidential**

| Defendant | Last Known Address |
|---|---|
| Dynamic Pharmaceuticals Supply Inc. | c/o James Murphy<br>30 Wall St, 8 Flr<br>New York, NY 10005 |
| Foster Media Group Inc. | 46 Main St, Ste 111<br>Monsey, NY 10952 |
| Foster Media Pharmaceutical Supply Corp. | c/o Jeffrey Schonsky<br>100 Church St, 8 Flr<br>New York, NY 10007 |
| Galaxy Rx Inc | 47-02 47 Ave<br>Woodside, NY 11377 |
| Island Pharmacy & Discount Corp. | 290 City Island Ave<br>Bronx, NY 10464 |
| Ivan Ohar | 1695 E 21 St, Apt C4<br>Brooklyn, NY 11210 |
| J&M Medical Supply Inc. | c/o Jeffrey Schonsky<br>1790 Broadway, 15 Flr<br>New York, NY 10019 |
| JFK Wholesale & Retail Medical Supply Corp. | c/o Matthew Wildman<br>42 Broadway<br>New York, NY 10004 |
| Merric Billing Inc. | 5314 16 Ave, Ste 299<br>Brooklyn, NY 11204 |
| New Line of Pharmaceutical, Inc. | 1216 Broadway<br>New York, NY 10001 |
| Northwest Pharmaceutical & Medical Supply Inc. | c/o Matthew Wildman<br>703 3 Ave<br>New York, NY 10017 |
| Onliner Marketing Corp. | 1421 58 St<br>Brooklyn, NY 11219 |
| Park Avenue Pharmaceutical Corp. | c/o David Mock<br>125 Park Ave, 25 Flr<br>New York, NY 10017 |

**Highly Confidential**

| Defendant | Last Known Address |
|---|---|
| Pharmaceutical Way, Inc. | 48 Wall St, Ste 1100<br>New York, NY 10005 |
| Pure Gear Consulting Inc. | 23 Oak Glen Rd<br>Monsey, NY 10952 |
| Rachel Aminov | 9517 67 Ave<br>Rego Park, NY 11374 |
| Y&S Statistic Medical Supply Inc. | c/o Steven Ferguson<br>445 Park Ave<br>New York, NY 10022 |
| Y&S Statistic Medical Supply Inc. | c/o James Murphy<br>30 Wall St, 8 Flr<br>New York, NY 10005 |

Dated: New York, New York
         August 1, 2025

         _/s/ Timothy A. Waters_
         TIMOTHY A. WATERS