UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GILEAD SCIENCES, INC., GILEAD SCIENCES IRELAND UC, and GILEAD SCIENCES LLC,

Plaintiffs,

v.

PETER KHAIM, *et al.*,

Defendants.
------------------------------------------------------------------x

**REPORT AND RECOMMENDATION**

24-CV-4259
(Merle, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

In this action, plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences LLC (collectively, "Gilead") allege that myriad defendants purportedly "manufactured and trafficked[1] . . . counterfeit Gilead-branded HIV medications to pharmacies and patients in at least New York and New Jersey, putting untold number of patients' health and safety at risk." Dkt. No. 1 ¶¶ 4, 6.[2] On July 17, 2024, the Court entered a preliminary injunction against defendants. *See* Minute Entry, dated July 17, 2024; Text Order, dated July 1, 2024; Dkt. Nos. 37, 38, 49, 84, 85. Gilead subsequently entered into consent judgments with certain defendants. *See* Dkt. No. 217. At the same time, a number of other defendants failed to appear or have otherwise defaulted.

Before the Court, on referral from the Honorable Natasha C. Merle, United States District Judge, is Gilead's motion for default judgment against twenty-six defendants who defaulted in this

[1] "'Trafficked' means participated in the importing, buying, selling, and distributing of counterfeit" medication not lawful in the United States. *Abbott Lab'ys v. Adelphia Supply USA,* No. 15-CV-5826 (CBA) (LB), 2024 WL 4250223, at *8 n.16 (E.D.N.Y. Aug. 22, 2024)*, report and recommendation adopted*, 2024 WL 4263935 (E.D.N.Y. Sep. 23, 2024).

[2] The present action is a "follow-on anticounterfeiting action" to *Gilead Sciences, Inc., et al., v. Safe Chain Solutions, LLC, et al.,* No. 21-CV-4106 (AMD) (JAM) ("*Gilead I*"), which is also pending in this district.

matter (collectively, "Defaulting Defendants").[3] Dkt. Nos. 251, 252.[4]

For the reasons set forth below, the undersigned respectfully recommends that Gilead's default judgment motion as to Defaulting Defendants be granted in part.[5]

---

[3] Defaulting Defendants are (1) Ivan Ohar; (2) Boris Aminov; (3) Antonio Payano; (4) Rachel Aminov; (5) Bless You Rx Inc.; (6) Christy Corvalan; (7) Island Pharmacy & Discount Corp.; (8) David Fernandez; (9) Dezyre Baez; (10) Crystal Medina; (11) Galaxy Rx Inc.; (12) Dynamic Pharmaceuticals Supply, Inc.; (13) "Dynamic Pharmaceutical Suply Inc."; (14) Northwest Pharmaceutical & Medical Supply Inc.; (15) J&M Medical Supply Inc.; (16) JFK Wholesale and Retail Medical Supply Corp.; (17) Merric Billing Inc.; (18) New Line of Pharmaceutical, Inc.; (19) Onliner Marketing Corp.; (20) Park Avenue Pharmaceutical Corp.; (21) Pharmaceutical Way, Inc.; (22) Foster Media Group, Inc.; (23) Foster Media Pharmaceutical Supply Corp.; (24) "Y&S Statistic Medical Suply Inc."; (25) Y&S Statistic Medical Supply Inc.; and (26) Pure Gear Consulting, Inc. *See* Dkt. No. 265-1. The Court notes that "Dynamic Pharmaceutical Suply Inc." and "Y&S Statistic Medical Suply Inc." have misspellings in their names.

The undersigned will collectively refer to Ivan Ohar, Boris Aminov, Antonio Payano, Rachel Aminov, Christy Corvalan, David Fernandez, Dezyre Baez, and Crystal Medina as the "Individual Defendants."

The undersigned will collectively refer to Bless You Rx Inc., Island Pharmacy & Discount Corp., Galaxy Rx Inc., Dynamic Pharmaceuticals Supply, Inc., "Dynamic Pharmaceutical Suply Inc.," Northwest Pharmaceutical & Medical Supply Inc., J&M Medical Supply Inc., JFK Wholesale and Retail Medical Supply Corp., Merric Billing Inc., New Line of Pharmaceutical, Inc., Onliner Marketing Corp., Park Avenue Pharmaceutical Corp., Pharmaceutical Way, Inc., Foster Media Group, Inc., Foster Media Pharmaceutical Supply Corp., "Y&S Statistic Medical Suply Inc.," Y&S Statistic Medical Supply Inc., and Pure Gear Consulting, Inc. as the "Corporate Defendants."

[4] Dkt. Nos. 251 and 252 contain identical documents and attachments, except that Dkt. No. 251 and its attachments are the redacted, publicly filed versions, and Dkt. No. 252 and its attachments are the versions filed under seal. For simplicity, the undersigned will cite to only Dkt. No. 252 and its attachments.

[5] This Report and Recommendation *sua sponte* amends and supersedes the prior unredacted Report and Recommendation entered on June 26, 2026 (Dkt. No. 259) and the prior redacted Report and Recommendation entered on June 29, 2026 (Dkt. No. 262). As discussed further below, while no objections were made to the prior Report and Recommendation, the Court *sua sponte* amends that Report and Recommendation to address errors in Gilead's damages calculations. *See CIT Bank, N.A. v. Williams*, No. 17-CV-2135 (DRH) (AKT), 2018 WL 2945612, at *1 (E.D.N.Y. May 24, 2018) ("Subsequent to the issuance of the Report and Recommendation, the Court became aware of several discrepancies in the calculations set forth in that document. The Court addresses these items below and the Report and Recommendation is amended to the limited extent set forth here."), *amended report and recommendation adopted*, 2018 WL 2943663 (E.D.N.Y. June 12, 2018). "Such an amendment is permitted pursuant to Federal Rule of Civil Procedure 60(a), which allows the Court to, by motion or on its own, 'correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record.'" *Marky's Martial Arts, Inc. v. FC Online Mktg., Inc.*, No. 19-CV-3363 (ALC) (VF), 2022 WL 18276016, at *1 n.1 (S.D.N.Y. Sep. 16, 2022) (quoting Fed. R. Civ P. 60(a)), *amended report and recommendation adopted*, 2023 WL 171401 (S.D.N.Y. Jan. 12, 2023).

As Gilead has filed its motion for default judgment under seal, the undersigned temporarily enters this Report and Recommendation under seal. Gilead shall file a letter attaching targeted and narrowly tailored redactions to this Report and Recommendation by 5:00 p.m. on October 28, 2026.[6]

## I. Factual Background

The following facts are taken from the Complaint (Dkt. No. 1), Gilead's default judgment motion and the attachments filed thereto (Dkt. Nos. 252 – 252-78), and Gilead's responses to various Court orders (*see, e.g.*, Dkt. Nos. 256, 257, 258, 265, 266). The facts are assumed to be true for the purposes of this motion. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (noting that "[i]n light of [the defendant's] default, a court is required to accept all of [the plaintiff's] factual allegations as true and draw all reasonable inferences in its favor" (citation omitted)). Given the number of Defaulting Defendants and their overlapping claims and issues, the undersigned addresses only the general factual allegations in this section.

Gilead develops and markets a large portfolio of lifesaving medications, including drugs for the treatment and prevention of HIV, and is the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine HIV and other medications. Dkt. No. 1 ¶ 70. Exhibit A of the Complaint depicts the complete list of these trademarks. Dkt. No. 1-4.

To ensure patient safety, Gilead permits only a limited number of distributors to sell its medicine in the United States, whom Gilead lists on its website. Dkt. No. 1 ¶ 83; *see also Authorized Distributors*, GILEAD, https://www.gilead.com/medicines/authorized-distributors (last

---

[6] Pursuant to Rule XII of the undersigned's Individual Practices and Rules, "[a]ny application to seal shall be accompanied by an affidavit or affidavits and a memorandum of law, demonstrating that the standards for sealing have been met and specifically addressing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)."

visited October 17, 2026). The Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq.*, requires every sale or transfer of a prescription drug to be accompanied by a "pedigree"—consisting of the transaction history, transaction information, and transaction statement, commonly referred to as "T3"—showing the chain of all sales or transfers of that drug, going back to the manufacturer. Dkt. No. 1 ¶¶ 80-81; *see also Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 58 (E.D.N.Y. 2023) ("Each bottle of medication is accompanied by a pedigree—a record documenting the chain of all its sales or transfers going back to the manufacturer."); *Janssen Scis. Ir. Unlimited Co. v. TLC Xpress Pharmacy Inc.*, No. 22-CV-1983 (BMC), 2025 WL 974299, at *2 (E.D.N.Y. Apr. 1, 2025) ("A pedigree contains three pieces of information: the drug's chain of custody, or its 'transaction history'; the details of each sale, or its 'transaction information'; and a formal transfer of ownership, or a 'transaction statement.'" (first quoting 21 U.S.C. § 360eee(25)-(27); and then citing 21 U.S.C. § 360eee-1)).

Gilead's medications are accompanied by a pedigree. Dkt. No. 1 ¶ 80. "For Gilead, pedigrees are anti-counterfeiting measures and also play other important internal quality-control functions, such as tracing the distribution of reported suspect bottles and facilitating targeted recalls." *Id.* ¶ 81. "For the distributors, pharmacies, and patients that buy Gilead's HIV and other prescription medications, authentic pedigrees that accurately disclose the original and subsequent sales of the product are an important feature of Gilead's product that certify the medication's authenticity and safety." *Id.*

Gilead alleges that Defaulting Defendants conspired to refill empty Gilead bottles with wrong medication, seal them with a counterfeit Gilead tamper-evident foil seal, and sell them to pharmacies throughout the United States through online pharmaceutical marketplaces, who in turn dispensed the counterfeit medication to unsuspecting customers. *Id.* ¶¶ 7, 76-79, 102; *see also*

Dkt. Nos. 252-23, 252-24, 252-25. Gilead alleges that Defaulting Defendants sold counterfeit medication with falsified or "counterfeit pedigrees listing fake chains of sale, or with no pedigree at all." Dkt. No. 1 ¶¶ 76, 82.

The Complaint brings nine causes of action against all Defendants: (1) federal trademark infringement under 15 U.S.C. § 1114(1)(A); (2) federal trademark infringement under 15 U.S.C. § 1114(1)(B); (3) federal false description and designation of origin in commerce under 15 U.S.C. § 1125(a)(1)(A); (4) federal false advertising under 15 U.S.C. § 1125(a)(1)(B); (5) federal dilution of mark under 15 U.S.C. § 1125(c); (6) dilution of mark and injury to business reputation under New York General Business Law § 360-1; (7) deceptive business practices under New York General Business Law § 349; (8) unfair competition under New York common law; and (9) unjust enrichment under New York common law. Dkt. No. 1 ¶¶ 142-98.

## II. Current Claims

Gilead moves for default judgment only on its federal claims arising under the Lanham Act pursuant to 15 U.S.C. § 1114(1) (Claims 1 and 2). Dkt. No. 256 at 3[7] ("To simplify the analysis, for purposes of its pending default judgment motion, Gilead will rely solely on its Lanham Act infringement and counterfeiting claims under 15 U.S.C. § 1114(1).").

Accordingly, in light of Gilead's position in its moving papers, the undersigned *sua sponte* respectfully recommends that the Court dismiss the remaining claims (Claims 3-9) against Defaulting Defendants without prejudice.[8]

---

[7] Page citations are to ECF-stamped pages unless otherwise noted.

[8] Gilead initially moved for default judgment on August 1, 2025. *See* Dkt. No. 224. Following multiple Court orders and conferences, Gilead voluntarily withdrew its motion without prejudice. *See* Minute Entry, dated Jan. 8, 2026. Gilead renewed the instant motion on March 20, 2026, consistent with the Court's orders. *See, e.g.*, Text Order, dated Feb. 6, 2026. From June 5, 2026 through June 11, 2026, the undersigned directed Gilead to clarify several areas of discussion, such as personal jurisdiction, venue, procedural compliance, liability, and damages by June 22, 2026. *See* Text Orders, dated June 5, 2026, June 9, 2026,

## III. Service, Jurisdiction, and Venue

The Court "must . . . satisfy itself that it has subject matter and personal jurisdiction before rendering judgment against defendants." *Dumolo v. Dumolo*, No. 17-CV-7294 (KAM) (CLP), 2019 WL 1367751, at *4 (E.D.N.Y. Mar. 26, 2019) (citing *Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 732 (2d Cir. 1980) ("A judgment entered against parties not subject to the personal jurisdiction of the rendering court is a nullity.")).

### A. Service of Process

"It is axiomatic that to obtain a default judgment against a defendant, the pleading must have been properly served upon him." *Freedom Mortg. Corp. v. Monteleone*, 628 F. Supp. 3d 455, 460 (E.D.N.Y. 2022); *see also Joe Hand Promotions, Inc. v. Necessary Studios, Inc.*, No. 21-CV-5551 (LDH) (RER), 2022 WL 18858972, at *3 (E.D.N.Y. Dec. 5, 2022) ("Ineffective service-of-process is a ground to deny a motion for default judgment." (quoting *Happy Homes, LLC v. Jenerette-Snead*, No. 15-CV-1788 (MKB) (RML), 2016 WL 6599826, at *3 n.10 (E.D.N.Y. Nov. 7, 2016))), *report and recommendation adopted*, Text Order, dated Dec. 22, 2022.

Rule 4(h) of the Federal Rules of Civil Procedure, which governs service on a corporation, partnership, or association, states that an entity served "in a judicial district of the United States" must be served, *inter alia*, "in the manner prescribed by Rule 4(e)(1) for serving an individual."

---

and June 12, 2026. On June 12, 2026, Gilead filed a letter containing additional briefing related to the pending default judgment motion, including a revised proposed order of judgment. *See* Dkt. No. 256. On June 18, 2026, the undersigned directed Gilead to clarify why it sought to recover actual damages from Chemistry Bench, a pharmacy not referenced in the Complaint. Text Order, dated June 18, 2026. On June 20, 2026, the undersigned directed Gilead to address whether it seeks damages for "Dynamic Pharmaceutical Suply Inc." and "Y&S Statistic Medical Suply Inc." Text Order, dated June 20, 2026. On June 22, 2026, Gilead filed a letter addressing the topics of the Text Orders, dated June 18, 2026 and June 20, 2026. Dkt. No. 258. Following additional Court orders, Gilead further supplemented its motion. *See* Dkt. Nos. 264-67.

Fed. R. Civ. P. 4(h)(1)(A). Rule 4(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by:
>
> > (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
> >
> > (2) doing any of the following:
> >
> > > (A) delivering a copy of the summons and of the complaint to the individual personally;
> > >
> > > (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> > >
> > > (C) delivering a copy of each to an agent authorized by appointment or by law to receive such process.

Fed. R. Civ. P. 4(e).

For the Corporate Defendants, New York law permits service by

> [p]ersonally delivering to and leaving with the secretary of state or a deputy, or with any person authorized by the secretary of state to receive such service, at the office of the department of state in the city of Albany, duplicate copies of such process together with the statutory fee, which fee shall be a taxable disbursement. Service of process on such corporation shall be complete when the secretary of state is so served.

N.Y. Bus. Corp. Law § 306(b)(1)(i); *see also Logan v. World Luxury Cars, Inc.*, No. 15-CV-248 (ENV) (PK), 2022 WL 2466834, at *3-4 (E.D.N.Y. Mar. 30, 2022) (recommending that such service was proper), *report and recommendation adopted*, 2023 WL 156878 (E.D.N.Y. Jan. 11, 2023). New York law also permits service "upon any domestic or foreign corporation, to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." New York Civil Practice Law and Rules

("N.Y. C.P.L.R.") § 311(a)(1); *see also* Fed. R. Civ. P. 4(h)(1)(B) (stating that a corporation, partnership, or association may be served in a judicial district of the United States "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant").

For the Individual Defendants, the N.Y. C.P.L.R. provides that service of process should be first attempted under N.Y. C.P.L.R. § 308(1), (2), and (4), which "provide for service by personal delivery, delivery and mailing, and nailing and mailing, respectively." *Weber Cap. LLC v. Racaniello*, 821 F. Supp. 3d 361, 382 (E.D.N.Y. 2026) (adopting report and recommendation) (citation omitted). Where these methods are "impracticable," N.Y. C.P.L.R. § 308(5) authorizes "nontraditional methods of service—such as electronic service." *Weber Cap.*, 821 F. Supp. 3d at 382 (citation omitted). Further, Title 22, § 202.5-b(f)(1) of the New York Codes, Rules and Regulations, which governs service of initiating documents in an action filed in the Supreme Court of the State of New York, states, "[i]nitiating documents may be served . . . by electronic means if the party served agrees to accept such service." N.Y. Comp. Codes R. & Regs tit. 22, § 202.5-b(f)(1).

The following chart provides an overview of the method of service for each of the twenty-six Defaulting Defendants below.

| **Defaulting Defendant** | **Individual or Corporate Defendant** | **Method of Service** | **Factual Basis** |
|---|---|---|---|
| (1) Ivan Ohar | Individual | Fed. R. Civ. P. 4(e)(1), (2)(B); N.Y. C.P.L.R. § 308(2) | Dkt. No. 58 |

| | | | |
|---|---|---|---|
| (2) Boris Aminov | Individual | Fed. R. Civ. P. 4(e)(1), (2)(A); N.Y. C.P.L.R. 308(1) | Dkt. No. 75 |
| (3) Antonio Payano | Individual | Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 308(4) | Dkt. No. 56 |
| (4) Rachel Aminov | Individual | Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 308(4) | Dkt. No. 53 |
| (5) Bless You Rx Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 63 |
| (6) Christy Corvalan | Individual | Fed. R. Civ. P. 4(e)(1); N.Y. Comp. Codes R. & Regs tit. 22, § 202.5-b(f)(1) | Dkt. No. 50 |
| (7) Island Pharmacy & Discount Corp. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 57 |
| (8) David Fernandez | Individual | Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 308(4) | Dkt. No. 64 |
| (9) Dezyre Baez | Individual | Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 308(4) | Dkt. No. 71 |
| (10) Crystal Medina | Individual | Fed. R. Civ. P. 4(e)(1), (2)(B); CPLR 308(2) | Dkt. No. 73 |
| (11) Galaxy Rx Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 80 |
| (12) Dynamic Pharmaceuticals Supply, Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 68 |
| (13) "Dynamic Pharmaceutical Suply Inc." | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 82 |
| (14) Northwest Pharmaceutical & Medical Supply Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 70 |

| | | | |
|---|---|---|---|
| (15) J&M Medical Supply Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 61 |
| (16) JFK Wholesale and Retail Medical Supply Corp. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 62 |
| (17) Merric Billing Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 65 |
| (18) New Line of Pharmaceutical, Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 69 |
| (19) Onliner Marketing Corp. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 72 |
| (20) Park Avenue Pharmaceutical Corp. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 74 |
| (21) Pharmaceutical Way, Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 76 |
| (22) Foster Media Group, Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 77 |
| (23) Foster Media Pharmaceutical Supply Corp. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 78 |
| (24) "Y&S Statistic Medical Suply Inc." | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 79 |
| (24) Y&S Statistic Medical Supply Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); N.Y. Bus. Corp. Law § 306 | Dkt. No. 52 |
| (26) Pure Gear Consulting, Inc. | Corporate | Fed. R. Civ. P. 4(h)(1)(A) & 4(e)(1); | Dkt. No. 81 |

| | | | |
|---|---|---|---|
| | | N.Y. Bus. Corp. Law § 306 | |

Based on the undersigned's review of the proofs of service docketed and outlined in the chart above, Gilead has shown that each Defaulting Defendant has been served in compliance with Rule 4. Therefore, the undersigned respectfully recommends that the Court find that Defaulting Defendants were properly served.

**B. Subject Matter Jurisdiction**

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Gilead invokes federal question jurisdiction by requesting relief under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*. Dkt. No. 1 ¶¶ 142-180; Dkt. No. 252-2 at 11.

Therefore, the undersigned respectfully recommends that the Court find that it has subject matter jurisdiction over Gilead's claims.

**C. Personal Jurisdiction**

The United States Court of Appeals for the Second Circuit has held that "a court *may* raise personal jurisdiction *sua sponte* when a defendant has failed to appear." *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 n.7 (2d Cir. 2010) (citation omitted). District courts within this Circuit have held "[p]ersonal jurisdiction is 'a necessary prerequisite to entry of a default judgment.'" *Burns v. Scott*, 635 F. Supp. 3d 258, 273 (S.D.N.Y. 2022) (citation omitted). In an abundance of caution, the undersigned will analyze personal jurisdiction.

To properly exercise personal jurisdiction, three requirements must be met. *NLRB v. Universal Smart Conts., LLC*, 166 F.4th 304, 314 (2d Cir. 2026) (Sullivan, J.) (citations omitted). First, "the plaintiff's service of process upon the defendant must have been procedurally proper." *Id.* (citations omitted). Second, "there must be a statutory basis for personal jurisdiction that

renders such service of process effective." *Id.* (citation omitted). Finally, "the district court's assertion of personal jurisdiction must otherwise 'comport with constitutional due process principles.'" *Id.* (citation omitted).

As to the first requirement, as explained above, the undersigned has already respectfully recommended a finding that service on Defaulting Defendants was proper in this case. As to the second requirement, the available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k). *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 673 F.3d 50, 59 (2d Cir. 2012). Rule 4(k)(1)(A) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Licci I*, 673 F.3d at 59 (citing Fed. R. Civ. P. 4(k)(1)(A)). Accordingly, "[a] district court's personal jurisdiction is determined by the law of the state in which the court is located." *Id.* (quoting *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010)). Thus, the court should look to New York law in determining the availability of personal jurisdiction over Defaulting Defendants.

"There are two types of personal jurisdiction: specific and general." *Monbo v. Nathan*, 623 F. Supp. 3d 56, 133 (E.D.N.Y. 2022) (Brodie, C.J.) (citation omitted). "General jurisdiction permits a court to exercise personal jurisdiction over a defendant regardless of whether the underlying claim has a connection to the forum." *Id.* (citation omitted). "Specific jurisdiction requires a connection between the forum exercising jurisdiction over the defendant and the underlying controversy that gave rise to the claim." *Id.* (citation omitted). Under New York law, courts exercise general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and specific jurisdiction pursuant to § 302. *Monbo*, 623 F. Supp. 3d at 133.

### 1. General Jurisdiction Exists Over the Corporate Defendants

"CPLR § 301 permits courts to exercise 'such jurisdiction over persons, property, or status as might have been exercised heretofore.'" *Great Bowery, Inc. v. Royal Beauty Studio Inc.*, No. 25-CV-3627 (FB) (JAM), 2026 WL 1029641, at *7 (E.D.N.Y. Apr. 16, 2026) (adopting report and recommendation, and quoting *Monbo*, 623 F. Supp. 3d at 136). "[E]xcept in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business." *Id.* (quoting *Monbo*, 623 F. Supp. 3d at 136). Regarding general jurisdiction for purposes of the Due Process Clause of the Fourteenth Amendment, the United States Supreme Court has held, "[w]ith respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation omitted).

Here, as illustrated in the chart below with data taken from the New York Secretary of State, Division of Corporations website, ENTITY SEARCH RESULTS, https://apps.dos.ny.gov/publicInquiry/EntityListDisplay (last visited October 17, 2026), the Court may exercise general jurisdiction over the Corporate Defendants, which are all New York domestic corporations.

| Defendant | New York Domestic or Foreign Corporation | Active or Inactive | New York Department of State ID |
|---|---|---|---|
| (5) Bless You Rx Inc. | Domestic | Active | 5574959 |
| (7) Island Pharmacy & Discount Corp. | Domestic | Active | 5259088 |
| (11) Galaxy Rx Inc. | Domestic | Active | 5860908 |
| (12) Dynamic Pharmaceuticals Supply, Inc. | Domestic | Active | 5539283 |
| (13) "Dynamic Pharmaceutical Suply Inc." | Domestic | Active | 5540504 |

| | | | |
|---|---|---|---|
| (14) Northwest Pharmaceutical & Medical Supply Inc. | Domestic | Active | 5577659 |
| (15) J&M Medical Supply Inc. | Domestic | Active | 5575727 |
| (16) JFK Wholesale and Retail Medical Supply Corp. | Domestic | Active | 5575766 |
| (17) Merric Billing Inc. | Domestic | Active | 5175929 |
| (18) New Line of Pharmaceutical, Inc. | Domestic | Active | 5711444 |
| (19) Onliner Marketing Corp. | Domestic | Active | 5175924 |
| (20) Park Avenue Pharmaceutical Corp. | Domestic | Active | 5722660 |
| (21) Pharmaceutical Way, Inc. | Domestic | Active | 5711490 |
| (22) Foster Media Group, Inc. | Domestic | Active | 5175923 |
| (23) Foster Media Pharmaceutical Supply Corp. | Domestic | Active | 5575688 |
| (24) "Y&S Statistic Medical Suply Inc." | Domestic | Active | 5540715 |
| (24) Y&S Statistic Medical Supply Inc. | Domestic | Active | 5539968 |
| (26) Pure Gear Consulting, Inc. | Domestic | Active | 5175931 |

### 2. Specific Jurisdiction Exists Over the Individual Defendants

Gilead argues that the Individual Defendants are subject to the Court's general jurisdiction because they are New York residents. Dkt. No. 252-2 at 16; *see also* Dkt. No. 256 at 1. The Supreme Court, has held, however, that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's *domicile*." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (emphasis added). Domicile is different from residency, and one cannot infer one from the other. *See Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (holding that owning an apartment in New York is insufficient to establish domicile for purposes of general jurisdiction and noting that "[o]ne may have more than one residence in different parts of this

country or the world, but a person may have only one domicile." (citation omitted)); *N. Am. Co. for Life & Health Ins. v. Pouncey*, No. 23-CV-137 (SVN), 2024 WL 4037005, at *6 (D. Conn. Sep. 3, 2024) ("[A] statement of residence, unlike domicile, tells the court only where the parties are *living* and not of which state they are *citizens*.' A court may not and cannot simply infer the latter from the former." (internal quotation marks and citation omitted)), *report and recommendation adopted*, Dkt. No. 39 (D. Conn. Sep. 30, 2024). Because Gilead has not shown that the Individual Defendants are domiciled in New York, the Court may not exercise general jurisdiction.

Nonetheless, Gilead argues, alternatively, that the Court may exercise specific jurisdiction over the Individual Defendants. Dkt. No. 256 at 2. Specifically, Gilead argues that the Individual Defendants are subject to New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1). Dkt. No. 256 at 2.

"In assessing whether personal jurisdiction is authorized, the court must look first to the long-arm statute of the forum state." *Gilead Scis.*, 2022 WL 22947596, at *6 (quoting *Yak v. BiggerPockets, LLC*, No. 20-3498, 2022 WL 67740, at *1 (2d Cir. Jan. 7, 2022)). N.Y. C.P.L.R. § 302(a)(1) provides that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." *Gilead Scis.*, 2022 WL 22947596, at *5 (quoting N.Y. C.P.L.R. § 302(a)(1)). "Two requirements must be met to establish personal jurisdiction under CPLR § 302(a)(1): '(1) The defendant must have transacted business within the state [or contracted anywhere to supply goods or services in the state]; and (2) the claim asserted must arise from that business activity.'" *Id.* (quoting *Eades v. Kennedy, P.C. L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015)); *see also D & R Global Selections, S.L. v. Bodega Olegario Falcon*

*Pieiro*, 78 N.E.3d 1172, 1175 (N.Y. 2017) (holding that courts should conduct a "twofold jurisdictional inquiry" under N.Y. C.P.L.R. § 302(a)(1): "[f]irst, the defendant must have purposefully availed itself of 'the privilege of conducting activities within the forum state' by either transacting business in New York or contracting to supply goods or services in New York," and "[s]econd, the claim must arise from that business transaction or from the contract to supply goods or services"). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is substantial relationship between the transaction and the claim asserted." *Gilead Scis.*, 2022 WL 22947596, at *6 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010)); *see also State v. Vayu, Inc.*, 206 N.E.3d 1236, 1240 (N.Y. 2023) ("CPLR 302 is a single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York.").

Here, the undersigned respectfully recommends that the Court may exercise specific jurisdiction over the Individual Defendants pursuant to N.Y. C.P.L.R. § 302(a)(1) because (1) each Individual Defendant transacted business within the state or contracted anywhere to supply goods or services in the state, and (2) the Lanham Act claims asserted arose from that business activity. Specifically, each Individual Defendant, who resides in New York, "managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit Gilead HIV medications" and "financially benefited from the trafficking of counterfeit Gilead medications and failed to exercise [his or her] authority to stop it." Dkt. No. 1 ¶ 19 (Ivan Ohar), ¶ 23 (Boris Aminov), ¶ 42 (Antonio Payano), ¶ 25 (Rachel Aminov), ¶ 43 (Christy Corvalan), ¶ 45 (David Fernandez), ¶ 46 (Dezyre Baez), ¶ 47 (Crystal Medina). Gilead's allegations regarding the Individual Defendants are set forth below.

**a. Ivan Ohar**

Ivan Ohar resides in Brooklyn, New York. Dkt. No. 1 ¶ 19. He is the "principal of record of Defendant Best Scripts [LLC]" ("Best Scripts"). *Id.* Gilead alleges that although Ohar is the nominal owner of Best Scripts, "in reality, Defendant [Peter] Khaim is the de facto owner and operator." *Id.* ¶ 98. Ohar has "deep ties" to Khaim, *i.e.,* Ohar is the organizer and sole member of two other businesses, both of which run out of storefronts in Khaim-controlled commercial properties. *Id.* ¶ 100.

Best Scripts is a retail pharmacy located in Queens, New York, that sold counterfeit Gilead-branded HIV medication with false documentation. *Id.* ¶¶ 18, 56, 92. Best Scripts is a "single-location retail pharmacy formed on June 6, 2023," and it has an active pharmacy license as well as an active wholesaler license in New York, both issued on August 30, 2023. *Id.* ¶ 98. Best Scripts shares the "exact same location, down to the suite number, as another pharmacy that Khaim used in one of his prior pharmaceutical fraud schemes." *Id.* ¶ 99.

On March 20, 2024, Gilead received a verification request from MatchRx, an online marketplace where pharmacies sell prescription medications to other pharmacies, regarding a bottle of Gilead medication, BIKTARVY®, sold by Best Scripts and purchased by a pharmacy in New Jersey. *Id.* ¶¶ 103-04. Gilead investigated the bottle, and determined that it was counterfeit. *Id.* ¶ 105. In connection with its sale via MatchRx, Best Scripts uploaded an invoice claiming that it had purchased the bottle of BIKTARVY® from AmerisourceBergen Corporation ("ABC"), a Gilead-authorized distributor. *Id.* ¶ 107. Gilead, however, contacted ABC, who verified that it never sold a bottle with the serial number matching what Best Scripts sold via MatchRx. *Id.*

Gilead subsequently obtained from the purchasing pharmacy the bottle of BIKTARVY® sold by Best Scripts, and found indicia of counterfeiting, such as missing instructional "outserts"[9] and removal of the adhesive of the instructional outserts. *Id.* ¶¶ 110, 12. Further, based on laboratory testing, Gilead verified that the adhesive used on the foil is inconsistent with the adhesive on authentic Gilead bottles. *Id.* ¶ 113. Gilead also alleges that Defendant Khaim used another New York-based pharmacy, 71st Rx Pharmacy Inc. ("71st Rx"), to sell counterfeit Gilead-branded HIV medication, including another bottle of BIKTARVY® that 71st Rx sold on MatchRx. *Id.* ¶¶ 16, 104-15.

**b. Rachel Aminov**

Rachel Aminov is Boris Aminov's mother, and resides in Queens, New York. Dkt. No. 1 ¶¶ 24, 25. She is the owner of record of Bless You Rx, Inc. ("Bless You Rx"), a single retail pharmacy located in Jamaica, New York. *Id.* ¶¶ 24, 25, 120. Boris Aminov is the "off-the-books principal" of Bless You Rx. *Id.* ¶ 24. Gilead alleges that Bless You Rx is "the pharmacy through which Defendant Boris Aminov distributed counterfeit Gilead medications to patients." *Id.* ¶¶ 25, 120. Gilead alleges that Rachel Aminov conspired with Boris Aminov to use Bless You Rx to dispense counterfeit Gilead-branded HIV medication. *Id.* ¶ 120.

**c. Boris Aminov and Antonio Payano**

According to Gilead, Boris Aminov and Antonio Payano are "at the top of the counterfeiting conspiracy." Dkt. No. 252-2 at 26.

Boris Aminov resides in Brooklyn, New York and served as the off-the-books principal of Bless You Rx. Dkt. No. 1 ¶ 21. He also served as an off-the-books principal for "a network of shell companies" (the "Shell Companies") that he used "to facilitate the sale of the counterfeits

[9] Gilead notes that "[o]n authentic Gilead bottles, the FDA-required patient instructions are affixed to the side of the bottle, and are known as 'outserts.'" Dkt. No. 1 ¶ 79.

and to hide and launder the illicit proceeds of their counterfeiting scheme." *Id.* ¶ 126. Boris Aminov allegedly set up these Shell Companies so that they had "nominal paper principals, but in practice, Boris Aminov owns and controls the entities." *Id.* Finally, he is also alleged to have laundered assets through real estate transactions. *Id.* ¶ 128.

The Shell Companies are Dynamic Pharmaceuticals Supply, Inc., "Dynamic Pharmaceutical Suply Inc.," Northwest Pharmaceutical & Medical Supply, Inc., J&M Medical Supply Inc., JFK Wholesale and Retail Medical Supply Corp., Merric Billing Inc., New Line of Pharmaceutical, Inc., Onliner Marketing Corp., Park Avenue Pharmaceutical Corp., Pharmaceutical Way, Inc., Foster Media Group, Inc., Foster Media Pharmaceutical Supply Corp., Y&S Statistic Medical Supply Inc., "Y&S Statistic Medical Suply Inc.," and Pure Gear Consulting, Inc.[10] *Id.* ¶ 21. As previously discussed, all of the Shell Companies are New York State corporations. *See* ENTITY SEARCH RESULTS, https://apps.dos.ny.gov/publicInquiry/EntityListDisplay (last visited October 17, 2026).

Boris Aminov used Bless You Rx and the Shell Companies to purchase, manufacture, and sell counterfeit Gilead-branded medications. Dkt. No. 1 ¶ 22. Specifically, Boris Aminov and others bought already-dispensed bottles of medication off the street or transacted with others who did so, manufactured counterfeits by altering and/or repacking the bottles to hide the fact that the bottles had already been dispensed and to make the bottles look legitimate, and then either dispensed the counterfeits to patients directly through Bless You Rx or sold them to other pharmacies owned by co-conspirators with payment rendered to one or more of the Shell

[10] The Complaint refers to the Shell Companies collectively as "Aminov Laundering Entities," and to the Shell Companies, with the addition of Bless You Rx, collectively as the "Aminov Entities." Dkt. No. 1 ¶¶ 21, 22. Gilead's brief, however, inconsistently refers to the Shell Companies as the "Aminov Entities." *See, e.g.*, Dkt. No. 252-2 at 33. Instead of using two different terms, the Report and Recommendation will refer to these entities as the "Shell Companies," and will note whenever Bless You Rx is included in the discussion.

Companies. *Id.* ¶¶ 22, 121-23. Gilead alleges, that in one instance, an individual sent Boris Aminov "WhatsApp messages with lists and photographs of which HIV medication bottles to acquire"; some of the bottles were "visibly used and adulterated." *Id.* ¶ 122.

The pharmacies who purchased counterfeits from Boris Aminov and others included Laconia Avenue Pharmacy Corp. ("Laconia Ave. Pharmacy"), who is not a defendant in this action but is a defendant in *Gilead I*, Island Pharmacy & Discount Corp. ("Island Pharmacy"), Galaxy Rx Inc. ("Galaxy Rx"), and River Chemists Corp. ("River Chemists"). *Id.* ¶ 131. Gilead alleges that these pharmacies who bought counterfeit Gilead-branded medication knew they were buying counterfeit HIV medication and "willfully trafficked" in the counterfeits to make an illicit profit at the expense of patients. *Id.* Although not alleged in the Complaint, Gilead states that Roman Shamalov operated another pharmacy, Chemistry Bench Inc. ("Chemistry Bench"), in which he sold counterfeit medication purchased from Boris Aminov. Dkt. No. 252-2 at 27 (first citing Dkt. No. 252-26 (EzriRx.com data); then citing Dkt. No. 252-28; and then citing Dkt. No. 252-29 (additional order of restitution for Shamalov)).

Importantly, Island Pharmacy, whose principal is Christy Corvalan, purchased the counterfeit HIV medication from Boris Aminov. Dkt. No. 1 ¶ 131. Boris Aminov personally instructed Christy Corvalan and others to make payment to the Shell Companies. *Id.* ¶ 132.

Antonio Payano, a resident of the Bronx, New York, is a "supplier of counterfeit HIV medication for" Boris Aminov, Bless You Rx, and the Shell Companies, among others. *Id.* ¶¶ 42, 129. Payano purchased already-dispensed bottles of HIV medication from patients off of the street and processed those bottles into counterfeits. *Id.* Antonio Payano sold at least some counterfeit HIV medication to New York City pharmacies, including to Christy Corvalan. *Id.* ¶ 130.

Gilead alleges that Boris Aminov pled guilty to money-laundering charges and was sentenced to 108 months in prison "for running this counterfeit HIV [medication] scheme." Dkt. No. 1 ¶¶ 124, 128. In March 2023, Gilead alleges that stockpiles of counterfeit HIV medication, bottles containing labels and names of patients from different pharmacies, printing labels, lighter fluids for use to strip the adhesive from medication bottles, cash, firearms, and ammunitions were found at a townhouse in Queens connected with Boris Aminov. *Id.* ¶ 125.

Both Boris Aminov and Antonio Payano pled guilty to conspiracy to commit healthcare fraud in the U.S. District Court for the Southern District of New York. Dkt. Nos. 252-31, 252-32. In Antonio Payano's sentencing memorandum in this Southern District of New York action, Payano, through counsel, stated that "Mr. Payano joined a conspiracy with Christy Corvalan, Irina Polvanova, Roman Shamalov, Boris Aminov and others to divert and distribute black market HIV medications." Dkt. No. 252-30 at 2. Payano admitted during his plea allocution that he "joined a conspiracy to commit healthcare fraud," by making "street purchases of prescription medications, including HIV medications, from illegal sources at below wholesale prices and resold them" to pharmacies located in the Bronx, New York for a profit. Dkt. No. 252-33 at 35.[11]

**d. Christy Corvalan, David Fernandez, Dezyre Baez, and Crystal Medina**

Christy Corvalan resides in the Bronx, New York. Dkt. No. 1 ¶ 43. She is the principal of record of Island Pharmacy and an off-the-books principal of another pharmacy, Laconia Ave. Pharmacy.[12] *Id.*

[11] The sentencing memorandum states that the conspiracy was between 2020 and 2022 (Dkt. No. 252-30 at 2), while Payano stated during his plea allocution that the conspiracy was from 2020 to 2023 (Dkt. No. 252-33 at 35).

[12] Although not a defendant in this action, Laconia Ave. Pharmacy is mentioned throughout the Complaint here. *See* Dkt. No. 1 ¶¶ 43-47, 131-37.

Island Pharmacy is a single-location retail pharmacy in the Bronx, New York, which opened in 2018. *Id.* ¶ 44. "Corvalan paid approximately $6 million to [the Shell Companies] in exchange for counterfeit HIV medications, the majority of which were Gilead-branded HIV medications." *Id.* ¶ 133.

Corvalan allegedly employed David Fernandez, Dezyre Baez, and Crystal Medina; together they are co-conspirators in the trafficking of counterfeit Gilead medications "through Defendant Island Pharmacy & Discount Corp and/or Laconia Pharmacy." *Id.* ¶¶ 45-47. Corvalan, Fernandez, Baez, and Medina all supervised and personally participated in the pharmacies' trafficking of counterfeit medications. *Id.* ¶¶ 43-47, 133-39. Specifically, "Corvalan, Fernandez, Baez, and Medina purchased already-dispensed HIV medication from customers of the pharmacies who would sell back the HIV medication they were dispensed." *Id.* ¶ 134. Further, they "recruit and pay kickbacks to patients to induce them to fill their prescriptions for HIV medications at their preferred pharmacies, allowing Defendant Corvalan and her employees to harm even more patients by dispensing more counterfeit medication and reaping more enormous illicit profits." *Id.* ¶ 138. Corvalan used the illicit funds to purchase at least two waterfront properties in the Bronx, as well as a Mercedes Benz Maybach. *Id.* ¶ 139.

**3. Due Process Considerations**

Last, the Court must determine whether the exercise of specific jurisdiction comports with federal constitutional requirements of due process. *Dow Jones & Co., Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d 305, 330-31 (S.D.N.Y. 2025). "Due process considerations require that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 330 (citations omitted). First, a court evaluates whether a defendant has "sufficient minimum contacts" with the

forum, and second, whether, in light of various factors, the exercise of jurisdiction would "comport with fair play and substantial justice." *Id.* at 330-31 (citations omitted).

Regarding the minimum contacts, "[g]enerally, if a defendant meets the contacts requirement under the long-arm statute, it also meets the minimum contacts requirements under the constitutional analysis." *Id.* at 331 (citing *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 279 (2d Cir. 2024)). As discussed above, each Individual Defendant meets the minimum contact requirements under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), due to their various contacts with New York, and, thus, each Individual Defendant satisfies the minimum contact requirements under the constitutional analysis.

As to fair play and substantial justice, the Court considers the following factors:

> [(i)] the burden that the exercise of jurisdiction will impose on the defendant; [(ii)] the interests of the forum state in adjudicating the case; [(iii)] the plaintiff's interest in obtaining convenient and effective relief; [(iv)] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [(v)] the shared interest of the states in furthering substantive social policies.

*Dow Jones & Co.*, 797 F. Supp. 3d at 331 (citation omitted); *see also Agric. Logistics LLC v. Survival Transp. Inc.*, No. 22-CV-873 (MKB) (JMW), 2024 WL 4250354, at *8 (E.D.N.Y Aug. 7, 2024) (same), *report and recommendation adopted*, 2024 WL 4116684 (E.D.N.Y. Sep. 9, 2024).

As an initial matter, the Second Circuit recognized that it would be "rare" and "unusual" for the exercise of specific jurisdiction to "offend traditional notions of fair play and substantial justice" where a defendant transacted business in New York and the asserted claim arose from that business activity under N.Y. C.P.L.R. § 302(a)(2). *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 732 F.3d 161, 170 (2d Cir. 2013) (citations omitted). Furthermore, Defaulting Defendants cannot present any compelling case that would render jurisdiction unreasonable. *See Agric. Logistics*, 2024 WL 4250354, at *8 (stating that, "given Defendants' default, [the Court]

has not been provided, nor does it find, any reason why exercise of specific jurisdiction would be unreasonable”).

In any event, the factors as to fair play and substantial justice weigh in Gilead’s favor. First, the burden of the Court’s jurisdiction on the Individual Defendants is low because they are all residents of New York State. *See* Dkt. No. 1 ¶ 19 (Ivan Ohar), ¶ 21 (Boris Aminov), ¶¶ 24-25 (Rachel Aminov), ¶ 42 (Antonio Payano), ¶ 43 (Christy Corvalan), ¶ 45 (David Fernandez), ¶ 46 (Dezyre Baez), ¶ 47 (Crystal Medina); *see also Agric. Logistics*, 2024 WL 4250354, at *8 (noting that “the burden on Defendant, if any, to litigate here does not weigh strongly in its favor because ‘the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago’”).

Second, “New York has a clear interest in protecting in-state consumers from confusion resulting from the misappropriation of trademarks or trade dress.” *Dow Jones & Co.*, 797 F. Supp. 3d at 332 (quoting *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 5118638, at *5 (S.D.N.Y. Oct. 22, 2018)); *see also* Dkt. No. 252-24 at 53 (Ivan Ohar’s pharmacy, Best Scripts, sold to pharmacies located in the Bronx and Huntington Station, New York); Dkt. No. 252-25 at 3 (Boris Aminov and Rachel Aminov’s pharmacy, Bless You Rx, sold to Honeoye Falls Pharmacy located in New York State); Dkt. No. 1 ¶ 130 (“Defendant Payano sold at least some of the counterfeit HIV medication that he helped source and manufacture to New York City pharmacies, including Corvalan’s [pharmacies].”); *id.* ¶¶ 133-39 (describing a scheme in which Christy Corvalan, David Fernandez, Dezyre Baez, and Crystal Medina, purchased already dispensed HIV medication bottles from patients who bought the bottles from other pharmacies in the New York region).

Third, Gilead has a significant interest in obtaining convenient and effective relief. *See Henao v. Parts Auth.*, 557 F. Supp. 3d 490, 498 (S.D.N.Y. 2021) ("Plaintiffs have significant interest in obtaining convenient and effective relief, which would be inefficient if they are required to sue Parts Authority in New York and Browne in a separate forum.").

The final two factors are neutral because New York has an interest in the efficient resolution of controversies which arise under federal law, and New York has a shared interest in further developing the substantive law of actions involving counterfeit HIV medication. *See Dow Jones & Co.*, 797 F. Supp. 3d at 332. Thus, due process considerations are satisfied because the Individual Defendants have minimum contacts with New York such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

In sum, the undersigned respectfully recommends that the Court may exercise personal jurisdiction over all Defaulting Defendants.

**D. Venue**

A civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). Here, venue is proper in this District because "Defendants manufactured and sold counterfeit products in this District, and/or conspired to operate a counterfeiting operation that manufactured and sold counterfeit products in this District, and thus a substantial part of the events giving rise to Gilead's claims occurred in this District." Dkt. No. 1 ¶ 57; *see also* Dkt. No. 256 at 3 (arguing that venue is proper because "all of the counterfeits at issue are alleged to have been bought and sold through single-location retail pharmacies within this District"). Thus, the undersigned respectfully recommends that venue is proper in this District.[13]

[13] Gilead pleads that venue is also satisfied under 28 U.S.C. § 1391(b)(1) because all Individual Defendants are residents of this District. Dkt. No. 256 at 3. Of course, for purposes of venue, "a natural person . . .

## IV. Procedural Compliance with Federal Rules and Local Civil Rules

"A motion for default judgment will not be granted unless the party making the motion adheres to *all* of the applicable procedural rules." *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Eng'rs v. Allstate Mapping & Layout, LLC*, No. 22-CV-1831 (PKC) (TAM), 2023 WL 1475389, at *1 (E.D.N.Y. Feb. 2, 2023) (quoting *Century Surety Co. v. Atweek*, No. 16-CV-335 (ENV) (PK), 2018 WL 10466835, at *1 (E.D.N.Y. Jan. 9, 2018)). "Local rules have the force of law, as long as they do not conflict with a rule prescribed by the Supreme Court, Congress, or the Constitution." *Fin. Servs. Vehicle Tr. v. Osmanaj*, No. 22-CV-7491 (RPK) (CLP), 2023 WL 7000935, at *2 (E.D.N.Y. Aug. 15, 2023) (internal quotation marks and citation omitted), *report and recommendation adopted*, Text Order, dated Sep. 11, 2023.

Local Civil Rule 55.2 provides, in relevant part,

> (a) In addition to following the applicable procedures in either (b) or (c) below, any party seeking a default judgment must file:
>
> > (1) an affidavit or declaration showing that:
> >
> > > (A) the clerk has entered default under Local Civil Rule 55.1;
> > >
> > > (B) the party seeking default judgment has complied with the Servicemembers Civil Relief Act, 50a U.S.C. § 521; and
> > >
> > > (C) the party against whom judgment is sought is not known to be a minor or an incompetent person . . . . .
> >
> > (2) if proceeding by motion, the papers required by Local Civil Rule 7.1, including a memorandum of law, a proposed order detailing the proposed judgment to be entered; and

shall be deemed to reside in the judicial district in which that person is *domiciled*." 28 U.S.C. § 1391(c)(1) (emphasis added). Gilead, however, has not pled the domiciles of the Individual Defendants. *See* Dkt. No. 1 ¶¶ 19, 23, 25, 42, 43, 45, 46, 47. Nonetheless, venue remains proper in this District for the reasons set forth above.

> (3) a certificate of service stating that all documents in support of the request for default judgment, including the "Clerk's Certificate of Default" and any papers required by this rule, have been personally served on, or mailed to the last known residence (for an individual defendant) or business address (for other defendants) of, the party against whom default judgment is sought.
>
> . . .
>
> (c) By the Court (available under Fed. R. Civ. P. 55(b)(2)). In addition to the matters required in section (a), above, the party must file a statement of damages, sworn or affirmed to by one or more people with personal knowledge, in support of the request, showing the proposed damages and the basis for each element of damages, including interest, attorney's fees, and costs.

Loc. Civ. R. 55.2.

Here, Gilead properly obtained the certificate of default against Defaulting Defendants under Local Civil Rule 55.2(a)(1)(A). Dkt. No. 131. As to Local Civil Rule 55.2(a)(1)(B), Gilead has satisfied the requirements of the Servicemembers Civil Relief Act ("SCRA"). The Corporate Defendants are corporate entities such that the SCRA requirement does not apply to them. *See Loc. 1992 Pension Fund v. All Serv. Equip. Corp.*, No. 22-CV-2522 (HG) (JMW), 2023 WL 11868244, at *3 (E.D.N.Y. July 28, 2023) (noting that the SCRA's affidavit requirement does not apply to corporate defendants), *report and recommendation adopted*, Text Order, dated Aug. 18, 2023. As for the Individual Defendants, Gilead filed a report from the Department of Defense Manpower Data Center—an entity that hosts the SCRA verification website—certifying that the Individual Defendants are not in active military service as of the filing of Gilead's motion. Dkt. Nos. 252-44 – 252-51; *see also Wilmington Savs. Fund Soc'y FSB v. Fernandez*, 712 F. Supp. 3d 324, 333 (E.D.N.Y. 2024) (holding that "[a]dequate proof might consist of a report from the Department of Defense's website obtained after the defendant's default certifying that the defendant is not in active military service"). As to Local Civil Rule 55.2(a)(1)(C), no Defaulting Defendant is a minor or incompetent person. Dkt. No. 252-3 ¶ 3.

Next, Gilead complied with the procedural requirements of Local Civil Rules 7.1 and 55.2(a)(2). Local Civil Rule 7.1 requires that a plaintiff attach to a motion for default judgment: (1) a notice of motion specifying the applicable rules or statutes pursuant to which the motion is brought and specifying the relief sought; (2) a memorandum of law setting forth the cases and other authorities relied upon in support of the motion; (3) supporting affidavits and exhibits containing any factual information and portions of the record necessary for the decision of the motion; and (4) a certificate of compliance with the word count requirements of Local Civil Rule 7.1(c). *See* Loc. Civ. R. 7.1(a), (c). Local Civil Rule 55.2(a)(2) also requires a proposed order detailing the proposed judgment to be entered. Loc. Civ. R. 55.2(a)(2).

Gilead complied with the procedural requirement of Local Civil Rule 7.1 by filing a notice of motion (Dkt. No. 252), an attorney declaration and exhibits in support of the motion (Dkt. Nos. 252-3 – 252-78), and a memorandum of law (Dkt. No. 252-2). Gilead failed to include a page count certification statement under Local Civil Rule 7.1(c); the undersigned, however, respectfully recommends that the word count certification requirement be waived because the omission is not material to the relief sought. *See Great Bowery,* 2026 WL 1029641, at *9 n.6 (excusing the word count certification); *Andy Ryan Photographer, LLC v. City Visa, Inc.*, No. 24-CV-3369 (OEM) (JAM), 2025 WL 2778372, at *5 n.3 (E.D.N.Y. Sep. 30, 2025) (same), *report and recommendation adopted*, Text Order, dated Oct. 20, 2025. In any event, on March 13, 2026, Gilead filed a request to enlarge the page limit for its memorandum of law to forty-five pages, which the Court granted on the same day. Dkt. No. 250; Text Order, dated Mar. 13, 2026. Gilead's memorandum of law, exclusive of the cover page, table of contents, table of authorities, signature block, and certificate of service, is forty-five pages, in compliance with the previously granted enlargement. *See* Dkt. No. 252-2.

Further, Gilead filed a proposed order detailing the proposed judgment to be entered in compliance with Local Civil Rule 55.2(a)(2). *See* Dkt. No. 252-1 (proposed permanent injunction); Dkt. No. 265-1 (proposed final judgment against Defaulting Defendants). Thus, Gilead complied with Local Civil Rules 55.2(a)(2) and 7.1.

Pursuant to Local Civil Rule 55.2(a)(3), Gilead filed a certificate of service stating that all documents in support of the request for default judgment, including the "Clerk's Certificate of Default" and any papers required by the rule, have been mailed to Defaulting Defendants' business addresses. Dkt. No. 252-2 at 57-59; *see also* Dkt. No. 257.

Finally, Gilead has filed sufficient documentation to fulfill Local Civil Rule 55.2(c)'s requirement to "file a statement of damages, sworn or affirmed to by one or more people with personal knowledge, . . . showing the proposed damages and the basis for each element of damages, including interest, attorney's fees, and costs." Loc. Civ. R. 55.2(c); Dkt. No. 252-5 (expert report of Gregory K. Bell, Ph. D); Dkt. No. 252-8 (declaration of Susmitha Sunkara); Dkt. No. 252-9 (declaration of Harpreet Dhanota); Dkt. No. 252-14 (declaration of John Jorden).

Accordingly, the undersigned respectfully recommends that the Court find that Gilead has satisfied Local Civil Rules 7.1 and 55.2 in connection with the present motion.

## V. <u>Entry of Default Judgment</u>

As the United States Court of Appeals for the Second Circuit has explained,

> Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment. The first step is to obtain an entry of default. When a party against whom affirmative relief is sought has failed to plead or otherwise defend, a plaintiff may bring that fact to the court's attention. In such circumstances Rule 55(a) empowers the clerk of court to enter a default. The next step requires the plaintiff to seek a judgment by default under Rule 55(b). Rule 55(b)(1) allows the clerk to enter a default judgment if the plaintiff's claim is for a sum certain and the defendant has failed to appear. In all other cases Rule 55(b)(2) governs. It requires a party seeking a judgment by default to apply to the court for entry of a default judgment.

*Priestley v. Headminder, Inc.*, 647 F.3d 497, 504-05 (2d Cir. 2011). To "enter or effectuate judgment," a court is empowered to: "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

"A threshold question before reaching liability or damages is whether [the defaulting defendant's] conduct is sufficient to warrant default judgment being entered." *Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Eng'rs v. NAMOW, Inc.*, No. 17-CV-1469 (ARR) (SJB), 2018 WL 1440545, at *2 (E.D.N.Y. Feb. 28, 2018), *report and recommendation adopted*, 2018 WL 1440542 (E.D.N.Y. Mar. 22, 2018). The Second Circuit "generally disfavor[s]" default judgment and has repeatedly expressed a "preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993) (citation omitted). Nevertheless, "in evaluating a motion for default judgment, a court accepts as true the plaintiff's well-pleaded factual allegations, except those relating to damages." *BASF Corp. v. Original Fender Mender, Inc.*, No. 23-CV-2796 (HG) (JAM), 2023 WL 8853704, at *2 (E.D.N.Y. Dec. 22, 2023) (first citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); and then citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)), *report and recommendation adopted*, Text Order, dated Jan. 9, 2024. The plaintiff bears the burden of alleging "*specific* facts," rather than "mere 'labels and conclusions'" or a "formulaic recitation of the elements," so that a court may infer a defendant's liability. *Cardoza v. Mango King Farmers Mkt. Corp.*, No. 14-CV-3314 (SJ) (RER), 2015 WL 5561033, at *3 (E.D.N.Y. Sep. 1, 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *report and recommendation adopted*, 2015 WL 5561180 (E.D.N.Y. Sep. 21, 2015).

The decision to grant or deny a motion for default judgment is "left to the sound discretion of a district court." *Esquivel v. Lima Rest. Corp.*, No. 20-CV-2914 (ENV) (MMH), 2023 WL 6338666, at *3 (E.D.N.Y. Sep. 29, 2023) (quoting *Shah v. N.Y. State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999)), *report and recommendation adopted*, Text Order, dated Nov. 30, 2023. A court "possesses significant discretion" in granting a motion for default judgment, "including [determining] whether the grounds for default are clearly established." *Chen v. Oceanica Chinese Rest., Inc.*, No. 13-CV-4623 (NGG) (PK), 2023 WL 2583856, at *7 (E.D.N.Y. Mar. 21, 2023) (adopting report and recommendation) (citation omitted). The Court may also "consider numerous factors, including whether a plaintiff has been substantially prejudiced by the delay involved and whether the grounds for default are clearly established or in doubt." *Franco v. Ideal Mortg. Bankers, Ltd.*, No. 07-CV-3956 (JS) (AKT), 2010 WL 3780972, at *2 (E.D.N.Y. Aug. 23, 2010) (citation modified), *report and recommendation adopted*, 2010 WL 3780984 (E.D.N.Y. Sep. 17, 2010).

As the Second Circuit has observed, "[t]hese widely accepted factors are: (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Enron Oil Corp.*, 10 F.3d at 96 (citations omitted); *see also Trico Tarek Factory v. Jetax Inc.*, Nos. 24-CV-3731 (JMA) (ST), 24-CV-2409 (ST), 2025 WL 2625376, at *29 (E.D.N.Y Sep. 11, 2025) ("Notably, the *Enron* factors are used not only to determine whether to set aside an entry of default or default judgment, but also in deciding whether *granting* a default judgment is warranted in the first instance." (citing *Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 54-61 (E.D.N.Y. 2022))), *report and recommendation adopted*, 2025 WL 2782485 (E.D.N.Y. Sep. 30, 2025). "Willfulness 'is the most significant factor' but is not dispositive." *Henry v. Oluwole*, 108 F.4th 45, 52 (2d Cir. 2024) (citations omitted); *see also Grp.*

*One*, 625 F. Supp. 3d at 55 ("However, in neither case did the court find default judgment appropriate based solely on willfulness." (citations omitted)). "Other relevant equitable factors may also be considered, for instance, whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Enron Oil Corp.*, 10 F.3d at 96 (citation omitted).

Here, as to the first factor, Defaulting Defendants' failure to respond to the Complaint demonstrates the willfulness of their default. "'[W]illfulness,' in the context of a default, refer[s] to conduct that is more than merely negligent or careless," but is instead "egregious and . . . not satisfactorily explained." *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 186 (2d Cir. 2015) (citation omitted). As described above, Defaulting Defendants were properly served with the Complaint. Notwithstanding that service, Defaulting Defendants did not respond to the Complaint, did not appear, and have not in any way attempted to defend this action, thus constituting willfulness in the context of default judgment. *See, e.g.*, *Krevat v. Burgers to Go, Inc.*, No. 13-CV-6258 (JS) (AKT), 2014 WL 4638844, at *6 (E.D.N.Y. Sep. 16, 2014) (adopting report and recommendation, and holding that defendant's failure to appear demonstrated willfulness of default); *Sola Franchise Corp. v. Solo Salon Studios Inc.*, No. 14-CV-946 (JS) (AKT), 2015 WL 1299259, at *6 (E.D.N.Y. Mar. 23, 2015) (adopting report and recommendation, and holding that "[d]efendant's failure to answer the Complaint and to respond to the instant motion is sufficient to establish willfulness" (citations omitted)). Although Gilead has repeatedly served Defaulting Defendants with filings throughout this case, Defaulting Defendants have consistently failed to respond or appear. Such disregard for the Court and the present litigation militate in favor of the first factor being satisfied.

As to the second factor, the Second Circuit has held that "[w]hether a defense is meritorious 'is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense.'" *In re Orion HealthCorp*, 95 F.4th 98, 105 (2d Cir. 2024) (quoting *Enron Oil Corp.*, 10 F.3d at 98). The Court cannot conclude that Defaulting Defendants have a meritorious defense to the allegations in the Complaint because Defaulting Defendants did not appear in this case to proffer any defenses. *See Korzeniewski v. Sapa Pho Vietnamese Rest. Inc.*, No. 17-CV-5721 (MKB) (SJB), 2019 WL 312149, at *3 (E.D.N.Y. Jan. 3, 2019) ("[T]he Court cannot conclude there is any meritorious defense to the allegations because [the defendant] did not appear nor present evidence of such a defense."), *report and recommendation adopted*, 2019 WL 291145 (E.D.N.Y. Jan. 23, 2019). This factor therefore weighs in favor of entering default judgment because the allegations in Gilead's Complaint are deemed admitted. *See Sola Franchise Corp.*, 2015 WL 1299259, at *6 ("Here, Defendant has not interposed an answer, nor has it otherwise presented any defense to the Court. These factors weigh in favor of granting a default judgment, and the allegations in Plaintiffs' Complaint are deemed admitted." (citation omitted)).

As to the third factor, the Second Circuit has held that "delay alone is not a sufficient basis for establishing prejudice. Rather, it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery or provide greater opportunity for fraud and collusion." *Henry*, 108 F.4th at 52-53. Here, Gilead will suffer prejudice if its motion is denied because without the entry of default judgment, Gilead could be left without the ability to recover against Defaulting Defendants for the claims set forth in the Complaint. *See Sola Franchise Corp.*, 2015 WL 1299259, at *15 ("[D]enying this motion would be prejudicial to [p]laintiffs 'as there are no additional steps available to secure relief in this Court.'" (citation omitted)).

Therefore, the undersigned respectfully recommends that all three factors permit entry of a default judgment against Defendants. The Court thus turns to evaluating liability and damages.

## VI. Liability

As discussed above, Gilead moves for default judgment on its claims of (1) federal trademark infringement under 15 U.S.C. § 1114(1)(A), and (2) federal trademark infringement under 15 U.S.C. § 1114(1)(B). Dkt. No. 256 at 3. As noted above, "[i]n the context of a motion for default judgment, a court should accept the well-pleaded allegations of a complaint pertaining to liability as true." *Janssen Scis. Ir. Unlimited Co. v. Safe Chain Sols., LLC*, No. 22-CV-1983 (BMC), 2025 WL 3640661, at *1 (E.D.N.Y. Dec. 16, 2025); *see, e.g.*, *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir. 2019) ("In reviewing a default judgment, we generally 'deem[] all the well-pleaded allegations [as to liability] in the pleadings to be admitted.'").

The undersigned addresses liability as to each of Gilead's Lanham Act claims below.

### A. Federal Trademark Infringement Under 15 U.S.C. § 1114(1)(A)

Gilead successfully pleads that Defaulting Defendants are liable for federal trademark infringement pursuant to 15 U.S.C. § 1114(1)(A).

The Lanham Act states,

> [a]ny person who . . . without the consent of the registrant . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . . shall be liable in a civil action by the registrant.

*Ghost L.L.C. v. Ghost Fitness NYC, LLC*, No. 21-CV-3557 (NCM) (MMH), 2025 WL 2487826, at *6 (E.D.N.Y. Aug. 29, 2025) (quoting 15 U.S.C. § 1114(1)(a)), *report and recommendation adopted*, 2025 WL 2772887 (E.D.N.Y. Sep. 26, 2025); *see also Ngazimbi v. Disney Enters., Inc.*,

No. 25-CV-1405 (KAD), 2025 WL 3187335, at *4 (D. Conn. Nov. 14, 2025) (quoting 15 U.S.C. § 1114(1)(a)), *report and recommendation adopted*, Text Order, dated Dec. 9, 2025; *Johnson & Johnson v. Azam Int'l Trading*, No. 07-CV-4302 (SLT) (SMG), 2013 WL 4048295, at *9 (E.D.N.Y. Aug. 9, 2013) ("The Lanham Act prohibits, when done without consent of the trademark registrant and in a manner that is 'likely to cause confusion, or to cause mistake, or to deceive,' both: 1) the 'use in commerce" of 'any reproduction, counterfeit, copy, or colorable imitation of a registered mark,' and 2) the actual reproduction or counterfeiting of the registered mark.'" (quoting 15 U.S.C. § 1114(1))).

"In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, . . . a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods and services,' (5)[] without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (citations and footnotes omitted). Additionally, "the plaintiff must show that [(6)] defendant's use of that mark 'is likely to cause confusion.'" *Id.* (citations omitted); *see also Abbott Lab'ys*, 2024 WL 4250223, at *1 (quoting *1-800 Contacts*, 414 F.3d at 406-07).[14]

Here, Gilead demonstrates that, first, it has a valid mark entitled to protection. "A 'certificate of registration with the United States Patent and Trademark Office ('USPTO') is *prima facie* evidence that the mark is entitled to protection.'" *Googly Eye Cru*, 2025 WL 692125, at *2

[14] Some courts have simplified this test into two elements: "To prevail on a trademark infringement claim under the Lanham Act, a plaintiff must prove that: (1) it owns a valid, protectable trademark and (2) the defendant's use of the trademark creates a likelihood of consumer confusion." *Ghost*, 2025 WL 2487826, at *6 (quoting *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020)); *see also Googly Eye Cru, LLC v. Fast Retailing USA, Inc.*, No. 24-CV-3709 (VM), 2025 WL 692125, at *2 (S.D.N.Y. Mar. 4, 2025) (same); *Ngazimbi*, 2025 WL 3187335, at *4 (same); *Azam Int'l Trading*, 2013 WL 4048295, at *9 (same).

(quoting *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 427 (S.D.N.Y. 2021)). Gilead is "the collective owners of a number of well-established and famous registered trademarks . . . that appear on its genuine medications." Dkt. No. 1 ¶ 70; *see also* Dkt. No. 1-4 (listing the trademarks).

Gilead also sufficiently alleges that Defaulting Defendants used the trademark, in commerce, in connection with the sale of counterfeit Gilead medication and without Gilead's consent. "A mark is used in commerce when it is 'placed in any manner on the goods . . . and the goods are sold or transported in commerce.'" *Campbell v. Huertas*, No. 20-CV-3471 (KAM), 2023 WL 1967512, at *4 (E.D.N.Y. Feb. 13, 2023) (quoting 15 U.S.C. § 1127). Accordingly, courts ask "whether the trademark has been displayed to consumers in connection with a commercial transaction." *Id.* (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013)). Further, "[a] plaintiff is not required to demonstrate that a defendant made use of the mark in any particular way to satisfy the 'use in commerce' requirement. The element is satisfied if the mark is affixed to the goods 'in any manner.'" *Kelly-Brown*, 717 F.3d at 306 (first quoting 15 U.S.C. § 1127; and then citing *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 125-26 (2d Cir. 2009)).

Further, Gilead sufficiently alleges that each Defaulting Defendant sold or, alternatively, is jointly liable for selling, counterfeit Gilead-branded medications bearing multiple counterfeit Gilead marks. Dkt. No. 1 ¶¶ 70, 82-83. Specifically, each counterfeit sold was accompanied by a fake pedigree, bearing unauthorized replicas of Gilead's marks. *Id.* ¶¶ 7, 76, 82, 86. Further, the counterfeit medication sold had other fraudulent elements, such as bottles with wrong pills inside, bottles with attached counterfeit reproductions of Gilead's Patient Information documents that bore Gilead's marks, bottles with replica seals to make them appear unopened, and bottles with

counterfeit labels. *Id.* ¶¶ 7, 76, 78-79; *see also id.* ¶¶ 143, 158 (alleging "use[] in commerce" in the claims for relief).

Finally, Gilead sufficiently alleges that Defaulting Defendants' use of the trademark creates a likelihood of consumer confusion. To evaluate claims of consumer confusion, the Second Circuit generally employs the following eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961):

> [(1)] [T]he strength [of plaintiff's] mark, [(2)] the degree of similarity between the two marks, [(3)] the proximity of the products, [(4)] the likelihood that the [plaintiff] will bridge the gap, [(5)] actual confusion, and [(6)] the reciprocal of defendant's good faith in adopting its own mark, [(7)] the quality of defendant's product, and [(8)] the sophistication of the buyers.

*RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quoting *Polaroid*, 287 F.2d at 495); *see also Ghost*, 2025 WL 2487826, at *7 (same); *Googly Eye Cru*, 2025 WL 692125, at *3 (same); *Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc.*, 581 F. Supp. 3d 460, 468-69 (E.D.N.Y. 2021) (same).

"In a case of counterfeiting, however, a court need not undertake an exhaustive analysis of the *Polaroid* factors 'because counterfeits, by their very nature, cause confusion. Indeed, confusing the customer is the whole purpose of creating counterfeit goods.'" *Johnson & Johnson v. Guilin Chung Fai Biotech Co.*, No. 07-CV-1295 (LDH) (SMG), 2018 WL 2078233, at *9 (E.D.N.Y. Jan. 16, 2018) (quoting *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003)), *report and recommendation adopted*, Text Order, dated Jan. 16, 2018; *see also Safe Chain Sols.*, 2025 WL 3640661, at *1 ("I hardly think that the *Polaroid* factors are of much relevance in a case like this one involving counterfeit goods" (citing *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 312 (S.D.N.Y. 2007) (noting the limited relevance of the *Polaroid* factors in gray market cases because "the trademark at issue is always plaintiff's

actual mark" and is placed on a product that is "*almost* the same"))); *Abbott Lab'ys*, 2024 WL 4250223, at *4 ("[T]he *Polaroid* factors are of limited use in the context of 'gray market goods.'").

Therefore, in this matter, the Court "need only determine the more fundamental question of whether there are items to be confused in the first place—that is, whether the items at issue here are, in fact, counterfeit and whether Defendants sold those items." *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *9 (citation omitted); *see also Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 154 (E.D.N.Y. 2016) ("In the counterfeiting context, . . . the court need not undertake an exhaustive analysis of the *Polaroid* factors because 'counterfeit marks are inherently confusing.'" (citations omitted)).

The Complaint repeatedly and indisputably raises claims that Defaulting Defendants engaged in counterfeiting in the sale of Gilead-branded products. *See generally* Dkt. No. 1. Gilead pleads sufficient facts that amply demonstrate Defaulting Defendants' liability for trademark infringement. *See Safe Chain Sols.*, 2025 WL 3640661, at *1 ("It is self-evident that a consumer buying a Janssen-branded medication from a Defaulted Defendant thinks he is getting an authorized Janssen medication when he is not, and he is thereby confused. The counterfeit origin of the medication is the very *raison d'etre* for defendant's tortious conduct.").

The undersigned therefore respectfully recommends that Defaulting Defendants are liable on Gilead's first claim pursuant to 15 U.S.C. § 1114(1)(A).

### B. Federal Trademark Infringement Under 15 U.S.C. § 1114(1)(B)

Pursuant to 15 U.S.C. § 1114(1)(B),

> [a]ny person who . . . without the consent of the registrant . . . reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause

> confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(B). For the same reasons set forth in Part VI.A above, Gilead's allegations are sufficient to raise a federal trademark infringement claim under § 1114(1)(B). *See Int'l Code Council, Inc. v. Verma*, No. 24-CV-2026 (PKC) (RML), 2025 WL 2791155, at *4 (E.D.N.Y. Aug. 21, 2025) ("Plaintiff's well-pled allegations establish that the trademarks deployed by defendants are counterfeit as they are virtually indistinguishable from the [trademarks at issue]."), *report and recommendation adopted*, 2025 WL 2630056 (E.D.N.Y. Sep. 12, 2025).

The undersigned therefore respectfully recommends that Defaulting Defendants are liable on Gilead's second claim pursuant to 15 U.S.C. § 1114(1)(B).

## VII. Damages

As Gilead has proven Defaulting Defendants' liability, the Court next evaluates damages. "While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158 (citations omitted). "Rather, [t]he [C]ourt must be satisfied that [the] [p]laintiff has met the burden of proving damages to the [C]ourt with reasonable certainty." *Balhetchet v. Su Caso Mktg. Inc.*, No. 19-CV-4475 (PKC) (SJB), 2020 WL 4738242, at *3 (E.D.N.Y. Aug. 14, 2020) (internal quotation marks and citations omitted). On a default judgment motion, "[a]n evidentiary hearing is not required; rather, in determining damages, the Court may rely on detailed affidavits and other documentary evidence." *Abbott Lab'ys*, 2024 WL 4250223, at *7 (citations omitted). Concerning the scope of damage recovery pursuant to a default judgment, the Second Circuit has held that a default judgment does not give plaintiff "a blank check to recover from [defendant] any losses it had ever suffered from whatever source. [The plaintiff] can only recover those damages arising

from the acts and injuries pleaded and in this sense it was [plaintiff's] burden to show 'proximate cause.'" *Greyhound Exhibitgroup*, 973 F.2d at 159 (citation omitted).

A plaintiff in a Lanham Act case is authorized "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Abbott Lab'ys*, 2024 WL 4250223, at *7 (quoting 15 U.S.C. § 1117(a)); *see also Innovation Ventures*, 176 F. Supp. 3d at 158-59 (quoting same); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 316 (E.D.N.Y. 2009) (quoting same). "Damages sustained by the plaintiff" include "(1) lost sales or revenue; (2) sales at lower prices; (3) harm to market reputation; or (4) expenditures to prevent, correct, or mitigate consumer confusion." *Abbott Lab'ys*, 2024 WL 4250223, at *7 (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996)).

Gilead seeks two categories of damages. The first category concerns Defaulting Defendants Boris Aminov, Antonio Payano, Rachel Aminov, Bless You Rx, Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, and Galaxy Rx, in which Gilead seeks damages sustained by the Gilead in accordance with the methodology set forth in the expert report of Gilead's damages expert, Gregory K. Bell, Ph. D ("Dr. Bell").[15] Dkt. No. 252-2 at 20-31. Dr. Bell was tasked with assessing "the damages due to Gilead from the alleged infringing sale of certain Gilead prescription drug products." Dkt. No. 252-5.

[15] Gilead describes Dr. Bell as "a seasoned and well-respected damages expert who holds an M.B.A. and a Ph.D. in business economics, both from Harvard University, and is a Group Vice President at Charles River Associates, an economics and management consulting firm." Dkt. No. 252-2 at 11. For the past thirty years, Dr. Bell has led Charles River Associates' Life Sciences practice, which focuses on "economic issues in the pharmaceutical, biotechnology, medical device, diagnostic, and wellness industries." Dkt. No. 252-5 at 3.

The second category concerns Defaulting Defendants Ivan Ohar and the Shell Companies, in which Gilead seeks "any Defaulted Defendant's profits" as damages. Dkt. No. 252-2 at 32, 41-42. The two categories of damages are discussed, in turn, below.

**A. Damages Sustained by Gilead**

This section discusses the first category of damages sought against Defaulting Defendants Boris Aminov, Antonio Payano, Rachel Aminov, Bless You Rx, Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, and Galaxy Rx, in which Gilead seeks damages it sustained in accordance with the methodology from Dr. Bell's report. Dkt. No. 252-2 at 20-31.

**1. Joint and Several Liability**

As an initial matter, Gilead argues that "[e]ach defendant group (corporation plus principals)" must be jointly and severally liable. Dkt. No. 252-2 at 36. Gilead contends that "[s]ome of the [Defaulting] Defendants have overlapping liability—i.e., multiple Defaulting Defendants are liable for the sale of, and the resulting actual damages from, the same particular counterfeit bottle." *Id.* Plaintiff identifies these groups in its proposed final judgment against Defaulting Defendants. *See* Dkt. No. 265-1.

"Joint liability for violating the Lanham Act may be imposed on '[a]ll those who, in pursuance of a common plan to commit an act which is tortious, actively take part in it, or further it by cooperation or request, or lend aid or encouragement, or ratify and adopt the acts done,' for they 'are as equally liable as the person who performs the tortious act itself.'" *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *11 (first quoting 4 McCarthy on Trademarks and Unfair Competition § 25:23 (4th ed.); then citing *David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306 (7th Cir. 1989); then citing *Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*, No. 98-CV-6721

(ARR), 2006 WL 7077215, at *10 (E.D.N.Y. Nov. 13, 2006), *aff'd*, 279 F. App'x. 42 (2d Cir. 2008); and then citing *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 173-74 (S.D.N.Y. 1998)); *see also Azam Int'l Trading*, 2013 WL 4048295, at *12 (same).

Those who fall under this theory are jointly and severally liable, not merely jointly liable. *See Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *11 (finding defendants jointly and severally liable, not merely jointly liable); *Azam Int'l Trading*, 2013 WL 4048295, at *12 (same). "Joint liability is distinct from 'joint and several liability.'" *Lemache v. Tunnel Taxi Mgmt., LLC*, 354 F. Supp. 3d 149, 153 (E.D.N.Y. 2019) (adopting report and recommendation). "Where there is a claim premised on joint liability, it is impossible for one defendant to be liable unless all other defendants are also liable." *Id.* By contrast, in joint and several liability, "'[j]oint' refers to . . . liability imposed on several defendants acting together. The 'several' in 'joint and several' liability refers to individual liability, a liability not dependent on the actions of others." *Id.* (citation omitted). Thus, "[a] claim alleging 'joint and several liability' is one where any defendant can be liable to plaintiff in two ways: (1) regardless of whether any other defendant is liable ('several' or individual liability) or (2) where the defendant acted in concert with each and every other defendant ('joint' liability)." *Id.* In other words, "[w]hen a claim alleges joint and several liability and one defendant is found liable and other defendants are not, the two judgments are not inconsistent." *Id.* And, as the Second Circuit has held,

> [w]here two co-defendants in a civil lawsuit are found jointly and severally liable for the full amount of the damages, the plaintiff can collect that entire amount from one defendant, in full, without collecting anything from the other defendant, if that is the most expedient way for the plaintiff to enforce the judgment and be made whole (as, for example, where one defendant is wealthier than the other, or where the plaintiff can more easily attach the assets of one defendant than those of the other).

*United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022) (citations omitted); *see also Nissan Motor Acceptance Corp. v. Five Towns Nissan, LLC,* No. 16-CV-7028 (JS) (ARL), 2024 WL 2783512, at *7 (E.D.N.Y. May 29, 2024) (holding that in a contract dispute "joint and several liability permits a plaintiff to 'collect that entire amount from one defendant, in full, without collecting anything from' other parties who are also jointly and severally liable for such debts" (quoting *Yalincak*, 30 F.4th at 122)).

The undersigned discussed the connection of each of the Defaulting Defendants to the infringement scheme as part of the personal jurisdiction analysis above. *See Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *11 ("The same allegations and supporting documentation described there suffice to impose liability on each of the defendants in default."). At bottom, by selling and conspiring to sell counterfeit Gilead-branded medications bearing multiple counterfeit Gilead marks, the "groups" listed in Gilead's proposed final judgment against Defaulting Defendants are jointly and severally liable within their respective groups. *See Abbott Lab'ys*, 2024 WL 4250223, at *8-11 (holding corporate defendants and individual defendants jointly and severally liable and dividing by groups); *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *14 (recommending that judgment be entered against a corporate defendant and an individual defendant, jointly and severally, for statutory damages); *Innovation Ventures*, 176 F. Supp. 3d at 144 (describing nine groups of defendants, who are "comprised of companies alleged to have participated in the counterfeiting scheme and certain owners and/or principals of those companies"); *Allstate Ins. Co. v. Maccabi Pharmacy Rx Inc.*, No. 24-CV-6214 (CBA) (RML), 2026 WL 794231, at *12 (E.D.N.Y. Mar. 2, 2026) (imposing joint and several liability against nominal owners in a civil RICO case involving a fraud scheme), *report and recommendation adopted*, 2026 WL 792509 (E.D.N.Y. Mar. 20, 2026).

### 2. Dr. Bell's Expert Opinion

Dr. Bell's expert opinion has been recently employed and accepted in this District in *Abbott Laboratories v. Adelphia Supply USA*. *See* 2024 WL 4250223, at *8 ("This methodology which is supported by Abbott's expert, Dr. Gregory K. Bell, was already employed and accepted by the Court."); *see also* Dkt. No. 252-5 at 18-37 (list of Dr. Bell's testimony and expert reports); *see also Ghost*, 2025 WL 2487826, at *13 (finding that plaintiff was entitled to damages because plaintiff's "expert report establishes to a high degree of certainty that [defendant] benefitted from infringing on [plaintiff's mark] and the record does not suggest impropriety on Plaintiff's part" (internal quotation marks and citation omitted)).

As Dr. Bell explained, "the appropriate measure of Gilead's economic damages with regard to each sale of infringing products is the difference between the incremental profit Gilead would have earned from the sale of an equivalent unit and the incremental profit Gilead actually earned (i.e., zero)." Dkt. No. 252-5 ¶ 19. "The incremental profit per unit is equal to the lost incremental revenue per unit . . . less the incremental costs of manufacturing and distributing the product." *Id.* ¶ 23.

Regarding lost incremental revenue per unit, Dr. Bell explains, "Gilead sells its prescription drug products to its authorized distributors at the same [Wholesale Acquisition Cost ("WAC")] price, [redacted]." *Id.* ¶ 24. Thus, lost incremental revenue per unit is the "WAC price [redacted]." *Id.* As a "conservative estimate," Dr. Bell assumes that "all authorized distributors purchasing the legitimate Gilead drug products at issue would have [redacted]." *Id.* There are no other [redacted]. *Id.*

Regarding incremental costs of manufacturing and distributing the product, Dr. Bell uses Gilead's annual average Cost of Goods Sold ("COGS"), reported as a percentage of global net sales, to account for the manufacturing and distribution costs Gilead otherwise would have incurred but for Defaulting Defendants' supply of infringing products. *Id.* ¶ 26.

The resulting calculation for incremental profit per unit is in Exhibit D of Dr. Bell's expert report, in relevant part displayed below:

**Exhibit D: Incremental Profit per Unit Sold per Year by Gilead Drug Product**

| Drug Product<br>*(USD)* | 2020<br>[a] | 2021<br>[b] | 2022<br>[c] | 2023<br>[d] |
|---|---|---|---|---|
| [1] Atripla | [redacted] | | | |
| [2] Biktarvy | | | | |
| [3] Complera | | | | |
| [4] Descovy | | | | |
| [5] Emtriva 200 mg | | | | |
| [6] Epclusa | | | | |
| [7] Genvoya | | | | |
| [8] Harvoni | | | | |
| [9] Odefsey | | | | |
| [10] Ranexa 1000 mg | | | | |
| [11] Stribild | | | | |
| [12] Truvada | | | | |
| [13] Vosevi | | | | |

*Id.* at 49.

The annual units distributed by Defaulting Defendants for each drug product is depicted in Exhibit E of Dr. Bell's expert report. *Id.* ¶ 29; *id.* at 52. The data is based on "a conservative assumption," which includes only "(1) sales made on online pharmacy-to-pharmacy marketplaces, and (2) products dispensed to patients that were subject to Medicaid rebates." *Id.* ¶ 28. Further, the data "omit any sales that Defendants made outside of pharmacy-to-pharmacy marketplaces or were made to patients that were billed to private insurers." *Id.* Exhibit E is further broken down per pharmacy: Exhibit E-1 is the count of units distributed by Bless You Rx, Exhibit E-2 is the count of units distributed by Chemistry Bench, Exhibit E-3 is the count of units distributed by "D

J Drugs" (discussed further below), Exhibit E-4 is the count of units distributed by Galaxy Rx, Exhibit E-5 is the count of units distributed by Island Pharmacy, Exhibit E-6 is the count of units distributed by Laconia Ave. Pharmacy, and Exhibit E-7 is the count of units distributed by River Chemist. *Id.* at 52-59. Exhibit E is displayed below in relevant part:

**Exhibit E: Count of Units Distributed by Defendants**

| | Defendant *(Count)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Bless You Rx Inc | 6 | 216 | 641 | 175 | **1,038** |
| [2] | Chemistry Bench Inc | | 792 | 459 | 8 | **1,259** |
| [3] | D J Drugs | 17 | 7 | | 5 | **29** |
| [4] | Galaxy Rx Inc | | 10 | 736 | 224 | **970** |
| [5] | Island Pharmacy and Discount Corporation | 564 | 1,957 | 395 | | **2,916** |
| [6] | Laconia Avenue Pharmacy Corporation | 15 | 29 | 220 | | **264** |
| [7] | River Chemists Corp | | 80 | | | **80** |
| [8] | **Total** | **602** | **3,091** | **2,451** | **412** | **6,556** |

*Id.* at 52.

In sum, Dr. Bell calculates Gilead's economic loss as follows: "As shown on Exhibit F, [Dr. Bell] calculate[s] lost profit damages due to Gilead by each of the Defendants by multiplying the annual per unit incremental profit for each drug product (Exhibit D) by the annual number of infringing product for each drug product (Exhibit E)." *Id.* ¶ 30. In other words, the calculation of economic loss (Exhibit F) is equal to the totals identified in Exhibit D multiplied by the totals identified in Exhibit E.

Exhibit F is further broken down as lost profit damages due to Gilead on a per pharmacy basis: Exhibit F-1 is the lost profit damages by Bless You Rx, Exhibit F-2 is the lost profit damages by Chemistry Bench, Exhibit F-3 is the lost profit damages by "D J Drugs," Exhibit F-4 is the lost profit damages by Galaxy Rx, Exhibit F-5 the lost profit damages by Island Pharmacy, Exhibit F-6 is the lost profit damages by Laconia Ave. Pharmacy, and Exhibit F-7 is the lost profit damages by River Chemist. *Id.* at 61-67. Exhibit F is displayed below in relevant part:

**Exhibit F: Lost Profit Damages due to Gilead by Defendants**

| | Defendant *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Bless You Rx Inc | [redacted] | [redacted] | [redacted] | [redacted] | $2,529,188 |
| [2] | Chemistry Bench Inc | [redacted] | [redacted] | [redacted] | [redacted] | $3,126,625 |
| [3] | D J Drugs | [redacted] | [redacted] | [redacted] | [redacted] | $54,879 |
| [4] | Galaxy Rx Inc | [redacted] | [redacted] | [redacted] | [redacted] | $2,617,141 |
| [5] | Island Pharmacy and Discount Corporation | [redacted] | [redacted] | [redacted] | [redacted] | $6,920,737 |
| [6] | Laconia Avenue Pharmacy Corporation | [redacted] | [redacted] | [redacted] | [redacted] | $642,694 |
| [7] | River Chemists Corp | [redacted] | [redacted] | [redacted] | [redacted] | $190,161 |
| [8] | **Total** | [redacted] | [redacted] | [redacted] | [redacted] | $16,081,425 |

*Id.* at 60.

### 3. Specific Calculations

The specific damages calculations for each Defaulting Defendant are set out below.

#### a. Rachel Aminov, Bless You Rx, Boris Aminov, and Antonio Payano

The lost profit damages due to Gilead by Bless You Rx (Exhibit F-1) equals the incremental profit per unit sold per year by Gilead (Exhibit D, above) multiplied by the count of units distributed by Bless You Rx (Exhibit E-1). Rachel Aminov is jointly and severally liable because she is the owner of record of Bless You Rx. Dkt. No. 1 ¶¶ 24, 25, 120. Boris Aminov and Antonio Payano are jointly and severally liable because they are "at the top of the counterfeiting conspiracy." Dkt. No. 252-2 at 26. Thus, the lost profit damages due to Gilead by Rachel Aminov, Boris Aminov, Antonio Payano, and Bless You Rx, jointly and severally, is $2,529,188.00. The relevant portions of Dr. Bell's report are reproduced below:

**Exhibit E-1: Count of Units Distributed by Bless You Rx Inc**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | | 4 | | **4** |
| [2] | Biktarvy | | 75 | 414 | 109 | **598** |
| [3] | Complera | | | 3 | | **3** |
| [4] | Descovy | 6 | 113 | 59 | 9 | **187** |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | | 84 | 30 | **114** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | 16 | 50 | 13 | **79** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | 1 | | | **1** |
| [12] | Truvada | | 11 | 27 | 14 | **52** |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | **6** | **216** | **641** | **175** | **1,038** |

Dkt. No. 252-5 at 53.

**Exhibit F-1: Lost Profit Damages due to Gilead by Bless You Rx Inc**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | [redacted] | | | | |
| [2] | Biktarvy | | | | | |
| [3] | Complera | | | | | |
| [4] | Descovy | | | | | |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | | | | |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | | | |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Lost Profits** | [redacted] | | | | **$2,529,188** |

*Id.* at 61.

**b. Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, Boris Aminov, and Antonio Payano**

Gilead argues that Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, and Crystal Medina should be jointly and severally liable for lost profits in connection with Island Pharmacy and Laconia Ave. Pharmacy. Dkt. No. 252-2 at 30-31; Dkt. No. 265-1 ¶ 3.[16] Boris Aminov and Antonio Payano are also jointly and severally liable because they are "at the top of the counterfeiting conspiracy." Dkt. No. 252-2 at 26.

As a threshold matter, Gilead can obtain a civil judgment against Christy Corvalan even though the U.S. District Court for the Southern District of New York ordered Christy Corvalan to pay, jointly and severally with her co-conspirators, a $7.6 million criminal restitution award ("the SDNY Order") based on the same evidence of damages as presented here and in Dr. Bell's expert report. *Id.* at 30-31. The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3664(j)(2), provides, "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in [any federal or state civil proceeding]." *Yalincak*, 30 F.4th at 131 (quoting 18 U.S.C. § 3664(j)(2)). In this scenario, a defendant is "entitled to move the district court for a credit or offset to their restitution obligations pursuant to § 3664(j)(2) once a victim has recovered such damages." *United States v. Yalincak*, 853 F.3d 629, 637 (2d Cir. 2017). In other words, "[a] district court's resolution of a motion for credit under § 3664(j)(2) comes after an order of restitution has already been issued—when a victim 'later recover[s]' compensatory damages in a state or federal civil proceeding for the 'same loss' covered by the order of restitution." *Id.* (quoting 18 U.S.C. § 3664(j)(2)). Thus,

[16] Gilead's proposed final judgment contains two paragraphs that are both labeled "3." *See* Dkt. No. 265-1 at 2, 3-4. This citation refers to the second paragraph "3."

the criminal restitution order does not bar Gilead from obtaining a civil judgment against Christy Corvalan.[17]

Likewise, that Gilead has separately sued one of Christy Corvalan's pharmacies, Laconia Ave. Pharmacy, in *Gilead I* does not prevent Gilead from obtaining a civil judgment against Christy Corvalan, David Fernandez, Dezyre Baez, and Crystal Medina in the present action. As discussed above, Corvalan allegedly employed David Fernandez, Dezyre Baez, and Crystal Medina, and they are co-conspirators in the trafficking of counterfeit Gilead medications "through Defendant Island Pharmacy & Discount Corp and/or Laconia Pharmacy." Dkt. No. 1 ¶¶ 45-47. Each Corporate Defendant and/or Individual Defendant that is part of the same group is jointly and severally liable for the same damages. *See Abbott Lab'ys*, 2024 WL 4250223, at *8-11 ("The instant record supports an award of damages against the defaulted defendants based on Abbott's lost revenue theory. As to the differences between the defendants, Abbott's specific allegations support its calculation of damages against each defaulted defendant."); *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *14; *Innovation Ventures*, 176 F. Supp. 3d at 144. Further, "because of joint and several liability, joint tortfeasors and coconspirators are not indispensable parties under the Federal Rules of Civil Procedure." *Trs. of Nat'l Ret. Fund v. Fireservice Mgmt. LLC*, 384 F. Supp. 3d 412, 419 (S.D.N.Y. 2019) (citation omitted). In other words, "it is not necessary for all

[17] Gilead was able to partially recover funds from Christy Corvalan in connection with the criminal case against her in the Southern District of New York. Dkt. No. 254. On July 15, 2024, the U.S. District Court for the Southern District of New York action entered a preliminary order of forfeiture, forfeiting Christy Corvalan's right, title, and interest in a 2021 Mercedes-Benz Maybach, and all funds totaling $1.1 million in a JP Morgan Chase Account ending in 9587 ("the JPMorgan Chase Account"). Dkt. No. 254-1 at 4. Gilead applied to this Court for an order modifying the asset freeze (Dkt. No. 254), which this Court granted. Dkt. No. 255. Based upon the agreement between the U.S. Attorney's Office for the Southern District of New York and Gilead, once Gilead notifies the Government that the asset freeze order has been modified, the Government shall seize the entirety of the JP Morgan Chase Account and transmit to Gilead its portion of the funds, which total $555,094.00. Dkt. No. 254-1 at 6. Nevertheless, based on the record before the Court, it is premature at this juncture to determine whether this recovery is for the "same loss" covered by the order of restitution.

joint tortfeasors to be named as defendants in a single lawsuit." *Grimes v. CBS Corp.*, No. 17-CV-8361, 2018 WL 3094919, at *2 (S.D.N.Y. June 21, 2018) (Nathan, J.) (quoting *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990)).

But, as Gilead concedes, "that does not mean that Gilead can *recover* full damages against . . . Corvalan in this suit and also *recover* damages against Laconia Avenue Pharmacy in [*Gilead I*]. As in all instances involving joint-and-several liability, Gilead is entitled to *full judg[]ments* against each tortfeasor, but is limited to *recovering* its damages once." Dkt. No. 256 at 7. The Second Circuit's decision in *United States v. Yalincak*, 30 F.4th 115 (2d Cir. 2022), is illustrative. In *Yalincak*, the Second Circuit explained criminal restitution through the lens of joint and several liability in the context of common law torts. *Id.* at 122. As the Second Circuit explained, "[i]f the court chooses . . . [to] impose[] the full restitution obligation on both offenders, doing so does not entitle the victim to a double recovery; the goal of the statute is to provide crime victims with full compensation, but not with a windfall." *Id.* The Second Circuit further explained that it is "drawing from the common law . . . [of] 'joint and several' liability—although the MVRA does not use that term." *Id.* (citations omitted). According to the Second Circuit, "[i]n the common law tort context . . . the 'effect of joint liability . . . is to excuse one defendant from paying any portion of the judgment if the plaintiff collects the full amount from the other.'" *Id.* (citations omitted).[18]

In sum, although Gilead can obtain a civil judgment against Christy Corvalan notwithstanding the SDNY Order, and a civil judgment against Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, and Crystal Medina, jointly and severally,

[18] There are, of course, differences between the MVRA and "true" joint and several liability under the common law. *Yalincak*, 30 F.4th at 124-25 (explaining hybrid restitution orders). Further, the right of contribution available among joint tortfeasors is unavailable under the Lanham Act. *Getty Petrol. Corp. v. Island Transp. Corp.*, 862 F.2d 10, 16 (2d Cir. 1988). But this discussion is not relevant for the resolution of the present motion.

notwithstanding how Gilead has sued one of Corvalan's pharmacies, Laconia Ave. Pharmacy, in *Gilead I*, Gilead can ultimately only recover full damages once—which they are seeking here.

The lost profit damages due to Gilead by Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, and Crystal Medina are obtained by adding the total lost profits from Exhibit F-5 (the lost profit damages by Island Pharmacy) and Exhibit F-6 (the lost profit damages by Laconia Ave. Pharmacy). Exhibits F-5 and F-6 are obtained by multiplying the incremental profit per unit sold per year by Gilead (Exhibit D, above) by the totals in Exhibits E-5 and E-6 (the count of units distributed by Island Pharmacy and Laconia Ave. Pharmacy, respectively). Accordingly, the lost profit damages due to Gilead by Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, Boris Aminov, and Antonio Payano, jointly and severally, constitute $6,920,737.00 plus $642,694.00, which equals $7,563,431.00. The relevant portions of Dr. Bell's report are reproduced below:

**Exhibit E-5: Count of Units Distributed by Island Pharmacy and Discount Corporation**

| | Drug Product | 2020<br>[a] | 2021<br>[b] | 2022<br>[c] | 2023<br>[d] | Total<br>[e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | 4 | | | | **4** |
| [2] | Biktarvy | 262 | 1,156 | 248 | | **1,666** |
| [3] | Complera | 8 | 4 | 1 | | **13** |
| [4] | Descovy | 70 | 211 | 41 | | **322** |
| [5] | Emtriva 200 mg | 1 | | | | **1** |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | 143 | 383 | 65 | | **591** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | 48 | 113 | 33 | | **194** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | 1 | | | | **1** |
| [12] | Truvada | 27 | 90 | 7 | | **124** |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | **564** | **1,957** | **395** | | **2,916** |

Dkt. No. 252-5 at 57.

**Exhibit E-6: Count of Units Distributed by Laconia Avenue Pharmacy Corporation**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | | | | |
| [2] | Biktarvy | | | 138 | | **138** |
| [3] | Complera | | | 1 | | **1** |
| [4] | Descovy | | 1 | 26 | | **27** |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | 3 | 12 | 34 | | **49** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | 12 | | **12** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | 12 | 16 | 9 | | **37** |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | **15** | **29** | **220** | | **264** |

*Id.* at 58.

**Exhibit F-5: Lost Profit Damages due to Gilead by Island Pharmacy and Discount Corporation**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | [redacted] | | | | |
| [2] | Biktarvy | | | | | |
| [3] | Complera | | | | | |
| [4] | Descovy | | | | | |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | | | | |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | | | |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Lost Profits** | [redacted] | | | | **$6,920,737** |

*Id.* at 65.

**Exhibit F-6: Lost Profit Damages due to Gilead by Laconia Avenue Pharmacy Corporation**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [2] | Biktarvy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [3] | Complera | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [4] | Descovy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [5] | Emtriva 200 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [6] | Epclusa | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [7] | Genvoya | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [8] | Harvoni | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [9] | Odefsey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [10] | Ranexa 1000 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [11] | Stribild | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [12] | Truvada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [13] | Vosevi | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [14] | **Total Lost Profits** | [redacted] | [redacted] | [redacted] | | **$642,694** |

*Id.* at 66.

**c. Galaxy Rx, Boris Aminov, and Antonio Payano**

The lost profit damages due to Gilead by Galaxy Rx (Exhibit F-4) is equal to the incremental profit per unit sold per year by Gilead (Exhibit D, above) multiplied by the total in Exhibit E-4, the count of units distributed by Galaxy Rx. As explained separately, below, Boris Aminov and Antonio Payano are jointly and severally liable because they are "at the top of the counterfeiting conspiracy." Dkt. No. 252-2 at 26. Therefore, lost profit damages due to Gilead by Galaxy Rx, Boris Aminov, and Antonio Payano, jointly and severally, total $2,617,141.00. The relevant portions of Dr. Bell's report are reproduced below:

**Exhibit E-4: Count of Units Distributed by Galaxy Rx Inc**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | | | | |
| [2] | Biktarvy | | 5 | 517 | 141 | **663** |
| [3] | Complera | | | 1 | | **1** |
| [4] | Descovy | | 1 | 33 | 17 | **51** |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | 1 | 117 | 53 | **171** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | 3 | 68 | 13 | **84** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | | **10** | **736** | **224** | **970** |

Dkt. No. 252-5 at 56.

**Exhibit F-4: Lost Profit Damages due to Gilead by Galaxy Rx Inc**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | [redacted] | | | |
| [2] | Biktarvy | | | | | |
| [3] | Complera | | | | | |
| [4] | Descovy | | | | | |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | | | | |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | | | |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Lost Profits** | | [redacted] | | | **$2,617,141** |

*Id.* at 64.

**d. Boris Aminov and Antonio Payano**

As discussed, Gilead argues that "Boris Aminov and Antonio Payano were at the top of the counterfeiting conspiracy." Dkt. No. 252-2 at 26. Gilead submits that damages payable by Boris Aminov and Antonio Payano are as follows:

| **Pharmacy** | **Bottles Sold** | **Resulting Damages** |
|---|---|---|
| Bless You Rx | 1,038 | $2,529,188.00 |
| Island Pharmacy | 2,916 | $6,920,737.00 |
| Laconia Ave. Pharmacy | 264 | $642,694.00 |
| Galaxy Rx | 970 | $2,617,141.00 |
| Chemistry Bench | 1,259 | $3,126,625.00 |
| River Chemists | 109 | $245,040.00 |
| **Total** | **6,556** | **$16,081,425.00** |

*Id.* at 29.

As a threshold matter, the U.S. District Court for the Southern District of New York criminal action, Payano was ordered to pay, jointly and severally with his co-conspirators, $16 million in restitution, and Gilead did not seek a criminal restitution award against Boris Aminov. Dkt. No. 252-2 at 28 & n.6. For the same reasons as discussed regarding Christy Corvalan, the criminal restitution order does not bar Gilead's ability to obtain a civil judgment against Payano.

Further, as discussed, each Corporate Defendant and/or Individual Defendant who are part of the same group are jointly and severally liable for the same damages, *see Abbott Lab'ys*, 2024 WL 4250223, at *8-11, and it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit, *see Grimes*, 2018 WL 3094919, at *2.

In light of the above recommendations that Boris Aminov and Antonio Payano are jointly and severally liable with (1) Rachel Aminov and Bless You Rx for $2,529,188.00; (2) Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, and Crystal Medina for $7,563,431.00; and (3) Galaxy Rx for $2,617,141.00, the undersigned respectfully recommends that Boris Aminov and Antonio Payano should additionally be jointly and severally liable for lost profits relating to River Chemists and Chemistry Bench in the aggregate amount of $3,371,665.00.

*See* Dkt. No. 265-1 ¶ 1[19] ("That Plaintiffs [Gilead] have judgment against Boris Aminov and Antonio Payano, jointly and severally, in the amount of [three times $3,371,665.00].").

**i. River Chemists**

Gilead alleges that Boris Aminov and Antonio Payano are jointly and severally liable for lost profit damages due to Gilead by River Chemists. According to the National Provider Identifier database maintained by the U.S. Centers for Medicare & Medicaid Services, River Chemists does business as "D.J. Drugs." Dkt. No. 252-34; *see* Fed. R. Evid. 201(d) (stating that "[t]he court may take judicial notice at any stage of the proceeding"). Dr. Bell calculated the lost profits by what he calls "River Chemists Corp." and "D J Drugs" separately, but Gilead has clarified that they are the same entity. Dkt. No. 252-2 at 29 n.7.

The lost profit damages calculations due to Gilead by River Chemists are obtained by adding the total lost profits damages regarding River Chemists (Exhibit F-7) and D J Drugs (Exhibit F-3). *Id.* at 29; Dkt. No. 252-5 at 63, 67. Exhibits F-7 and F-3 are obtained by multiplying the incremental profit per unit sold per year by Gilead (Exhibit D, above) by the totals identified in Exhibits E-7 and E-3, the count of units distributed by River Chemists and D J Drugs, respectively. The relevant portions of Dr. Bell's report are reproduced below:

[19] Gilead's proposed final judgment contains two paragraphs that are both labeled "1." *See* Dkt. No. 265-1 at 1, 3. This citation refers to the second paragraph "1."

**Exhibit E-7: Count of Units Distributed by River Chemists Corp**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | 5 | | | **5** |
| [2] | Biktarvy | | 25 | | | **25** |
| [3] | Complera | | 2 | | | **2** |
| [4] | Descovy | | 4 | | | **4** |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | 22 | | | **22** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | 1 | | | **1** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | 2 | | | **2** |
| [12] | Truvada | | 18 | | | **18** |
| [13] | Vosevi | | 1 | | | **1** |
| [14] | **Total Units** | | **80** | | | **80** |

Dkt. No. 252-5 at 59.

**Exhibit E-3: Count of Units Distributed by D J Drugs**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | | | | |
| [2] | Biktarvy | | | | | |
| [3] | Complera | | | | | |
| [4] | Descovy | | | | | |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | 7 | 7 | | 5 | **19** |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | | | |
| [10] | Ranexa 1000 mg | 10 | | | | **10** |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | **17** | **7** | | **5** | **29** |

*Id.* at 55.

**Exhibit F-7: Lost Profit Damages due to Gilead by River Chemists Corp**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [2] | Biktarvy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [3] | Complera | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [4] | Descovy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [5] | Emtriva 200 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [6] | Epclusa | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [7] | Genvoya | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [8] | Harvoni | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [9] | Odefsey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [10] | Ranexa 1000 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [11] | Stribild | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [12] | Truvada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [13] | Vosevi | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [14] | **Total Lost Profits** | | **$190,161** | | | **$190,161** |

*Id.* at 67.

**Exhibit F-3: Lost Profit Damages due to Gilead by D J Drugs**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [2] | Biktarvy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [3] | Complera | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [4] | Descovy | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [5] | Emtriva 200 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [6] | Epclusa | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [7] | Genvoya | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [8] | Harvoni | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [9] | Odefsey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [10] | Ranexa 1000 mg | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [11] | Stribild | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [12] | Truvada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [13] | Vosevi | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [14] | **Total Lost Profits** | [redacted] | [redacted] | [redacted] | [redacted] | **$54,879** |

*Id.* at 63.

Accordingly, the lost profits due to Gilead in relation to River Chemists, and hence, by Boris Aminov and Antonio Payano, jointly and severally, are $190,161.00 plus $54,879.00, which equals $245,040.00.

**ii. Chemistry Bench**

Additionally, Gilead seeks damages as to Chemistry Bench, even though Chemistry Bench is not mentioned in the Complaint. *See* Dkt. No. 252-2 at 27 ("Moreover, Gilead learned through third-party discovery that one of [Boris] Aminov's customers, settled defendant Roman Shamalov (principal of defendant River Chemists), also operated another pharmacy through which he sold counterfeits purchased from [Boris] Aminov: Chemistry Bench Inc."); Dkt. No. 1 ¶ 50 (alleging that Shamalov is "the principal of record and CEO of defendant River Chemists Corp," but not mentioning Chemistry Bench); Dkt. No. 258 (supplemental letter dated June 22, 2026, where Gilead explains how "Gilead seeks damages attributable to sales of counterfeit Gilead-branded medicines that Boris Aminov and Antonio Payano made to . . . Chemistry Bench Inc.").

Because the Complaint does not contain allegations regarding Chemistry Bench, on June 18, 2026, the undersigned directed Gilead to file a supplemental letter setting forth the factual and legal basis for recovery of damages relating to Chemistry Bench. Text Order, dated June 18, 2026. On June 22, 2026, Gilead filed a letter, arguing that the proof of sales to Chemistry Bench do "not go to the issue of *liability*," but rather "to the question of *damages*." Dkt. No. 258 at 2.[20] For the reasons discussed below, the undersigned respectfully recommends that the requested damages relating to Chemistry Bench be awarded to Gilead as against Boris Aminov.

---

[20] Gilead cites to *Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F. Supp. 2d 669 (S.D.N.Y. 2009), for the proposition that "in a typical Lanham Act case involving consumer goods, it would be impossible for plaintiff to plead the identity of all the purchasers of the infringing product." Dkt. No. 258 at 1. *Phillip Morris USA*, however, is distinguishable because, there, "Philip Morris employed purchasers who bought one or more counterfeit packs of cigarettes from *each* defendant's retail establishment," 592 F. Supp. 2d at 672 (emphasis added), whereas here, Gilead seeks to obtain damages from Boris Aminov and Antonio Payano regarding their sale of counterfeit medication to a pharmacy not named in the Complaint. *Philip Morris USA* is further distinguishable because the plaintiff there sought statutory damages under 15 U.S.C. § 1117(c) because of the "difficulty of calculating actual damages caused by counterfeiters." 592 F. Supp. 2d at 673.

As set forth above, liability is established as to each Defaulting Defendant. Liability is also established as to Boris Aminov and Antonio Payano in relation to Chemistry Bench; the Complaint alleges that Boris Aminov "sold [the counterfeits] to other pharmacies owned by his coconspirators" (Dkt. No. 1 ¶ 22), and that "Payano sold at least some of the counterfeit HIV medication that he helped source and manufacture to New York City pharmacies" (*id.* ¶ 130). Roman Shamalov allegedly used his pharmacy River Chemists to "knowingly and willfully buy counterfeit HIV medications, including Gilead-branded medication, from Defendant Boris Aminov" and another individual not relevant to this motion. *Id.* ¶ 140. Shamalov paid Boris Aminov through the Shell Companies that disguised the nature of the payments. *Id.* Once Shamalov procured the counterfeit HIV medication, he distributed it to unsuspecting patients of his pharmacies. *Id.* Shamalov also resold counterfeit HIV medication to other pharmacies through the online pharmaceutical marketplaces. *Id.* ¶ 141. Importantly, Gilead alleges that the pharmacies who purchased counterfeit medication from Boris Aminov and his co-conspirators included "at a minimum" River Chemists, whose principal is Shamalov. *Id.* ¶ 131.

Through third-party discovery, Gilead learned that, in addition to River Chemists, Roman Shamalov also operated another pharmacy through which he sold counterfeit Gilead branded medication purchased from Boris Aminov. Dkt. No. 252-2 at 27; *see also* Dkt. No. 252-26 at 37 (EzriRx.com data that shows Roman Shamalov is connected with Chemistry Bench); Dkt. No. 252-28 at 9 (Gilead requesting restitution for sales of counterfeit Gilead-branded medication through Chemistry Bench); Dkt. No. 252-29 (U.S. District Court for the Southern District of New York action granting restitution for sales of counterfeit medication through Chemistry Bench). In Antonio Payano's sentencing memorandum as part of the Southern District of New York action, Payano, through counsel, stated that "Mr. Payano joined a conspiracy with . . . Roman Shamalov,

Boris Aminov and others to divert and distribute black market HIV medications." Dkt. No. 252-30 at 2. Because Gilead has established that Boris Aminov and Antonio Payano committed trademark infringement in relation to Chemistry Bench, the only question is whether Gilead proved damages with "reasonable certainty." *Balhetchet*, 2020 WL 4738242, at *3.

Here, Gilead has proven damages relating to Chemistry Bench with a "reasonable certainty." Based on the third-party production of documents showing transactions involving EzriRx.com, Shamalov is the operator of Chemistry Bench. Dkt. No. 252-26 at 37; *see also* Dkt. No. 252-28 (Gilead requesting restitution for sales through Chemistry Bench in the criminal action in the U.S. District Court for the Southern District of New York); Dkt. No. 252-29 (additional order of restitution as to sales through Chemistry Bench in the U.S. District Court for the Southern District of New York action). The remainder of the damages calculations is derived from the same method as with other Defaulting Defendants in the first category of damages sustained by Gilead, to wit, as set forth in Dr. Bell's expert report.

The lost profit damages due to Gilead in relation to Chemistry Bench (Exhibit F-2) is equal to the incremental profit per unit sold per year by Gilead (Exhibit D, above) multiplied by the total in Exhibit E-2, the count of units distributed by Chemistry Bench. The relevant portions of Dr. Bell's report are reproduced below:

**Exhibit E-2: Count of Units Distributed by Chemistry Bench Inc**

| | Drug Product | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | 1 | | | 1 |
| [2] | Biktarvy | | 486 | 275 | 2 | **763** |
| [3] | Complera | | 9 | 4 | | **13** |
| [4] | Descovy | | 112 | 79 | 4 | **195** |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | 3 | 1 | | **4** |
| [7] | Genvoya | | 110 | 43 | | **153** |
| [8] | Harvoni | | | 1 | | **1** |
| [9] | Odefsey | | 62 | 46 | | **108** |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | 9 | 10 | 2 | **21** |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Units** | | **792** | **459** | **8** | **1,259** |

Dkt. No. 252-5 at 54.

**Exhibit F-2: Lost Profit Damages due to Gilead by Chemistry Inc Bench**

| | Drug Product *(USD)* | 2020 [a] | 2021 [b] | 2022 [c] | 2023 [d] | Total [e] |
|---|---|---|---|---|---|---|
| [1] | Atripla | | [redacted] | | | |
| [2] | Biktarvy | | | | | |
| [3] | Complera | | | | | |
| [4] | Descovy | | | | | |
| [5] | Emtriva 200 mg | | | | | |
| [6] | Epclusa | | | | | |
| [7] | Genvoya | | | | | |
| [8] | Harvoni | | | | | |
| [9] | Odefsey | | | | | |
| [10] | Ranexa 1000 mg | | | | | |
| [11] | Stribild | | | | | |
| [12] | Truvada | | | | | |
| [13] | Vosevi | | | | | |
| [14] | **Total Lost Profits** | | [redacted] | | | **$3,126,625** |

*Id.* at 62.

Accordingly, the lost profits due to Gilead in relation to Chemistry Bench, and hence, due by Boris Aminov and Antonio Payano, jointly and severally, are $3,126,625.00.

***

In sum, as a separate group, Boris Aminov and Antonio Payano are jointly and severally liable for lost profit damages in relation to River Chemists, in the amount of $245,040.00, and Chemistry Bench, in the amount of $3,126,625.00. The sum of these two figures yields $3,371,665.00.

**B. Defendants' Profits**

This section discusses the second category of damages regarding Defaulting Defendants Ivan Ohar and the Shell Companies, from which Gilead seeks the "equitable relief" of profits from Ivan Ohar's and the Shell Companies' sales of infringing products. Dkt. No. 252-2 at 32, 41-42.

"The Lanham Act provides for a prevailing plaintiff . . . to recover the 'defendant's profits' deriving from a trademark violation." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 325 (2025) (quoting 15 U.S.C. § 1117(a)). "The most straightforward—though admittedly incomplete—measure of relief in this action is disgorgement of defendant's profits. An award of the infringer's profits serves the purpose of preventing unjust enrichment and deterring willful infringement, in addition to providing an alternative measure of the mark holder's actual damages." *Hilton v. Int'l Perfume Palace, Inc.*, No. 12-CV-5074, 2013 WL 5676582, at *6 (E.D.N.Y. Oct. 17, 2013) (Bianco, J.) (adopting report and recommendation) (citation omitted).

Under 15 U.S.C. § 1117(a), "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 359 (E.D.N.Y. Apr. 12. 2010) (Bianco, J.) (quoting 15 U.S.C. § 1117(a)). In the context of a default judgment motion, a "plaintiff is entitled to recover [a defaulting defendant's proven] gross revenue . . . with no reductions for expenses." *Hilton*, 2013 WL 5676582, at *6 (citation omitted). Gilead need not show willful infringement to obtain an award of Defaulting Defendants' profits. *RVC Floor Decor, Ltd. v. Floor & Decor*

*Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 331 (E.D.N.Y. 2021) (citing, *inter alia*, *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020)).

**1. Ivan Ohar**

Gilead has submitted third-party records obtained from three online platforms—MatchRx.com, Rxeed.com, and RxWorld.com—that show the gross revenue of Best Scripts, of which Ivan Ohar is a principal. *See* Dkt. No. 252-23 (MatchRx.com); Dkt. No. 252-24 (Rxeed.com); Dkt. No. 252-25 (RxWorld.com). Gilead summarized the data in its moving papers and in a supplemental declaration and spreadsheet, at the request of the Court. *See* Dkt. No. 252-2 at 33; Dkt. No. 266; Dkt. No. 267-1. The Court has reviewed Gilead's supplemental declaration (Dkt. No. 266) and spreadsheet (Dkt. No. 267-1), and also independently conducted its own review of the data. The Court attaches two appendices to this Report and Recommendation showing the total proceeds calculated by the undersigned (Appendix A) and how the undersigned calculated the data (Appendix B).

The below chart summarizes the Court's calculations as to the proceeds attributable to Ivan Ohar via Best Scripts:[21]

[21] The proffered table does not have a column for price because the price of the same medication differs among the three online platforms, and even differs on the same platform by the same pharmacy. For example, on MatchRx.com, on March 11, 2024, Best Scripts sold an alleged counterfeit bottle of BIKTARVY® for $3,423.84, and the following day sold the same medication for $3,384.02. Dkt. No. 252-23 at 2.

| Drug Product | Bottles | Total Proceeds of Sales |
|---|---|---|
| Biktarvy® | 73 | $217,556.88 |
| Descovy® | 40 | $62,070.25 |
| Epclusa® | 3 | $59,500.00 |
| Genvoya® | 6 | $17,705.00 |
| Odefsey® | 7 | $18,755.00 |
| Sovaldi® | 1 | $6,000.00 |
| Truvada® | 2 | $2,405.00 |
| Vosevi® | 1 | $13,000.00 |
| **TOTAL** | **134** | **$396,992.13**[22] |

Appendix A; *see also* Appendix B.

### 2. The Shell Companies

As established above, Boris Aminov used the Shell Companies "to facilitate the sale of the counterfeits and to hide and launder the illicit proceeds of their counterfeiting scheme." Dkt. No. 1 ¶ 126. Boris Aminov personally instructed the pharmacy customers to make payments to the Shell Companies in exchange for the counterfeit medications. *Id.* ¶ 127. Although the Shell Companies received payments from other pharmacies that purchased counterfeits, Gilead was able to obtain payment records from only Island Pharmacy and Laconia Ave. Pharmacy. *See, e.g.*, Dkt. Nos. 252-42, 252-43.

On September 29, 2026, the Court entered an order noting that, upon further review, there appear to be mathematical errors in the proceeds calculation in Gilead's motion, at Dkt. No. 252-2 at 34, as to ten of the Shell Companies: Dynamic Pharmaceuticals Supply Inc.; Foster Media Group Inc.; Foster Media Pharmaceutical Supply Corp.; J&M Medical Supply Inc.; JFK

[22] This total is $1,500.00 less than the total proceeds calculated by Gilead. *See* Dkt. No. 252-2 at 33. The discrepancy lies in Gilead's calculation of the proceeds as to Descovy, which Gilead calculated as $63,570.25. *Id.* Upon review of Gilead's spreadsheet, the undersigned found that Gilead twice counted an order with the same order number (117958), lot number (040476), and price ($1,500.00). Dkt. No. 267-1. While the buyers of these orders appear to be different according to the underlying document, all of the other information concerning these entries is the same, including the order date. Dkt. No. 252-24 at 3, 196. Accordingly, the listing of this order twice, with different buyers, appears to be a scrivener's error. The undersigned, therefore, counted this purchase only once and has reduced the proceeds by $1,500.00. *See* Appendix A; Appendix B.

Wholesale & Retail Medical Supply Corp.; New Line of Pharmaceutical, Inc.; Onliner Marketing Corp.; Park Avenue Pharmaceutical Corp.; Pharmaceutical Way, Inc.; and Y&S Statistic Medical Supply Inc. *See* Text Order, dated Sep. 29, 2026. The Court ordered Gilead to file a supplemental memorandum of law in further support of its motion that corrects any damages errors regarding the Shell Companies. *Id.* The Court ordered Gilead to attach to its supplemental memorandum of law the following: (1) a declaration explaining the basis for each damages assertion made related to the Shell Companies; and (2) a spreadsheet of each respective damages calculation. *Id.* Because the damages calculations are derived from adding the individual checks from banking records (Dkt. Nos. 252-42, 252-43), the Court ordered Gilead to include references to the individual check numbers for each calculation on the spreadsheet. Text Order, dated Sep. 29, 2026.

On October 8, 2026, consistent with the Court's order, Gilead filed its supplemental memorandum in support of its motion. *See* Dkt. No. 264. As explained in their supplemental memorandum, "Gilead's outside counsel conducted a careful manual re-review of all of the checks within [Dkt. Nos.] 252-42 and [] 252-43 and created an entirely new spreadsheet to keep track of it, logging each check number (as set forth in the Court's Order) as well as the page number on which each check appears for the Court's reference." *Id.* at 4. Gilead then compared its new spreadsheet to "the original spreadsheet that it used as the basis for its earlier damages request and discovered that the earlier spreadsheet contained a handful of tabulation errors." *Id.* As Gilead notes, "the prior spreadsheet did not include entries for certain checks that five of the . . . Shell Companies received, resulting in a net under-count of their damages," and also "duplicated certain entries with respect to two of the . . . Shell Companies, resulting in a net over-count of their damages." *Id.*

The Court has reviewed Gilead's supplemental memorandum, as well as Gilead's supplemental declaration (Dkt. No. 264-1) and Gilead's detailed spreadsheet (Dkt. No. 264-2) and independently conducted its own review of the data. To that end, the Court attaches three appendices to this Report and Recommendation showing the total proceeds calculated by the undersigned (Appendix C) and how the undersigned calculated the data (Appendix D (showing the checks in Dkt. No. 252-42); Appendix E (showing the checks in Dkt. No. 252-43)).

The below chart summarizes the Court's calculations as to the proceeds that each Shell Company received based on the documents filed by Gilead:

| **Shell Company** | **Total Proceeds Received** |
|---|---|
| Dynamic Pharmaceuticals Supply Inc. | $473,532.51 |
| Foster Media Group Inc. | $459,039.32 |
| Foster Media Pharmaceutical Supply Corp. | $483,301.49 |
| J&M Medical Supply Inc. | $544,732.53 |
| JFK Wholesale & Retail Medical Supply Corp. | $505,113.73 |
| Merric Billing Inc. | $556,304.62 |
| New Line of Pharmaceutical, Inc. | $476,459.82 |
| Northwest Pharmaceutical & Medical Supply Inc. | $557,771.53 |
| Onliner Marketing Corp. | $532,792.70 |
| Park Avenue Pharmaceutical Corp. | $489,978.52 |
| Pharmaceutical Way, Inc. | $507,806.74 |
| Pure Gear Consulting Inc. | $509,879.98 |
| Y&S Statistic Medical Supply Inc. | $497,644.85 |

Appendix C; *see also* Appendix D; Appendix E.

Because Gilead did not set forth any damages owed by "Dynamic Pharmaceutical Suply Inc." and "Y&S Statistic Medical Suply Inc.," on June 20, 2026, the undersigned directed Gilead to file a letter addressing whether it is seeking damages for those two entities. Text Order, dated June 20, 2026. On June 22, 2026, Gilead filed a letter stating that it does not seek monetary damages against those two entities. Dkt. No. 258 at 2. Therefore, the undersigned respectfully

recommends that no damages be awarded as to "Dynamic Pharmaceutical Suply Inc." and "Y&S Statistic Medical Suply Inc."

**C. Treble Damages**

Gilead seeks treble damages under 15 U.S.C. § 1117(b). Dkt. No. 252-2 at 43. 15 U.S.C. § 1117(b), which governs "[t]reble damages for use of counterfeit mark" under the Lanham Act, provides, in relevant part,

> [i]n assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title . . . , the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—
>
> > (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services.

15 U.S.C. § 1117(b)(1); *see also Sream, Inc. v. Khan Gift Shop, Inc.*, No. 15-CV-2091 (KMW) (DF), 2016 WL 1130610, at *8 (S.D.N.Y. Feb. 23, 2016) ("[W]hereas the Lanham Act allows for trebling of actual damages under Section 1117(b), it does not allow for trebling of statutory damages, awarded under Section 1117(c)."), *report and recommendation adopted*, 2016 WL 1169517 (S.D.N.Y. Mar. 22, 2016).

Importantly, trebling applies both to the first category of damages sustained by Gilead and to the second category of Defaulting Defendants' profits. First, trebling applies to damages sustained by Gilead. *See Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 357 (S.D.N.Y. 2010) ("Trebling of actual damages under 15 U.S.C. § 1117(b) would also be warranted in this case because defendants acted willfully."). Second, the trebling of Defaulting Defendants' profits is appropriate under 15 U.S.C. § 1117(b). *See RVC Floor Decor*, 527 F. Supp. 3d at 331 (discussing how "Plaintiff must show Defendant's willful infringement to win treble damages,"

and holding that "Defendant's argument that the Lanham Act does not authorize trebling disgorged profits is also unconvincing" (citations omitted)); *see also Samsonite IP Holdings S.àr.l. v. Shenzhen Liangyiyou E-Com. Co.*, No. 19-CV-2564 (PGG) (DF), 2021 WL 9036273, at *12 (S.D.N.Y. Apr. 27, 2021) (holding that 15 U.S.C. § 1117(a) does not permit trebling, but "Plaintiffs may, alternatively, have chosen to seek treble damages under 15 U.S.C. § 1117(b)" (citations omitted)), *report and recommendation adopted*, 2023 WL 8805645 (S.D.N.Y. Dec. 20, 2023); *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo "Spartak"*, No. 13-CV-2303 (ENV) (LB), 2017 WL 9989599, at *2 (E.D.N.Y. June 16, 2017) (holding that there was no basis to treble where the counterclaim plaintiff is not seeking disgorgement of profits under § 1117(b), only § 1117(a)).

As the Second Circuit explained, "[t]he plain language of Section 1117(b) *mandates* the imposition of treble damages and attorneys' fees for the 'intentional[]' and 'knowing' use of a counterfeit mark." *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 409 F. App'x 389, 390 (2d Cir. 2010) (emphasis added); *see also Kenyatta v. Combs*, No. 24-CV-6923 (JGK), 2026 WL 1649213, at *9 (S.D.N.Y. June 8, 2026) ("Section 1117(b) provides treble damages 'for any violation of section 1114(1)(a) . . . in a case involving use of a counterfeit mark or designation' if the violation among other things, consists of 'intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark.'" (quoting 15 U.S.C. § 1117(b))); *Ghost*, 2025 WL 2487826, at *13 ("The Court must treble damages upon a finding of willfulness, absent extenuating circumstances." (citing 15 U.S.C. § 1117(b))).

"Congress has indicated that 'it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages.'" *Koon Chun Hing Kee Soy & Sauce Factory*, 628 F. Supp. 2d at 325 (quoting *Fendi S.a.s. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp.

1143, 1147 (S.D.N.Y. 1986)). "Where the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family,' treble damages may be inappropriate." *Id.* (quoting *Fendi*, 642 F. Supp. at 1147).

"[T]he standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Id.* at 322 (citation omitted). "A defendant's default alone is sufficient to establish willfulness." *Brand Advance, LLC v. Brand Advance UK*, No. 24-CV-8384 (EK) (PCG), 2026 WL 443990, at *10 (E.D.N.Y. Jan. 27, 2026) (citation omitted), *report and recommendation adopted*, 2026 WL 443990 (E.D.N.Y. Feb. 13, 2026); *see also Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *12 ("Moreover, defendants' default is itself evidence of willful infringement." (citing *Rolls-Royce, PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 157 (E.D.N.Y. 2010))); *Palace Skateboards Grp. v. Glob. Outlet Store*, Nos. 20-CV-6103 (GBD) (SN), 20-CV-6108 (GBD) (SN), 2024 WL 4534668, at *4 (S.D.N.Y. Sep. 6, 2024) ("[T]he Court deems the Defendants' default and subsequent failure to participate in this inquest as an admission that their use of the counterfeit marks was willful under the Lanham Act standard." (citations omitted)), *report and recommendation adopted*, 2025 WL 1947470 (S.D.N.Y. July 16, 2025); *Kyjen Co., LLC v. Individuals, Corps., Ltd.*, No. 23-CV-612 (JHR) (SN), 2024 WL 1421126, at *5 (S.D.N.Y. Mar. 4, 2024) ("[B]y virtue of their default and subsequent failure to participate in this inquest, the Defaulting Defendants are deemed to have acted willfully." (citation omitted)), *report and recommendation adopted*, 2024 WL 2033857 (S.D.N.Y. Mar. 26, 2024); *Hilton*, 2013 WL 5676582, at *6 ("A defendant's default may be considered evidence of willful infringement." (citations omitted)).

Here, by the nature of Defaulting Defendants' default, their actions are deemed willful, which warrants treble damages. Further, willfulness is bolstered by how Defendants counterfeited Gilead-branded HIV medication by using once-authentic Gilead bottles, and then selling "the counterfeit patient bottles with counterfeit patient information documents, counterfeit caps, and/or counterfeit pedigrees or invoices." Dkt. No. 1 ¶ 76; *see also id.* ¶ 7 ("The counterfeiters began by acquiring once-authentic bottles (empty or full) of Gilead-branded HIV medications that had already been dispensed to patients . . . .the counterfeiters filled them with other medication, and then re-sealed the bottle with a fake version of Gilead's tamper-evident seal."). Last, there is no reason not to impose treble damages here. *Id.* ¶ 8 ("The human cost of the Defendants' counterfeiting is staggering. Every counterfeit sold represents a patient who has been deprived of his or her prescribed, life-saving HIV medication.").

In sum, because Defaulting Defendants' trademark infringement is willful, the undersigned respectfully recommends trebling damages. The following table summarizes Defaulting Defendants' damages in their respective groups:

| **Defaulting Defendants' Group, Jointly and Severally Liable** | **Damages Before Trebling** | **Damages After Trebling** |
|---|---|---|
| Boris Aminov and Antonio Payano | $3,371,665.00 | $10,114,995.00 |
| Rachel Aminov, Bless You Rx, Boris Aminov, and Antonio Payano | $2,529,188.00 | $7,587,564.00 |
| Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, Boris Aminov, and Antonio Payano | $7,563,431.00 | $22,690,293.00 |
| Galaxy Rx, Boris Aminov, and Antonio Payano | $2,617,141.00 | $7,851,423.00 |
| Ivan Ohar | $396,992.13 | $1,190,976.39 |
| Dynamic Pharmaceuticals Supply Inc. | $473,532.51 | $1,420,597.53 |

| | | |
|---|---|---|
| Foster Media Group Inc. | $459,039.32 | $1,377,117.96 |
| Foster Media Pharmaceutical Supply Corp. | $483,301.49 | $1,449,904.47 |
| J&M Medical Supply Inc. | $544,732.53 | $1,634,197.59 |
| JFK Wholesale & Retail Medical Supply Corp. | $505,113.73 | $1,515,341.19 |
| Merric Billing Inc. | $556,304.62 | $1,668,913.86 |
| New Line of Pharmaceutical, Inc. | $476,459.82 | $1,429,379.46 |
| Northwest Pharmaceutical & Medical Supply Inc. | $557,771.53 | $1,673,314.59 |
| Onliner Marketing Corp. | $532,792.70 | $1,598,378.10 |
| Park Avenue Pharmaceutical Corp. | $489,978.52 | $1,469,935.56 |
| Pharmaceutical Way, Inc. | $507,806.74 | $1,523,420.22 |
| Pure Gear Consulting Inc. | $509,879.98 | $1,529,639.94 |
| Y&S Statistic Medical Supply Inc. | $497,644.85 | $1,492,934.55 |

**D. Injunctive Relief**

"The Lanham Act gives courts the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable.'" *Int'l Code Council*, 2025 WL 2791155, at *5 (quoting 15 U.S.C. § 1116(a)). "A plaintiff seeking a permanent injunction must demonstrate: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Id.* (first quoting *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010); and then quoting *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006)).

All factors merit the entry of a permanent injunction here. As an initial matter, on July 17, 2024, the Court entered a preliminary injunction against defendants. *See* Minute Entry, dated July 17, 2024; *see, e.g.*, Text Order, dated July 1, 2024; 37; 38; 49; 84; 85; *see also Gilead Scis.*, 684 F. Supp. 3d at 63 ("To justify a preliminary injunction, a movant must demonstrate by a

preponderance of the evidence '(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.'" (citation omitted)). In any event, all the requirements for permanent injunction are met.

First, "[i]n trademark disputes, a showing of likelihood of confusion establishes . . . irreparable harm." *Int'l Code Council*, 2025 WL 2791155, at *5 (quoting *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005)); *see also Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *14 ("In trademark infringement cases, irreparable injury may be established by demonstrating 'a likelihood of confusion.'" (citation omitted)). Because of "[t]he unique nature of the trademark's . . . function in representing such an intangible asset 'as reputation and good will' . . . irreparable harm is almost always found [in infringement cases] where probability of confusion exists." *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *14 (citations omitted). Thus, Gilead has demonstrated irreparable harm.

Second, in trademark cases, monetary damages alone are generally insufficient to compensate the plaintiff for the injury because damages will not prohibit future infringement. *Int'l Code Council*, 2025 WL 2791155, at *5 ("Monetary damages are insufficient to compensate plaintiff for the injury it has suffered because such damages will not prohibit future infringement in their continuing online storefronts." (quoting *Malibu Media, LLC v. Ofiesh*, No. 16-CV-202 (FJS) (DEP), 2017 WL 2633526, at *3 (N.D.N.Y. June 19, 2017))); *see also Abbott Lab'ys*, 2024 WL 4250223, at *6 ("The diversion of international strips causes irreparable injury to Abbott's goodwill and reputation that cannot be compensated solely by money damages." (quotation omitted)).

Third, the balance of hardship tips in Gilead's favor. First, Gilead has shown that "[t]he human cost of the Defendants' counterfeiting is staggering. Every counterfeit sold represents a patient who has been deprived of his or her prescribed, life-saving HIV medication." Dkt. No. 1 ¶ 8. Further, Defaulting Defendants suffer no hardship because the permanent injunction will require Defaulting Defendants to do no more than stop engaging in trademark infringement. *See Int'l Code Council*, 2025 WL 2791155, at *6 ("[T]here is no hardship to defendants because a permanent injunction will require defendants to do no more than simply stop engaging in infringement."); *see also Malibu Media*, 2017 WL 2633526, at *3 ("With regard to the balance of the hardships, there is no hardship to Defendant because a permanent injunction will do no more than prevent Defendant from engaging in further unlawful activity.").

Finally, "the public has 'an interest in not being deceived [and] being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.'" *Guilin Chung Fai Biotech Co.*, 2018 WL 2078233, at *14 (quoting *Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010)); *see also Int'l Code Council*, 2025 WL 2791155, at *6 ("Further, a permanent injunction is in the public interest since it will protect copyrighted and trademarked material and encourage compliance with the law." (quoting *Malibu Media*, 2017 WL 2633526, at *3)).

Therefore, the undersigned respectfully recommends that a permanent injunction be entered against the Defaulting Defendants.

**E. Pre-Judgment Interest**

Awarding pre-judgment interest is "within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Abbott Lab'ys*, 2024 WL 4250223, at *12 (quoting *4 Pillar Dynasty, LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 215 (2d Cir. 2019)). Because "[a]wards of

prejudgment interest in 'exceptional cases' are evaluated under the same standard used by courts to determine the entitlement to attorneys' fees," the decisions analyzing whether a case is "exceptional" in the context of awarding attorneys' fees also apply to awarding prejudgment interest. *Sirius XM Radio Inc. v. Aura Multimedia Corp.*, No. 21-CV-6963 (GHW) (SDA), 2024 WL 1756854, at *6 (S.D.N.Y. Apr. 6, 2024) (internal quotation marks omitted) (quoting *Omega SA v. 375 Canal LLC*, No. 12-CV-6979 (PAC), 2019 WL 2442434, at *3 (S.D.N.Y. June 12, 2019), *aff'd*, 984 F.3d 244 (2d Cir. 2021)), *report and recommendation adopted*, 2024 WL 1739905 (S.D.N.Y. Apr. 23, 2024).

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *see also Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 522 (2d Cir. 2018) (holding that "*Octane Fitness LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), which sets forth the standard for determining whether an award of attorney's fees under the Patent Act is permissible also applies to the Lanham Act"). In considering whether a case is exceptional, the Second Circuit has held that district courts are "to be given a wide latitude as they engage in a 'case-by-case exercise of their discretion, considering the totality of the circumstances.'" *4 Pillar Dynasty*, 933 F.3d at 215 (quoting *Octane Fitness*, 572 U.S. at 554). "In that 'case-by-case exercise,' courts may consider factors including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* (quoting *Octane Fitness*, 572 U.S. at 554 n.6).

The Second Circuit has held that willful infringement by itself does not necessarily determine whether a case is exceptional. *See id.* at 216 (holding that "*Octane Fitness* establishes no presumption—rebuttable or otherwise—that cases involving willful infringement are necessarily 'exceptional'); *see also Abbott Lab'ys*, 2024 WL 4250223, at *12 (rejecting Abbott Laboratories' position that "cases against the defaulted defendants should be deemed exceptional because of defendants' willful infringement"). Nor does a defendant's default make the case exceptional. *See Abbott Lab'ys*, 2024 WL 4250223, at *12 (holding that the defaulting defendants "could not have litigated unreasonably because [they] did not litigate at all" (quoting *Sirius XM Radio Inc.*, 2024 WL 1756854, at *7)).

Courts within the Second Circuit "generally hold claims of objective unreasonableness to a high bar and usually award attorneys' fees in cases only where there is 'substantial litigation misconduct.'" *LPD N.Y., LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2025 WL 3441339, at *2 (E.D.N.Y. Aug. 25, 2025) (Chin, J.) (citation omitted); *see also Sleepy's LLC v. Select Comfort Wholesale Corp.*, 612 F. Supp. 3d 115, 133 (E.D.N.Y. 2020) (holding, on remand from the Second Circuit, that, "[c]ourts in the Second Circuit generally determine cases to be exceptional under the *Octane Fitness* standard when litigants have acted unreasonably or in bad faith," such as where defendants "took unreasonable positions throughout th[e] litigation" and violated the court's discovery orders (citations omitted)); *Abbott Lab'ys*, 2024 WL 4250223, at *12 (concluding that "most post-*Octane* [*Fitness*] cases awarding fees continue to involve substantial litigation misconduct" (quoting *Sirius XM Radio Inc.*, 2024 WL 1756854, at *7)).

Here, pre-judgment interest is not warranted because this is not an "exceptional" case under Second Circuit case authority. This action does not involve "substantial litigation misconduct" or the like. *See LPD N.Y.*, 2025 WL 3441339, at *4 ("LPD generally engaged in a pattern of

unreasonable and vexatious behavior that unnecessarily prolonged the litigation."); *Experience Hendrix, L.L.C. v. Pitsicalis*, No. 17-CV-1927 (PAE) (GWG), 2020 WL 3564485, at *16 (S.D.N.Y. July 1, 2020) (finding it to be an exceptional case because defendant failed to participate in discovery despite multiple court orders), *report and recommendation adopted*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, No. 15-CV-4244 (JGK), 2021 WL 1172335, at *3-4 (S.D.N.Y. Mar. 26, 2021) (finding a case exceptional where the party had "vigorously pursued untenable claims against competitors which were based on theories rejected in other cases").

The most analogous case is *Abbott Laboratories v. Adelphia Supply USA*, a case in which the plaintiff moved for default judgment and a permanent injunction against eighty-five corporate and individual defendants who engaged in willful trademark infringement. *See* 2024 WL 4250223, at *12. The district court found that the action was not "exceptional" under the law despite willfulness and defendants' default. *See id.* ("Abbott relies heavily on the notion that their cases against the defaulted defendants should be deemed exceptional because of defendants' willful infringement[.] However, here, . . . there is no allegation, nor record support, that any of these defendants engaged in 'substantial litigation misconduct.'").

Likewise, the cases cited by Gilead to be "exceptional" are all based on the finding of willful infringement, and these cases pre-date *Octane Fitness*, where the Court clarified the standard for "exceptional" cases. *See* Dkt. No. 252-2 at 45 (first citing *Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*, No. 11-CV-6049 (CBA), 2012 WL 6621288, at *10 (E.D.N.Y. Aug. 29, 2012) ("Courts have held that treble damages [for an exceptional case] may be appropriate where, as here, the infringer has engaged in willful behavior."), *report and recommendation adopted*, 2012 WL 6589208 (E.D.N.Y. Dec. 17, 2012); then citing *AW Indus., Inc. v. Sleepingwell*

*Mattress Inc.*, No. 10-CV-04439 (NGG) (RER), 2011 WL 4404029, at *7 (E.D.N.Y. Aug. 31, 2011) ("Under the Lanham Act, courts are empowered to award reasonable attorney's fees, however, only in exceptional cases. The Second Circuit has explained that such awards are appropriate in instances of . . . willful infringement."), *report and recommendation adopted*, 2011 WL 4406329 (E.D.N.Y. Sep. 21, 2011); and then citing *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 431 (S.D.N.Y. 2013) ("This finding is only confirmed by the need to deter Acella from engaging in such willful violations in the future." (citation omitted))).

Accordingly, the undersigned respectfully recommends that Gilead's request for pre-judgment interest be denied.

**F. Post-Judgment Interest**

With respect to post-judgment interest,

> [t]he Lanham Act . . . permit[s] a plaintiff to receive post-judgment interest 'on any money judgment in a civil case recovered in a district court . . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

*Int'l Code Council*, 2025 WL 2791155, at *8 (quoting 28 U.S.C. § 1961(a)).

Therefore, the undersigned respectfully recommends that Gilead be awarded post-judgment interest. *Id.* (citing, *inter alia*, *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (affirming that post-judgment interest is mandatory for civil judgments in federal district courts)).

**G. Attorneys' Fees and Costs**

Gilead submits that it "is also entitled to an award of its attorneys' fees, but does not seek such relief in this motion in order to avoid the burden on Gilead and the Court of calculating and apportioning such fees." Dkt. No. 252-2 at 33 n.11. Nor does Gilead seek costs associated with

the litigation. Dkt. No. 265-1 (proposed judgment reflecting no attorneys' fees and costs). In light of Gilead's position, the undersigned need not address any attorneys' fees or costs.

**VIII. <u>Conclusion</u>**

For the reasons set forth above, the undersigned respectfully recommends that Gilead's default judgment motion be granted in part, to wit, that Defaulting Defendants are liable for the first and second causes of action alleged in the Complaint and the remaining causes of action be dismissed without prejudice, and that damages be awarded as follows:

1. judgment be entered against Boris Aminov and Antonio Payano, jointly and severally, in the amount of $10,114,995.00;
2. judgment be entered against Rachel Aminov, Bless You Rx, Boris Aminov and Antonio Payano, jointly and severally, in the amount of $7,587,564.00;
3. judgment be entered against Christy Corvalan, Island Pharmacy, David Fernandez, Dezyre Baez, Crystal Medina, Boris Aminov, and Antonio Payano, jointly and severally, in the amount of $22,690,293.00;
4. judgment be entered against Galaxy Rx, Boris Aminov, and Antonio Payano, jointly and severally, in the amount of $7,851,423.00;
5. judgment be entered against Ivan Ohar in the amount of $1,190,976.39;
6. judgment be entered against Dynamic Pharmaceuticals Supply Inc. in the amount of $1,420,597.53;
7. judgment be entered against Foster Media Group Inc. in the amount of $1,377,117.96;
8. judgment be entered against Foster Media Pharmaceutical Supply Corp. in the amount of $1,449,904.47;

9. judgment be entered against J&M Medical Supply Inc. in the amount of $1,634,197.59;

10. judgment be entered against JFK Wholesale & Retail Medical Supply Corp. in the amount of $1,515,341.19;

11. judgment be entered against Merric Billing Inc. in the amount of $1,668,913.86;

12. judgment be entered against New Line of Pharmaceutical, Inc. in the amount of $1,429,379.46;

13. judgment be entered against Northwest Pharmaceutical & Medical Supply Inc. in the amount of $1,673,314.59;

14. judgment be entered against Onliner Marketing Corp. in the amount of $1,598,378.10;

15. judgment be entered against Park Avenue Pharmaceutical Corp. in the amount of $1,469,935.56;

16. judgment be entered against Pharmaceutical Way, Inc. in the amount of $1,523,420.22;

17. judgment be entered against Pure Gear Consulting Inc. in the amount of $1,529,639.94;

18. judgment be entered against Y&S Statistic Medical Supply Inc. in the amount of $1,492,934.55;

19. no damages be awarded against "Dynamic Pharmaceutical Suply Inc." and "Y&S Statistic Medical Suply Inc.";

20. pre-judgment interest be denied;

21. post-judgment interest be awarded at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment;

22. no attorneys' fees or costs be awarded; and

23. entry of a permanent injunction against Defaulting Defendants.

A copy of this Report and Recommendation is being electronically served on counsel. This Court directs Gilead to serve a copy of this Report and Recommendation by first-class mail and overnight mail on Defaulting Defendants and file proof of service by October 28, 2026.

Any objections to this Report and Recommendation must be filed within fourteen days after service of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (d) (addressing computation of days). Any requests for an extension of time for filing objections must be directed to Judge Merle. The "failure to object timely to a [magistrate judge]'s report operates as a waiver of any further judicial review of the [magistrate judge]'s decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d. Cir. 1989)). Indeed, "a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Stevens v. Duquette*, No. 22-1571, 2024 WL 705954, at *1 (2d Cir. Feb. 21, 2024) (quoting *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)). Accordingly, the failure to file objections within this timeframe or specify the particular issues to be reviewed precludes further review of this Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Frego v. Kelsick*, 690 F. App'x 706, 709 (2d Cir. 2017) (appellate review barred because plaintiff

failed to object to the magistrate judge's report and recommendation pertaining to the claim on which plaintiff now seeks to appeal (citing *Caidor*, 517 F.3d at 604)).

Dated: Brooklyn, New York
October 26, 2026

**SO ORDERED.**

*/s/ Joseph A. Marutollo*
JOSEPH A. MARUTOLLO
United States Magistrate Judge

# APPENDIX A

| | 252-23 | | 252-24 | | 252-25 | | | |
|---|---|---|---|---|---|---|---|---|
| **Drug Product** | **Bottles** | **Proceeds** | **Bottles** | **Proceeds** | **Bottles** | **Proceeds** | **Total Bottles** | **Total Proceeds** |
| Biktarvy | 3 | 10,191.88 | 68 | 200865 | 2 | 6500 | 73 | $217,556.88 |
| Descovy | 2 | 4,008.18 | 37 | 56080 | 1 | 1982.07 | 40 | $62,070.25 |
| Epclusa | | | 3 | 59500 | | | 3 | $59,500.00 |
| Genvoya | | | 6 | 17705 | | | 6 | $17,705.00 |
| Odefsey | | | 7 | 18755 | | | 7 | $18,755.00 |
| Sovaldi | | | 1 | 6000 | | | 1 | $6,000.00 |
| Truvada | | | 2 | 2405 | | | 2 | $2,405.00 |
| Vosevi | | | 1 | 13000 | | | 1 | $13,000.00 |
| | | | | | | | **133** | **$396,992.13** |

# APPENDIX B

| Order Number | Drug Product | Bottle | Total Proceeds of Sales | Lot Number | Document Number | Page number |
|---|---|---|---|---|---|---|
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 397 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| [redacted] | Biktarvy Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 397 |
| [redacted] | Biktarvy | [redacted] | [redacted] | [redacted] | 252-23 | 2 |
| [redacted] | Biktarvy | [redacted] | [redacted] | [redacted] | 252-23 | 2 |
| [redacted] | Biktarvy | [redacted] | [redacted] | [redacted] | 252-23 | 2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| [redacted] | Biktarvy 50mg-200mg-25mg Tablet | [redacted] | [redacted] | [redacted] | 252-25 | 3 |
| | Biktarvy 50mg-200mg-25mg Tablet | | | | 252-25 | 3 |
| | | 73 | 217556.88 | | | |
| | Descovy Oral Table | [redacted] | [redacted] | [redacted] | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy Oral Tablet | | | | 252-24 | 4 |
| | Descovy Oral Tablet | | | | 252-24 | 3 |
| | Descovy | | | | 252-23 | 2 |
| | Descovy | | | | 252-23 | 2 |
| | Descovy 200mg-25mg Tablet | | | | 252-25 | 3 |
| | | 40 | $62,070.25 | | | |
| | Epclusa Oral Tablet, | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| | Epclusa Oral Tablet, | | | | 252-24 | 3 |
| | Epclusa Oral Tablet, | | | | 252-24 | 3 |
| | Genvoya Oral Tablet | | | | 252-24 | 3 |
| | Genvoya Oral Tablet | | | | 252-24 | 4 |
| | Genvoya Oral Tablet | | | | 252-24 | 4 |
| | Genvoya Oral Tablet | | | | 252-24 | 4 |
| | Genvoya Oral Tablet | | | | 252-24 | 4 |
| | Genvoya Oral Tablet | | | | 252-24 | 4 |
| | | 6 | $17,705.00 | | | |
| | Odefsey Oral Tablet | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | | 7 | $18,755.00 | | | |
| | Sovaldi Oral Tablet, | 1 | $6,000.00 | [redacted] | 252-24 | 3 |
| | Truvada Oral Tablet, film coated | [redacted] | [redacted] | [redacted] | 252-24 | 3 |
| | Truvada Oral Tablet, film coated | | | | | |
| | Odefsey Oral Tablet | | | | 252-24 | 3 |
| | | 2 | $2,405.00 | | | |
| | Vosevi Oral Tablet, film coated | 1 | $13,000.00 | [redacted] | 252-24 | 4 |

# APPENDIX C

| Shell Company | Total Profits |
|---|---|
| Dynamic Pharmaceuticals | $473,532.51 |
| Foster Media Group | $459,039.32 |
| Foster Media Pharma Supply | $483,301.49 |
| J & M Medical Supply | $544,732.53 |
| JFK Wholesale | $505,113.73 |
| Merric Billing | $556,304.62 |
| New Line of Pharmaceutical | $476,459.82 |
| Northwest Pharmaceutical & Medical Supply | $557,771.53 |
| Onliner Marketing Corp | $532,792.70 |
| Park Avenue Pharmaceutical | $489,978.52 |
| Pharmaceutical Way | $507,806.74 |
| Pure Gear | $509,879.98 |
| Y&S Statistic Medical Supply | $497,644.85 |

# APPENDIX D

| Page | Shell Company | Amount | Check Number |
|---|---|---|---|
| 51 | Pure Gear | $15,201.78 | 6641 |
| 52 | Merric Billing | $14,605.11 | 6638 |
| 53 | Onliner Marketing Corp | $16,410.68 | 6639 |
| 54 | Foster Media Group | $17,910.80 | 6642 |
| 55 | J & M Medical Supply | $14,101.57 | 6640 |
| 58 | Foster Media Pharma Supply | $13,502.11 | 6233 |
| 59 | Pure Gear | $14,910.78 | 6230 |
| 60 | Foster Media Group | $13,604.98 | 6221 |
| 61 | Merric Billing | $16,401.58 | 6227 |
| 62 | Onliner Marketing Corp | $14,608.37 | 6224 |
| 63 | Pharmaceutical Way | $15,900.67 | 6216 |
| 64 | JFK Wholesale | $14,101.81 | 6236 |
| 65 | New Line of Pharmaceutical | $12,402.11 | 6219 |
| 66 | Park Avenue Pharmaceutical | $13,401.10 | 6213 |
| 67 | J & M Medical Supply | $14,901.80 | 6210 |

# APPENDIX E

| Page | Shell Company | Amount | Check number |
|---|---|---|---|
| 19 | Pure Gear Consulting | $14,750.80 | 107 |
| 20 | Dynamic Pharmaceuticals | $12,422.10 | 104 |
| 21 | Foster Media Group | $7,519.05 | 105 |
| 22 | Northwest Pharmaceutical & Medical Supply | $11,503.96 | 103 |
| 23 | Y&S Statistic Medical Supply | $9,457.02 | 108 |
| 24 | Merric Billing | $11,410.09 | 106 |
| 29 | Northwest Pharmaceutical & Medical Supply | $13,700.90 | 112 |
| 30 | Onliner Marketing Corp. | $9,505.10 | 110 |
| 31 | J&M Medical Supply Inc. | $10,595.17 | 111 |
| 32 | JFK Wholesale & Retail Medical Supply Corp | $12,420.16 | 109 |
| 39 | Onliner Marketing Corp. | $13,455.08 | 126 |
| 40 | Merric Billing | $9,861.10 | 125 |
| 41 | Northwest Pharmaceutical & Medical Supply | $13,121.76 | 120 |
| 42 | Foster Media Group | $9,177.11 | 121 |
| 43 | J&M Medical Supply Inc. | $10,522.12 | 122 |
| 46 | JFK Wholesale & Retail Medical Supply Corp | $12,510.01 | 124 |
| 66 | J&M Medical Supply Inc. | $9,576.01 | 132 |
| 67 | New Line of Pharmaceutical, Inc. | $9,151.10 | 144 |
| 68 | Northwest Pharmaceutical & Medical Supply | $10,132.16 | 138 |
| 69 | Foster Media Pharmaceutical | $11,521.10 | 141 |
| 70 | Merric Billing | $9,750.10 | 139 |
| 71 | Park Avenue Pharmaceutical Corp. | $11,521.90 | 142 |
| 72 | Pharmaceutical Way, Inc. | $12,521.10 | 143 |
| 86 | J&M Medical Supply Inc. | $10,900.20 | 167 |
| 87 | Foster Media Group | $14,520.01 | 151 |
| 88 | Foster Media Pharmaceutical | $9,405.07 | 169 |
| 89 | JFK Wholesale & Retail Medical Supply Corp | $12,904.11 | 168 |
| 90 | Dynamic Pharmaceuticals | $11,500.10 | 154 |
| 91 | Pharmaceutical Way, Inc. | $10,921.05 | 171 |
| 92 | Pure Gear Consulting | $14,500.20 | 166 |
| 93 | Park Avenue Pharmaceutical Corp. | $13,509.12 | 172 |
| 96 | Y&S Statistic Medical Supply | $9,157.12 | 149 |
| 97 | Merric Billing | $14,520.10 | 163 |

| | | | |
|---|---|---|---|
| 98 | Northwest Pharmaceutical & Medical Supply | $13,500.12 | 152 |
| 99 | Onliner Marketing Corp. | $13,215.07 | 164 |
| 121 | J&M Medical Supply Inc. | $15,902.17 | 177 |
| 122 | Pure Gear Consulting | $13,102.17 | 176 |
| 123 | Foster Media Pharmaceutical | $8,503.27 | 178 |
| 124 | Merric Billing | $11,200.19 | 180 |
| 125 | JFK Wholesale & Retail Medical Supply Corp | $12,055.39 | 181 |
| 126 | Park Avenue Pharmaceutical Corp. | $12,052.10 | 175 |
| 127 | Onliner Marketing Corp. | $7,073.32 | 179 |
| 150 | Foster Media Group | $12,486.10 | 204 |
| 151 | Onliner Marketing Corp. | $11,480.05 | 205 |
| 152 | Foster Media Pharmaceutical | $11,500.10 | 208 |
| 153 | Northwest Pharmaceutical & Medical Supply | $10,987.11 | 201 |
| 154 | Y&S Statistic Medical Supply | $13,541.10 | 203 |
| 155 | J&M Medical Supply Inc. | $9,510.09 | 210 |
| 156 | Pharmaceutical Way, Inc. | $11,421.10 | 260 |
| 157 | Dynamic Pharmaceuticals | $9,187.15 | 202 |
| 158 | Pure Gear Consulting | $10,587.01 | 207 |
| 159 | New Line of Pharmaceutical, Inc. | $10,313.10 | 259 |
| 160 | Merric Billing | $9,871.60 | 206 |
| 161 | Park Avenue Pharmaceutical Corp. | $10,521.09 | 211 |
| 162 | JFK Wholesale & Retail Medical Supply Corp | $9,510.19 | 209 |
| 187 | Foster Media Pharmaceutical | $11,100.11 | 230 |
| 188 | JFK Wholesale & Retail Medical Supply Corp | $11,039.10 | 223 |
| 190 | Park Avenue Pharmaceutical Corp. | $12,490.10 | 224 |
| 191 | New Line of Pharmaceutical, Inc. | $10,901.10 | 226 |
| 192 | Pharmaceutical Way, Inc. | $10,152.11 | 225 |
| 193 | Foster Media Pharmaceutical | $11,112.19 | 221 |
| 197 | J&M Medical Supply Inc. | $9,652.11 | 214 |
| 198 | Merric Billing | $8,910.89 | 220 |
| 199 | Onliner Marketing Corp. | $11,210.27 | 216 |
| 200 | Pure Gear Consulting | $10,521.17 | 215 |
| 201 | Dynamic Pharmaceuticals | $13,521.18 | 217 |
| 202 | Northwest Pharmaceutical & Medical Supply | $13,422.10 | 212 |
| 203 | Y&S Statistic Medical Supply | $14,305.18 | 218 |
| 204 | Foster Media Group | $12,510.17 | 213 |

| | | | |
|---|---|---|---|
| 209 | Northwest Pharmaceutical & Medical Supply | $7,931.07 | 237 |
| 210 | Foster Media Pharmaceutical | $13,101.10 | 231 |
| 213 | Onliner Marketing Corp. | $10,702.08 | 240 |
| 214 | Pharmaceutical Way, Inc. | $10,952.11 | 235 |
| 215 | New Line of Pharmaceutical, Inc. | $8,922.10 | 236 |
| 216 | Park Avenue Pharmaceutical Corp. | $14,101.85 | 234 |
| 218 | Pure Gear Consulting | $8,923.10 | 242 |
| 219 | JFK Wholesale & Retail Medical Supply Corp | $12,807.88 | 244 |
| 220 | J&M Medical Supply Inc. | $9,521.85 | 245 |
| 221 | Foster Media Pharmaceutical | $11,305.97 | 243 |
| 222 | Foster Media Group | $14,085.99 | 239 |
| 223 | Merric Billing | $13,500.52 | 241 |
| 224 | Y&S Statistic Medical Supply | $15,053.11 | 238 |
| 244 | Northwest Pharmaceutical & Medical Supply | $13,512.10 | 362 |
| 245 | Dynamic Pharmaceuticals | $11,912.19 | 374 |
| 246 | Y&S Statistic Medical Supply | $9,550.10 | 375 |
| 247 | Foster Media Pharmaceutical | $9,310.17 | 368 |
| 252 | Foster Media Group | $13,503.11 | 376 |
| 253 | J&M Medical Supply Inc. | $14,902.19 | 370 |
| 254 | JFK Wholesale & Retail Medical Supply Corp | $13,500.25 | 369 |
| 255 | Onliner Marketing Corp. | $14,910.11 | 371 |
| 256 | Merric Billing | $14,305.11 | 372 |
| 257 | Pharmaceutical Way, Inc. | $15,509.32 | 364 |
| 258 | Park Avenue Pharmaceutical Corp. | $13,922.11 | 363 |
| 259 | New Line of Pharmaceutical, Inc. | $11,910.11 | 366 |
| 260 | Pure Gear Consulting | $15,607.19 | 373 |
| 265 | JFK Wholesale & Retail Medical Supply Corp | $15,910.10 | 389 |
| 266 | Pure Gear Consulting | $11,512.11 | 380 |
| 267 | Y&S Statistic Medical Supply | $14,920.11 | 378 |
| 272 | Dynamic Pharmaceuticals | $12,905.17 | 382 |
| 273 | Onliner Marketing Corp. | $13,912.10 | 385 |
| 274 | Foster Media Group | $15,705.17 | 379 |
| 276 | Pharmaceutical Way, Inc. | $14,902.10 | 387 |
| 277 | Merric Billing | $13,912.17 | 381 |
| 278 | Northwest Pharmaceutical & Medical Supply | $12,650.23 | 383 |
| 279 | J&M Medical Supply Inc. | $10,521.11 | 390 |

| | | | |
|---|---|---|---|
| 280 | Foster Media Pharmaceutical | $10,455.13 | 384 |
| 281 | Park Avenue Pharmaceutical Corp. | $11,911.10 | 386 |
| 282 | New Line of Pharmaceutical, Inc. | $10,612.13 | 388 |
| 294 | Pure Gear Consulting | $13,502.22 | 392 |
| 295 | Dynamic Pharmaceuticals | $15,912.10 | 399 |
| 296 | New Line of Pharmaceutical, Inc. | $10,531.11 | 297 |
| 297 | J&M Medical Supply Inc. | $12,305.10 | 398 |
| 298 | JFK Wholesale & Retail Medical Supply Corp | $13,922.10 | 397 |
| 299 | Merric Billing | $15,900.11 | 393 |
| 300 | Foster Media Group | $11,205.99 | 396 |
| 301 | Pharmaceutical Way, Inc. | $14,110.11 | 400 |
| 302 | Northwest Pharmaceutical & Medical Supply | $14,900.75 | 298 |
| 303 | Y&S Statistic Medical Supply | $14,910.11 | 395 |
| 304 | Park Avenue Pharmaceutical Corp. | $12,950.11 | 296 |
| 306 | Northwest Pharmaceutical & Medical Supply | $11,922.11 | 309 |
| 307 | J&M Medical Supply Inc. | $14,612.10 | 308 |
| 308 | Y&S Statistic Medical Supply | $15,700.90 | 317 |
| 309 | Onliner Marketing Corp. | $13,800.76 | 314 |
| 310 | Merric Billing | $13,900.27 | 307 |
| 311 | Foster Media Group | $15,705.11 | 311 |
| 312 | Pharmaceutical Way, Inc. | $14,810.27 | 304 |
| 313 | JFK Wholesale & Retail Medical Supply Corp | $12,920.86 | 316 |
| 314 | Pure Gear Consulting | $13,206.17 | 312 |
| 315 | JFK Wholesale & Retail Medical Supply Corp | $14,920.10 | 323 |
| 316 | Park Avenue Pharmaceutical Corp. | $11,552.11 | 324 |
| 317 | Dynamic Pharmaceuticals | $12,905.17 | 325 |
| 318 | Y&S Statistic Medical Supply | $13,500.11 | 328 |
| 319 | New Line of Pharmaceutical, Inc. | $15,652.09 | 310 |
| 320 | Park Avenue Pharmaceutical Corp. | $9,421.17 | 303 |
| 321 | Dynamic Pharmaceuticals | $12,952.39 | 313 |
| 322 | Northwest Pharmaceutical & Medical Supply | $11,291.86 | 319 |
| 323 | Merric Billing | $13,908.10 | 320 |
| 324 | New Line of Pharmaceutical, Inc. | $14,920.11 | 315 |
| 325 | Pharmaceutical Way, Inc. | $11,510.86 | 330 |
| 326 | Pure Gear Consulting | $13,907.11 | 329 |
| 327 | Onliner Marketing Corp. | $15,805.23 | 327 |

| | | | |
|---|---|---|---|
| 328 | Foster Media Pharmaceutical | $13,550.99 | 326 |
| 329 | J&M Medical Supply Inc. | $10,905.11 | 331 |
| 354 | Merric Billing | $12,800.77 | 349 |
| 355 | Foster Media Pharmaceutical | $15,905.86 | 347 |
| 356 | Pure Gear Consulting | $13,710.15 | 348 |
| 357 | Onliner Marketing Corp. | $11,710.01 | 346 |
| 358 | Foster Media Group | $14,900.80 | 345 |
| 359 | Y&S Statistic Medical Supply | $15,800.75 | 344 |
| 360 | Northwest Pharmaceutical & Medical Supply | $13,902.11 | 343 |
| 361 | New Line of Pharmaceutical, Inc. | $13,411.27 | 352 |
| 362 | Dynamic Pharmaceuticals | $15,120.86 | 341 |
| 363 | New Line of Pharmaceutical, Inc. | $15,910.19 | 3675 |
| 364 | Pharmaceutical Way, Inc. | $13,612.11 | 350 |
| 365 | JFK Wholesale & Retail Medical Supply Corp | $13,415.80 | 407 |
| 366 | J&M Medical Supply Inc. | $16,905.66 | 340 |
| 367 | Park Avenue Pharmaceutical Corp. | $14,500.80 | 351 |
| 369 | Merric Billing | $14,091.86 | 3674 |
| 370 | Pure Gear Consulting | $15,408.52 | 3677 |
| 371 | Y&S Statistic Medical Supply | $13,905.17 | 405 |
| 372 | Foster Media Pharmaceutical | $12,512.10 | 406 |
| 373 | Foster Media Group | $12,750.80 | 3681 |
| 374 | Park Avenue Pharmaceutical Corp. | $12,910.17 | 3680 |
| 375 | JFK Wholesale & Retail Medical Supply Corp | $11,520.25 | 338 |
| 379 | J&M Medical Supply Inc. | $13,950.11 | 3671 |
| 380 | Pharmaceutical Way, Inc. | $14,809.90 | 3678 |
| 381 | Dynamic Pharmaceuticals | $13,552.10 | 402 |
| 382 | Northwest Pharmaceutical & Medical Supply | $14,910.80 | 401 |
| 383 | Onliner Marketing Corp. | $14,802.11 | 403 |
| 388 | Y&S Statistic Medical Supply | $12,590.80 | 412 |
| 389 | JFK Wholesale & Retail Medical Supply Corp | $13,900.11 | 408 |
| 390 | Pure Gear Consulting | $15,910.86 | 409 |
| 394 | Foster Media Group | $15,301.81 | 416 |
| 395 | New Line of Pharmaceutical, Inc. | $13,905.33 | 417 |
| 396 | Northwest Pharmaceutical & Medical Supply | $13,920.17 | 414 |
| 397 | Park Avenue Pharmaceutical Corp. | $13,402.81 | 418 |
| 398 | Merric Billing | $13,902.57 | 410 |

| | | | |
|---|---|---|---|
| 399 | Pharmaceutical Way, Inc. | $12,910.11 | 420 |
| 400 | Onliner Marketing Corp. | $11,405.80 | 415 |
| 401 | Dynamic Pharmaceuticals | $12,915.10 | 413 |
| 402 | Foster Media Pharmaceutical | $11,550.80 | 411 |
| 403 | J&M Medical Supply Inc. | $12,405.80 | 419 |
| 417 | Y&S Statistic Medical Supply | $14,920.88 | 337 |
| 418 | Dynamic Pharmaceuticals | $13,505.86 | 336 |
| 419 | Northwest Pharmaceutical & Medical Supply | $13,902.11 | 335 |
| 422 | Park Avenue Pharmaceutical Corp. | $14,610.11 | 528 |
| 423 | Foster Media Group | $13,410.90 | 521 |
| 424 | New Line of Pharmaceutical, Inc. | $14,505.80 | 530 |
| 425 | Onliner Marketing Corp. | $13,815.75 | 522 |
| 426 | Merric Billing | $12,912.70 | 523 |
| 427 | Pure Gear Consulting | $13,510.80 | 524 |
| 428 | Foster Media Pharmaceutical | $11,952.80 | 525 |
| 429 | JFK Wholesale & Retail Medical Supply Corp | $12,805.21 | 526 |
| 430 | J&M Medical Supply Inc. | $13,412.77 | 527 |
| 431 | Pharmaceutical Way, Inc. | $11,910.65 | 529 |
| 432 | Foster Media Pharmaceutical | $12,902.17 | 437 |
| 433 | Pharmaceutical Way, Inc. | $13,910.77 | 447 |
| 434 | Merric Billing | $15,912.10 | 441 |
| 435 | Park Avenue Pharmaceutical Corp. | $11,905.17 | 445 |
| 436 | Northwest Pharmaceutical & Medical Supply | $12,905.17 | 432 |
| 437 | J&M Medical Supply Inc. | $11,512.77 | 444 |
| 438 | JFK Wholesale & Retail Medical Supply Corp | $11,650.75 | 438 |
| 442 | Dynamic Pharmaceuticals | $13,502.80 | 433 |
| 443 | New Line of Pharmaceutical, Inc. | $13,905.17 | 446 |
| 444 | Foster Media Group | $12,610.80 | 443 |
| 445 | Pure Gear Consulting | $12,612.69 | 440 |
| 446 | Y&S Statistic Medical Supply | $13,507.80 | 436 |
| 447 | Onliner Marketing Corp. | $13,904.11 | 435 |
| 448 | Onliner Marketing Corp. | $11,915.10 | 537 |
| 449 | Merric Billing | $10,492.17 | 538 |
| 450 | New Line of Pharmaceutical, Inc. | $12,510.88 | 545 |
| 451 | Foster Media Group | $11,505.86 | 536 |
| 452 | Y&S Statistic Medical Supply | $15,810.19 | 535 |
| 453 | JFK Wholesale & Retail Medical Supply | $13,631.10 | 541 |
| 455 | Pharmaceutical Way, Inc. | $14,631.60 | 544 |

| | | | |
|---|---|---|---|
| 456 | Northwest Pharmaceutical & Medical Supply | $13,901.80 | 533 |
| 457 | Dynamic Pharmaceuticals | $13,912.65 | 534 |
| 459 | J&M Medical Supply Inc. | $14,922.10 | 542 |
| 460 | Park Avenue Pharmaceutical Corp. | $15,532.75 | 543 |
| 461 | Foster Media Pharmaceutical | $14,710.80 | 540 |
| 482 | Foster Media Group | $15,620.80 | 607 |
| 483 | Onliner Marketing Corp. | $14,510.80 | 606 |
| 484 | Merric Billing | $13,910.10 | 605 |
| 485 | New Line of Pharmaceutical, Inc. | $11,450.81 | 610 |
| 486 | JFK Wholesale & Retail Medical Supply | $12,905.80 | 603 |
| 487 | Northwest Pharmaceutical & Medical Supply | $13,412.57 | 612 |
| 488 | Y&S Statistic Medical Supply | $10,905.80 | 611 |
| 489 | Pharmaceutical Way, Inc. | $13,802.77 | 609 |
| 490 | Dynamic Pharmaceuticals | $14,512.11 | 608 |
| 492 | Foster Media Pharmaceutical | $15,612.73 | 550 |
| 493 | Onliner Marketing Corp. | $14,550.56 | 551 |
| 494 | Y&S Statistic Medical Supply | $13,905.11 | 549 |
| 495 | J&M Medical Supply Inc. | $12,506.80 | 556 |
| 496 | Merric Billing | $10,912.55 | 552 |
| 497 | Foster Media Pharmaceutical | $13,905.35 | 554 |
| 498 | Dynamic Pharmaceuticals | $12,512.77 | 548 |
| 499 | Northwest Pharmaceutical & Medical Supply | $13,690.70 | 547 |
| 500 | Pure Gear Consulting | $14,805.75 | 553 |
| 501 | JFK Wholesale & Retail Medical Supply Corp | $14,600.11 | 555 |
| 502 | Pharmaceutical Way, Inc. | $15,906.81 | 532 |
| 503 | New Line of Pharmaceutical, Inc. | $15,920.80 | 546 |
| 504 | Park Avenue Pharmaceutical Corp. | $13,905.80 | 531 |
| 505 | Pure Gear Consulting | $15,910.81 | 560 |
| 506 | Foster Media Pharmaceutical | $14,605.99 | 559 |
| 507 | Merric Billing | $13,702.55 | 561 |
| 508 | Park Avenue Pharmaceutical Corp. | $12,905.71 | 568 |
| 509 | Dynamic Pharmaceuticals | $10,904.11 | 571 |
| 510 | JFK Wholesale & Retail Medical Supply Corp | $13,405.86 | 558 |
| 511 | J&M Medical Supply Inc. | $10,912.86 | 557 |
| 512 | Onliner Marketing Corp. | $14,603.47 | 562 |
| 513 | Y&S Statistic Medical Supply | $13,902.71 | 563 |
| 514 | Foster Media Pharmaceutical | $11,450.33 | 564 |

| | | | |
|---|---|---|---|
| 522 | New Line of Pharmaceutical, Inc. | $13,501.92 | 567 |
| 523 | Northwest Pharmaceutical & Medical Supply | $12,900.75 | 566 |
| 524 | Pharmaceutical Way, Inc. | $11,902.80 | 569 |
| 550 | J&M Medical Supply Inc. | $12,902.11 | 668 |
| 551 | Dynamic Pharmaceuticals | $14,905.18 | 656 |
| 552 | Northwest Pharmaceutical & Medical Supply | $15,302.81 | 673 |
| 554 | Park Avenue Pharmaceutical Corp. | $13,907.68 | 653 |
| 555 | New Line of Pharmaceutical, Inc. | $13,812.96 | 664 |
| 556 | JFK Wholesale & Retail Medical Supply Corp | $15,900.81 | 660 |
| 559 | Pharmaceutical Way, Inc. | $15,910.56 | 662 |
| 560 | Foster Media Pharmaceutical | $11,608.81 | 658 |
| 561 | Onliner Marketing Corp. | $15,505.11 | 670 |
| 563 | Y&S Statistic Medical Supply | $13,609.77 | 657 |
| 564 | Pure Gear Consulting | $14,900.81 | 672 |
| 565 | Merric Billing | $13,408.79 | 671 |
| 566 | Merric Billing | $14,912.81 | 582 |
| 567 | Onliner Marketing Corp. | $14,910.11 | 581 |
| 568 | JFK Wholesale & Retail Medical Supply Corp | $13,902.75 | 675 |
| 569 | Pure Gear Consulting | $13,808.46 | 663 |
| 570 | Northwest Pharmaceutical & Medical Supply | $11,910.11 | 584 |
| 571 | Pharmaceutical Way, Inc. | $10,950.80 | 654 |
| 572 | New Line of Pharmaceutical, Inc. | $14,612.81 | 661 |
| 573 | J&M Medical Supply Inc. | $15,902.81 | 674 |
| 574 | Foster Media Pharmaceutical | $12,605.11 | 587 |
| 587 | Y&S Statistic Medical Supply | $12,651.71 | 682 |
| 588 | Park Avenue Pharmaceutical Corp. | $13,512.77 | 600 |
| 589 | Dynamic Pharmaceuticals | $10,904.75 | 585 |
| 590 | New Line of Pharmaceutical, Inc. | $15,910.81 | 599 |
| 592 | Onliner Marketing Corp. | $15,612.81 | 685 |
| 593 | Merric Billing | $11,402.71 | 690 |
| 594 | Pharmaceutical Way, Inc. | $14,812.71 | 580 |
| 595 | Dynamic Pharmaceuticals | $14,810.31 | 688 |
| 596 | Pure Gear Consulting | $13,904.11 | 334 |
| 597 | Northwest Pharmaceutical & Medical Supply | $13,802.55 | 687 |
| 598 | Y&S Statistic Medical Supply | $13,904.80 | 684 |
| 599 | Park Avenue Pharmaceutical Corp. | $14,920.79 | 579 |

| | | | |
|---|---|---|---|
| 600 | JFK Wholesale & Retail Medical Supply Corp | $14,803.75 | 686 |
| 602 | J&M Medical Supply Inc. | $10,812.57 | 590 |
| 603 | New Line of Pharmaceutical, Inc. | $15,905.81 | 578 |
| 604 | Foster Media Pharmaceutical | $15,910.81 | 577 |
| 621 | Northwest Pharmaceutical & Medical Supply | $17,912.49 | 786 |
| 622 | Pharmaceutical Way, Inc. | $16,631.71 | 778 |
| 624 | J&M Medical Supply Inc. | $16,812.81 | 794 |
| 625 | Park Avenue Pharmaceutical Corp. | $16,821.71 | 777 |
| 630 | New Line of Pharmaceutical, Inc. | $16,910.77 | 948 |
| 631 | Merric Billing | $15,651.89 | 940 |
| 632 | Pharmaceutical Way, Inc. | $15,712.86 | 817 |
| 633 | Foster Media Group | $16,915.77 | 938 |
| 634 | Foster Media Pharmaceutical | $17,912.77 | 943 |
| 635 | Pure Gear Consulting | $16,507.80 | 941 |
| 638 | JFK Wholesale & Retail Medical Supply Corp | $15,912.81 | 815 |
| 639 | Onliner Marketing Corp. | $18,522.55 | 939 |
| 640 | JFK Wholesale & Retail Medical Supply Corp | $16,908.89 | 944 |
| 641 | Y&S Statistic Medical Supply | $18,055.77 | 811 |
| 642 | Northwest Pharmaceutical & Medical Supply | $17,911.18 | 935 |
| 643 | Dynamic Pharmaceuticals | $16,821.86 | 936 |
| 644 | New Line of Pharmaceutical, Inc. | $14,910.56 | 816 |
| 645 | Park Avenue Pharmaceutical Corp. | $18,612.47 | 946 |
| 646 | J&M Medical Supply Inc. | $15,910.75 | 819 |
| 649 | Pharmaceutical Way, Inc. | $16,905.80 | 947 |
| 650 | Y&S Statistic Medical Supply | $15,405.76 | 937 |
| 651 | Foster Media Pharmaceutical | $17,402.89 | 814 |
| 659 | Dynamic Pharmaceuticals | $16,812.81 | 806 |
| 660 | J&M Medical Supply Inc. | $16,905.57 | 945 |
| 661 | Park Avenue Pharmaceutical Corp. | $18,606.81 | 818 |
| 663 | Pure Gear Consulting | $16,507.21 | 813 |
| 664 | Foster Media Group | $17,804.77 | 812 |
| 665 | Northwest Pharmaceutical & Medical Supply | $17,910.71 | 807 |
| 667 | Merric Billing | $15,910.55 | 809 |
| 668 | Onliner Marketing Corp. | $16,805.19 | 810 |
| 700 | J&M Medical Supply Inc. | $16,905.80 | 844 |
| 701 | Y&S Statistic Medical Supply | $15,902.57 | 832 |

| | | | |
|---|---|---|---|
| 702 | Park Avenue Pharmaceutical Corp. | $13,906.81 | 843 |
| 703 | JFK Wholesale & Retail Medical Supply Corp | $14,903.11 | 839 |
| 704 | Pure Gear Consulting | $16,905.80 | 840 |
| 705 | Foster Media Pharmaceutical | $17,905.50 | 841 |
| 707 | New Line of Pharmaceutical, Inc. | $14,503.10 | 842 |
| 708 | Merric Billing | $15,902.17 | 836 |
| 709 | Onliner Marketing Corp. | $15,710.11 | 834 |
| 710 | Pharmaceutical Way, Inc. | $16,911.10 | 835 |
| 711 | Foster Media Group | $14,612.81 | 837 |
| 712 | Northwest Pharmaceutical & Medical Supply | $17,802.87 | 838 |
| 713 | Dynamic Pharmaceuticals | $15,650.78 | 831 |
| 715 | Onliner Marketing Corp. | $14,650.17 | 973 |
| 716 | Foster Media Group | $17,510.87 | 976 |
| 717 | Y&S Statistic Medical Supply | $15,402.11 | 974 |
| 718 | Merric Billing | $16,912.55 | 972 |
| 719 | Pure Gear Consulting | $13,608.78 | 984 |
| 720 | Foster Media Pharmaceutical | $16,904.68 | 981 |
| 721 | Park Avenue Pharmaceutical Corp. | $15,912.81 | 983 |
| 722 | J&M Medical Supply Inc. | $13,920.25 | 982 |
| 723 | JFK Wholesale & Retail Medical Supply Corp | $16,903.81 | 985 |
| 725 | Northwest Pharmaceutical & Medical Supply | $17,905.81 | 978 |
| 726 | New Line of Pharmaceutical, Inc. | $14,610.81 | 986 |
| 727 | Dynamic Pharmaceuticals | $14,812.99 | 979 |
| 728 | Pharmaceutical Way, Inc. | $14,512.91 | 980 |
| 742 | J&M Medical Supply Inc. | $17,508.77 | 994 |
| 743 | JFK Wholesale & Retail Medical Supply Corp | $14,950.80 | 997 |
| 744 | Foster Media Pharmaceutical | $15,912.58 | 1000 |
| 746 | Park Avenue Pharmaceutical Corp. | $17,912.98 | 970 |
| 747 | Pure Gear Consulting | $16,922.81 | 992 |
| 748 | Dynamic Pharmaceuticals | $15,710.80 | 999 |
| 750 | Pharmaceutical Way, Inc. | $15,910.11 | 4196 |
| 751 | New Line of Pharmaceutical, Inc. | $17,501.80 | 4199 |
| 752 | Y&S Statistic Medical Supply | $14,709.41 | 996 |
| 753 | Northwest Pharmaceutical & Medical Supply | $15,420.80 | 991 |
| 754 | Foster Media Group | $18,503.77 | 993 |
| 755 | Merric Billing | $13,905.56 | 995 |

| | | | |
|---|---|---|---|
| 756 | Onliner Marketing Corp. | $14,851.67 | 998 |
| 757 | Y&S Statistic Medical Supply | $15,305.37 | 863 |
| 758 | Dynamic Pharmaceuticals | $12,409.18 | 856 |
| 759 | Northwest Pharmaceutical & Medical Supply | $16,310.81 | 864 |
| 764 | Foster Media Group | $13,902.28 | 855 |
| 765 | Onliner Marketing Corp. | $16,410.11 | 868 |
| 766 | Merric Billing | $16,410.80 | 862 |
| 767 | Pure Gear Consulting | $14,605.23 | 859 |
| 768 | Foster Media Pharmaceutical | $13,912.18 | 867 |
| 769 | JFK Wholesale & Retail Medical Supply Corp | $15,641.10 | 861 |
| 770 | Pharmaceutical Way, Inc. | $15,802.51 | 860 |
| 771 | New Line of Pharmaceutical, Inc. | $16,910.78 | 857 |
| 773 | J&M Medical Supply Inc. | $14,910.27 | 858 |
| 774 | Park Avenue Pharmaceutical Corp. | $17,405.11 | 866 |
| 776 | Y&S Statistic Medical Supply | $15,610.77 | 884 |
| 777 | Northwest Pharmaceutical & Medical Supply | $17,910.80 | 872 |
| 778 | Dynamic Pharmaceuticals | $16,504.11 | 869 |
| 780 | Merric Billing | $14,604.80 | 875 |
| 781 | Onliner Marketing Corp. | $15,609.18 | 878 |
| 782 | Foster Media Group | $16,902.57 | 881 |
| 783 | J&M Medical Supply Inc. | $16,802.80 | 886 |
| 784 | JFK Wholesale & Retail Medical Supply Corp | $16,905.10 | 879 |
| 786 | Pure Gear Consulting | $11,905.10 | 885 |
| 787 | Foster Media Pharmaceutical | $14,804.23 | 882 |
| 788 | Park Avenue Pharmaceutical Corp. | $12,601.17 | 883 |
| 943 | Park Avenue Pharmaceutical Corp. | $14,907.27 | 739 |
| 944 | JFK Wholesale & Retail Medical Supply Corp | $12,604.33 | 738 |
| 945 | J&M Medical Supply Inc. | $16,406.81 | 735 |
| 946 | Y&S Statistic Medical Supply | $17,902.10 | 731 |
| 947 | Dynamic Pharmaceuticals | $16,510.18 | 720 |
| 948 | New Line of Pharmaceutical, Inc. | $14,510.17 | 737 |
| 949 | Foster Media Pharmaceutical | $15,312.93 | 924 |
| 950 | Pure Gear Consulting | $14,405.17 | 721 |
| 951 | Onliner Marketing Corp. | $15,609.78 | 733 |
| 957 | Pharmaceutical Way, Inc. | $10,407.15 | 736 |
| 958 | Northwest Pharmaceutical & Medical Supply | $14,907.18 | 923 |

| | | | |
|---|---|---|---|
| 959 | Foster Media Group | $14,910.27 | 725 |
| 960 | Merric Billing | $14,910.18 | 727 |
| 994 | J&M Medical Supply Inc. | $15,910.10 | 1007 |
| 995 | Y&S Statistic Medical Supply | $14,912.87 | 1018 |
| 996 | Pharmaceutical Way, Inc. | $13,904.87 | 1004 |
| 997 | New Line of Pharmaceutical, Inc. | $14,602.17 | 1005 |
| 998 | Merric Billing | $12,650.17 | 1015 |
| 999 | JFK Wholesale & Retail Medical Supply Corp | $16,612.78 | 1012 |
| 1000 | Foster Media Pharmaceutical | $13,407.28 | 1011 |
| 1001 | Foster Media Group | $15,608.97 | 1013 |
| 1002 | Pure Gear Consulting | $11,904.27 | 1010 |
| 1003 | Dynamic Pharmaceuticals | $14,507.58 | 1017 |
| 1004 | Onliner Marketing Corp. | $10,460.98 | 1014 |
| 1005 | Northwest Pharmaceutical & Medical Supply | $16,904.27 | 1016 |
| 1043 | J&M Medical Supply Inc. | $12,450.37 | 775 |
| 1044 | JFK Wholesale & Retail Medical Supply Corp | $17,905.17 | 772 |
| 1045 | Pure Gear Consulting | $14,960.90 | 765 |
| 1047 | Onliner Marketing Corp. | $13,407.58 | 771 |
| 1048 | Dynamic Pharmaceuticals | $15,406.11 | 767 |
| 1049 | Merric Billing | $17,902.69 | 768 |
| 1050 | Y&S Statistic Medical Supply | $16,507.80 | 764 |
| 1051 | Pharmaceutical Way, Inc. | $14,603.17 | 769 |
| 1052 | Park Avenue Pharmaceutical Corp. | $15,607.28 | 766 |
| 1053 | New Line of Pharmaceutical, Inc. | $17,903.57 | 773 |
| 1054 | Northwest Pharmaceutical & Medical Supply | $15,612.97 | 770 |
| 1055 | Foster Media Group | $14,712.17 | 774 |
| 1094 | Pharmaceutical Way, Inc. | $16,508.77 | 1060 |
| 1095 | New Line of Pharmaceutical, Inc. | $15,612.10 | 1095 |
| 1096 | Park Avenue Pharmaceutical Corp. | $13,902.88 | 1063 |
| 1097 | Foster Media Group | $10,904.57 | 1053 |
| 1098 | Foster Media Pharmaceutical | $15,804.81 | 1056 |
| 1099 | Northwest Pharmaceutical & Medical Supply | $14,910.88 | 1062 |
| 1100 | Onliner Marketing Corp. | $13,405.80 | 1050 |
| 1101 | J&M Medical Supply Inc. | $13,905.80 | 1049 |
| 1102 | Dynamic Pharmaceuticals | $13,504.78 | 1059 |
| 1103 | Y&S Statistic Medical Supply | $10,902.80 | 1056 |
| 1104 | Pure Gear Consulting | $16,610.56 | 1058 |

| | | | |
|---|---|---|---|
| 1105 | Merric Billing | $15,910.80 | 1061 |
| 1128 | Northwest Pharmaceutical & Medical Supply | $16,404.77 | 5987 |
| 1129 | Dynamic Pharmaceuticals | $15,901.37 | 5990 |
| 1130 | Onliner Marketing Corp. | $17,602.75 | 5988 |
| 1131 | Y&S Statistic Medical Supply | $17,910.80 | 5984 |
| 1132 | J&M Medical Supply Inc. | $17,902.10 | 5992 |
| 1133 | Merric Billing | $18,402.87 | 5985 |
| 1137 | Pharmaceutical Way, Inc. | $14,604.85 | 5989 |
| 1138 | Pure Gear Consulting | $16,910.80 | 5986 |
| 1139 | Foster Media Group | $18,204.57 | 5991 |
| 1142 | Pharmaceutical Way, Inc. | $17,608.54 | 1094 |
| 1143 | New Line of Pharmaceutical, Inc. | $17,904.37 | 1091 |
| 1144 | Foster Media Pharmaceutical | $14,420.67 | 1096 |
| 1153 | Dynamic Pharmaceuticals | $14,703.81 | 1105 |
| 1154 | Onliner Marketing Corp. | $16,412.87 | 1098 |
| 1155 | Merric Billing | $16,910.87 | 1104 |
| 1157 | Foster Media Group | $14,510.57 | 1095 |
| 1158 | Northwest Pharmaceutical & Medical Supply | $16,908.11 | 1101 |
| 1159 | JFK Wholesale & Retail Medical Supply Corp | $14,901.47 | 1093 |
| 1160 | J&M Medical Supply Inc. | $13,905.27 | 1103 |
| 1161 | Pure Gear Consulting | $13,410.78 | 1099 |
| 1162 | Y&S Statistic Medical Supply | $13,606.37 | 1092 |
| 1163 | Park Avenue Pharmaceutical Corp. | $14,412.80 | 1097 |